# EXHIBIT A

**FILED**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

1 **1090**
KENT R. ROBISON, ESQ. - NSB #1167
2 BARRY L. BRESLOW, ESQ. -NSB #3023
KRISTEN L. MARTINI, ESQ. -NSB #11272
3 Robison, Belaustegui, Sharp & Low
A Professional Corporation
4 71 Washington Street
Reno, Nevada 89503
5 Telephone: (775) 329-3151
Facsimile: (775) 329-7169
6 Attorneys for Plaintiffs St. Mary's Regional Medical Center
and St. Mary's Medical Group Inc.
7

8   **IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA**

9     **IN AND FOR THE COUNTY OF WASHOE**

10 ST. MARY'S REGIONAL MEDICAL
CENTER, a Nevada corporation; and
11 ST. MARY'S MEDICAL GROUP INC.,
a Nevada professional corporation;   **CASE NO.: CV13-02632**
12 RICHARD H. BRYAN, JR., M.D., F.A.C.C.;
FRANK P. CARREA, M.D., F.A.C.C.;   **DEPT. NO.: B7**
13 RAM M. CHALLAPALLI, M.D., F.A.C.C.;
SRIDEVI CHALLAPALLI, M.D., F.A.C.C.;
14 DEVANG M. DESAI, M.D., F.A.C.C.;
ERIC M. DRUMMER, M.D., F.A.C.C.;
15 JOSEPH STEVENSON, D.O., F.A.C.C.;
and KOSTA M. ARGER, M.D.,
16

17     Plaintiffs,
  v.
18
RENOWN HEALTH, a Nevada non-profit
19 corporation; RENOWN REGIONAL
MEDICAL CENTER, a Nevada non-profit
20 corporation; NEVADA HEART INSTITUTE,
a Nevada non-profit corporation;
21 HOMETOWN HEALTH PLAN, a commercial
health insurance company; DAVID LINE, an
22 individual; JAMES I. MILLER, an individual;
KELLY TESTOLIN, an individual;
23 ANDREW PEARL, an individual; and DOES
I through X,
24
     Defendants.
25 _____/

26  <u>**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**</u>
    **ARBITRATION EXEMPTED PER NAR 3(A)**
27
   For their Amended Complaint, Plaintiffs allege as follows:
28

# I.

## INTRODUCTION / OVERVIEW

1.    For years, Renown Health (all Renown Defendants are referred to hereinafter as "Renown") has engaged in monopolistic business activities and tortious misconduct for the purposes of causing St. Mary's financial harm. From 2009 through March 2011, Renown has developed a business plan and scheme to destroy St. Mary's position in the area of cardiology. Renown did so in violation of the applicable provisions of NRS 598A.060, *et seq.*, and, although not a claimed basis for relief, the Sherman Act and Clayton Act, all of which prohibit antitrust and monopolistic conduct. By acquiring all cardiology practices in the Reno-Sparks area, Renown was found to have knowingly violated § 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2.    Nevada's Unfair Trade Practices Act prohibits Renown from:

    (a)    monopolization of inpatient and outpatient cardiology services in Washoe County;

    (b)    attempting to monopolize cardiology services in Washoe County; and

    (c)    combining or conspiring to monopolize cardiology services in Washoe County.

3.    Renown's confirmed and proven efforts to monopolize inpatient and outpatient cardiology services in Washoe County violates NRS 598A.060. The Nevada Unfair Trade Practices Act further provides that any party, in this case St. Mary's, with the right to obtain an injunction, recover all damages sustained by Renown's monopolistic behavior, in addition to treble damages, attorneys' fees and costs of court.

4.    Renown has not only conspired to, attempted to, and successfully monopolized adult cardiology services in Washoe County, it has also in violation of specific duties and Court orders regarding patient contact information for over 11,200 patients of the cardiologists in this community who have within the last year left the employment of Renown. Based on information provided by Renown, its improper exclusive possession of patient contact information for St.

Mary's cardiologists' patients could cause a loss of revenue of over $10,000,000 per year. In addition to other harm and consequential damages, St. Mary's has been damaged because of Renown's improper refusal to provide patient contact information for patients that have been treated and should be presently treated by St. Mary's cardiologists.

5.     St. Mary's employs eight cardiologists and Renown has specifically, intentionally and maliciously refused to provide these eight cardiologists with information which would allow these cardiologists to contact their patients for whom they have provided treatment for many years. Since February 4, 2013, two judges, the Honorable David Gamble (ret.) and the Honorable Brent Adams, have considered Renown's contentions, have rejected them and have directed Renown to provide these cardiologists with patient contact information. (*See* **EXHIBITS 1 AND 2**). Renown still refuses to honor these judicial directives. St. Mary's present cardiologists are now prevented, illegally, improperly and maliciously, by Renown from being able to contact approximately 10,000 patients that have been treated by these cardiologists for many years.

6.     After Renown was determined to be in violation of antitrust legislation by the Federal Trade Commission ("FTC"), Renown tried to interfere with and violate specific provisions of the FTC's Decisions and Orders with an intent to cause financial harm and damages to St. Mary's. Renown interfered with the FTC Decisions and Orders by contriving a method by which Drs. Theodore B. Berndt and Jerry N. Zebrack could feign a procedure by which they were characterized as leaving Renown's employment when in fact a ruse was created, which did not change the composition of Drs. Berndt's and Zebrack's relationship with Renown.

7.     Renown furthered its efforts to damage St. Mary's by attempting to interfere with the decisions made by Drs. Richard Bryan, Ram Challapalli, Sridevi Challapalli, Devang Desai, Eric Drummer, Frank Carrea and Joseph Stevenson to obtain and pursue gainful employment with St. Mary's. Renown effectuated this scheme to financially damage St. Mary's by diverting patients from these doctors to doctors employed by Renown and interfered with these doctors' rights and entitlements to continue to treat members of the HTH/HHP insurance program.

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

3

1    Renown continued to effectuate its efforts to cause St. Mary's financial damage by depriving

2    these doctors access to their patients and by depriving these doctors who were employed by St.

3    Mary's access to contact information for their patients.

4         8.      As a result of the monopolistic behavior of Renown, its ongoing conspiracy to

5    violate Federal and Nevada law, and its purposeful and intentional malicious interference with

6    St. Mary's business activities, Renown has caused and is causing St. Mary's to sustain substantial

7    economic and financial damages and Renown should be held accountable for its malicious,

8    oppressive and fraudulent misconduct by and through an award of substantial punitive damages.

9                                    **II.**

10                                  **PARTIES**

11        9.      Plaintiff St. Mary's Regional Medical Center ("St. Mary's") is an acute-care

12   hospital and is a Nevada corporation providing medical services, including but not limited to

13   adult cardiology services and offers a broad range of adult cardiology sub-specialties in Washoe

14   County.  St. Mary's product market is adult cardiology services with related markets including

15   in-patient hospital cardiology services and out-patient cardiology services.  These cardiology sub-

16   specialties, including non-invasive, invasive, interventional and electrophysiology, are required

17   to fully meet the needs of patients with heart conditions.

18        10.     Plaintiff St. Mary's Medical Group Inc. ("Medical Group" also referred to as  "St.

19   Mary's" or "Plaintiffs"), is a Nevada professional corporation providing out-patient medical

20   services, including but not limited to adult cardiology services that offer a broad range of adult

21   cardiology sub-specialties in Northern Nevada.  These cardiology sub-specialties, including non-

22   invasive, invasive, interventional and electrophysiology, are required to fully meet the needs of

23   patients with heart conditions.

24        11.     Richard H. Bryan, M.D. ("Bryan") is a licensed practicing cardiologist formerly

25   employed with Sierra Nevada Cardiology Associates ("SNCA").  Bryan's stock in SNCA was

26   purchased by Renown on or about January 1, 2011, at which time Bryan became an employee of

27   Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI").  As a result of the FTC

28
Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

                                         4

1    Orders and Decisions, Bryan became employed with St. Mary's in December of 2012. Bryan

2    was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of

3    that action, which was also memorialized by a Settlement Agreement and Mutual Release

4    ("SAMR") on March 28, 2013, to which Bryan is a party. (*See* **EXHIBIT 3**). Because of

5    Renown's breach of the SAMR, Bryan and his former SNCA colleagues filed an action, CV13-

6    01644, to enforce the settlement so as to compel Renown to provide Bryan and his SNCA

7    colleagues with patient contact information for his patients. Bryan and his SNCA colleagues

8    prevailed with the decisions of two judges being in favor of Bryan and his SNCA colleagues and

9    said decisions resulted in Renown being ordered pursuant to a Judgment to provide Bryan and his

10   SNCA colleagues with patient contact information for patients having been treated and being

11   treated by Bryan for a period of time from January 1, 2011, through and including March 28,

12   2013.

13       12.    Frank P. Carrea, M.D. ("Carrea") is a licensed practicing cardiologist formerly

14   employed with Sierra Nevada Cardiology Associates ("SNCA"). Carrea's stock in SNCA was

15   purchased by Renown on or about January 1, 2011, at which time Carrea became an employee of

16   Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of the FTC

17   Orders and Decisions, Carrea became employed with St. Mary's in December of 2012. Carrea

18   was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of

19   that action, which was also memorialized by a Settlement Agreement and Mutual Release

20   ("SAMR") on March 28, 2013, to which Carrea is a party. (*Id.*) Because of Renown's breach of

21   the SAMR, Carrea and his former SNCA colleagues filed an action, CV13-01644, to enforce the

22   settlement so as to compel Renown to provide Carrea and his SNCA colleagues with patient

23   contact information for his patients. Carrea and his SNCA colleagues prevailed with the

24   decisions of two judges being in favor of Carrea and his SNCA colleagues and said decisions

25   resulted in Renown being ordered pursuant to a Judgment to provide Carrea and his SNCA

26   colleagues with patient contact information for patients having been treated and being treated by

27   Carrea for a period of time from January 1, 2011, through and including March 28, 2013.

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

13.     Ram M. Challapalli, M.D. ("R. Challapalli") is a licensed practicing cardiologist formerly employed with Sierra Nevada Cardiology Associates ("SNCA"). R. Challapalli's stock in SNCA was purchased by Renown on or about January 1, 2011, at which time R. Challapalli became an employee of Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of the FTC Orders and Decisions, R. Challapalli became employed with St. Mary's in December of 2012. R. Challapalli was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of that action, which was also memorialized by a Settlement Agreement and Mutual Release ("SAMR") on March 28, 2013, to which R. Challapalli is a party. (*Id.*) Because of Renown's breach of the SAMR, R. Challapalli and his former SNCA colleagues filed an action, CV13-01644, to enforce the settlement so as to compel Renown to provide R. Challapalli and his SNCA colleagues with patient contact information for his patients. R. Challapalli and his SNCA colleagues prevailed with the decisions of two judges being in favor of R. Challapalli and his SNCA colleagues and said decisions resulted in Renown being ordered pursuant to a Judgment to provide R. Challapalli and his SNCA colleagues with patient contact information for patients having been treated and being treated by R. Challapalli for a period of time from January 1, 2011, through and including March 28, 2013.

14.     Sridevi Challapalli, M.D. ("S. Challapalli") is a licensed practicing cardiologist formerly employed with Sierra Nevada Cardiology Associates ("SNCA"). S. Challapalli's stock in SNCA was purchased by Renown on or about January 1, 2011, at which time S. Challapalli became an employee of Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of the FTC Orders and Decisions, S. Challapalli became employed with St. Mary's in December of 2012. S. Challapalli was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of that action, which was also memorialized by a Settlement Agreement and Mutual Release ("SAMR") on March 28, 2013, to which S. Challapalli is a party. (*Id.*) Because of Renown's breach of the SAMR, S. Challapalli and her former SNCA colleagues filed an action, CV13-01644, to enforce the settlement so as to compel Renown to provide S. Challapalli and her SNCA colleagues with patient contact information for her patients. S.

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1    Challapalli and her SNCA colleagues prevailed with the decisions of two judges being in favor of

2    S. Challapalli and her SNCA colleagues and said decisions resulted in Renown being ordered

3    pursuant to a Judgment to provide S. Challapalli and her SNCA colleagues with patient contact

4    information for patients having been treated and being treated by S. Challapalli for a period of

5    time from January 1, 2011, through and including March 28, 2013.

6         15.    Devang M. Desai, M.D. ("Desai") is a licensed practicing cardiologist formerly

7    employed with Sierra Nevada Cardiology Associates ("SNCA"). Desai's stock in SNCA was

8    purchased by Renown on or about January 1, 2011, at which time Desai became an employee of

9    Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of the FTC

10   Orders and Decisions and because his Employment Agreement with NHI was void, Desai

11   became employed with St. Mary's in December of 2012 or January of 2013. Desai was a

12   Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of that

13   action, which was also memorialized by a Settlement Agreement and Mutual Release ("SAMR")

14   on March 28, 2013, to which Desai is a party. (*Id.*) Because of Renown's breach of the SAMR,

15   Desai and his former SNCA colleagues filed an action, CV13-01644, to enforce the settlement so

16   as to compel Renown to provide Desai and his SNCA colleagues with patient contact

17   information for his patients. Desai and his SNCA colleagues prevailed with the decisions of two

18   judges being in favor of Desai and his SNCA colleagues and said decisions resulted in Renown

19   being ordered pursuant to a Judgment to provide Desai and his SNCA colleagues with patient

20   contact information for patients having been treated and being treated by Desai for a period of

21   time from January 1, 2011, through and including March 28, 2013.

22        16.    Eric M. Drummer, M.D. ("Drummer") is a licensed practicing cardiologist

23   formerly employed with Sierra Nevada Cardiology Associates ("SNCA"). Drummer's stock in

24   SNCA was purchased by Renown on or about January 1, 2011, at which time Drummer became

25   an employee of Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result

26   of the FTC Orders and Decisions, Drummer became employed with St. Mary's in December of

27   2012. Drummer was a Plaintiff in Case No. CV11-02477 and was a party to the February 4,

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

7

1   2013 settlement of that action, which was also memorialized by a Settlement Agreement and

2   Mutual Release ("SAMR") on March 28, 2013, to which Drummer is a party. (*Id.*) Because of

3   Renown's breach of the SAMR, Drummer and his former SNCA colleagues filed an action,

4   CV13-01644, to enforce the settlement so as to compel Renown to provide Drummer and his

5   SNCA colleagues with patient contact information for his patients. Drummer and his SNCA

6   colleagues prevailed with the decisions of two judges being in favor of Drummer and his SNCA

7   colleagues and said decisions resulted in Renown being ordered pursuant to a Judgment to

8   provide Drummer and his SNCA colleagues with patient contact information for patients having

9   been treated and being treated by Drummer for a period of time from January 1, 2011, through

10  and including March 28, 2013.

11      17.     Joseph Stevenson ("Stevenson") is a licensed practicing cardiologist formerly

12  employed with Sierra Nevada Cardiology Associates ("SNCA"). Stevenson's stock in SNCA

13  was purchased by Renown on or about January 1, 2011, at which time Stevenson became an

14  employee of Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of

15  the FTC Orders and Decisions and because his Employment Agreement with NHI was void,

16  Stevenson became employed with St. Mary's in December of 2012 or January of 2013.

17  Stevenson was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013

18  settlement of that action, which was also memorialized by a Settlement Agreement and Mutual

19  Release ("SAMR") on March 28, 2013, to which Stevenson is a party. (*Id.*) Because of

20  Renown's breach of the SAMR, Stevenson and his former SNCA colleagues filed an action,

21  CV13-01644, to enforce the settlement so as to compel Renown to provide Stevenson and his

22  SNCA colleagues with patient contact information for his patients. Stevenson and his SNCA

23  colleagues prevailed with the decisions of two judges being in favor of Stevenson and his SNCA

24  colleagues and said decisions resulted in Renown being ordered pursuant to a Judgment to

25  provide Stevenson and his SNCA colleagues with patient contact information for patients having

26  been treated and being treated by Stevenson for a period of time from January 1, 2011, through

27  and including March 28, 2013.

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

8

18.     Kosta M. Arger, M.D. ("Arger") is a licensed practicing cardiologist formerly employed with Sierra Nevada Cardiology Associates ("SNCA"). Arger's stock in SNCA was purchased by Renown on or about January 1, 2011, at which time Arger became an employee of Renown's wholly owned subsidiary, Nevada Heart Institute ("NHI"). As a result of the FTC Orders and Decisions, Arger became employed with Northern Nevada Hospital but on January 1, 2014, became employed with St. Mary's. Arger was a Plaintiff in Case No. CV11-02477 and was a party to the February 4, 2013 settlement of that action, which was also memorialized by a Settlement Agreement and Mutual Release ("SAMR") on March 28, 2013, to which Arger is a party. (*Id.*) Because of Renown's breach of the SAMR, Arger and his former SNCA colleagues filed an action, CV13-01644, to enforce the settlement so as to compel Renown to provide Arger and his SNCA colleagues with patient contact information for his patients. Arger and his SNCA colleagues prevailed with the decisions of two judges being in favor of Arger and his SNCA colleagues and said decisions resulted in Renown being ordered pursuant to a Judgment to provide Arger and his SNCA colleagues with patient contact information for patients having been treated and being treated by Arger for a period of time from January 1, 2011, through and including March 28, 2013.

19.     The above-identified cardiologists now employed by St. Mary's (and to be employed by St. Mary's) are referred to herein as "The Cardiologists". The term "SNCA" or "SNCA Cardiologists" refers to all former SNCA Cardiologists employed by NHI from January 1, 2011, to approximately December 2012 and January 2013, each of whom is a party to the SAMR. Former SNCA Cardiologists, Bidart, Fuller, Newmark and Nylk, are not parties to this action.

20.     Defendant Renown Health ("Renown") is a Nevada non-profit corporation, organized, existing and doing business under the laws of the State of Nevada with its principal place of business located in Washoe County, Nevada. On information and belief, Renown owns and operates Renown Regional Medical Center and Renown South Meadows Medical Center, among other facilities. On further information and belief, Renown owns and operates Hometown

Health Plan ("Hometown Health"), a commercial health insurance company that is the insurance division of Renown.

21.     Defendant Renown Regional Medical Center ("RRMC" also included in the term "Renown") is, on information and belief, a Nevada non-profit corporation doing business primarily in Washoe County, Nevada.

22.     Defendant Nevada Heart Institute ("NHI") is, on information and belief, a Nevada non-profit corporation doing business primarily in Washoe County, Nevada.  On further information and belief, NHI is a wholly-owned subsidiary of Renown and does business as the Renown Institute for Heart and Vascular Health.

23.     Defendant Hometown Health ("HTH/HHP" ) includes Hometown Health Plan, Inc. and where applicable, Hometown Health Providers Insurance Company.  These entities comprise a commercial health insurance network operating and conducting business in Northern Nevada as well as in other portions of the State of Nevada.

24.     Defendant David Line ("Line") is Chairman of the Board of the Board of Directors of Renown Health and has been serving as acting-interim President of Renown since early 2013.  Individually, Defendant Line has attempted to interfere with St. Mary's relationship with Carson Tahoe Hospital and has urged Carson Tahoe Hospital to assist Renown in Renown's efforts and intent to destroy St. Mary's cardiology market.

25.     Defendant James I. Miller ("Miller") is an individual who, upon information and belief, is a resident of Washoe County, Nevada.  From at least 2008 through March 2013, Miller served as Chief Executive Officer of Renown.

26.     Defendant Kelly Testolin ("Testolin") is an individual who, upon information and belief, is a resident of Washoe County, Nevada.  Testolin, from January 2010 through approximately March 2013, acted as Renown's General Counsel and was actively involved in the improper and tortious activity described herein.

27.     Defendant Andrew Pearl ("Pearl") is an individual who, upon information and belief, is a resident of Washoe County, Nevada.  Pearl, from January 2010 through approximately

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

10

1   March 2013, acted as a Renown corporate executive and business advisor to Miller, who was

2   actively involved in the improper and tortious activity described herein.

3       28.     Defendants sued fictitiously as Does I through X are, on information and belief,

4   other individuals or entities whose conduct, actions, or inaction, whether separately or in concert

5   with others, caused or contributed to the harm and damages alleged herein.  When Plaintiffs

6   ascertain the true identity of such fictitiously named Defendants, Plaintiffs will seek leave to

7   substitute such known Defendants for one or more of the Doe Defendants alleged herein.

8                               III.

9                 **GENERAL AND BACKGROUND ALLEGATIONS**

10      29.     St. Mary's, on the one hand, and Renown– including through its wholly-owned

11  subsidiary, NHI, and its captive commercial health insurance company, Hometown Health–on

12  the other hand, are competitors in the Northern Nevada market for the provision of adult

13  cardiology services, *i.e.*, diagnostic or treatment services by cardiologists who provide non-

14  invasive services (general cardiology), invasive services (including diagnostic cardiac

15  catheterization procedures), interventional cardiology (including the placement of stents), and

16  electrophysiology services (including the insertion and/or removal of devises related to heart

17  rhythm functions).

18      30.     Renown has a well-known reputation in Northern Nevada for attempting to drive

19  competitors out of business and/or attempting to create a monopoly in certain areas regarding the

20  provision of medical care or services.  More recent examples of such improper activity occurred

21  in 2006 with its efforts to interfere with Reno Diagnostic Centers' diagnostic imaging business.

22  Similarly, Renown has engaged in such activity with pediatric oncology and efforts in 2010

23  through 2012 to integrate the practices of virtually all adult cardiology physicians in Washoe

24  County under its NHI subsidiary.

25  A.   **Background/SNCA and RHP's Merger With Renown.**

26      31.     In 2009, Reno Heart Physicians ("RHP") was a Nevada corporation that employed

27  cardiologists.  Plaintiffs had enjoyed an excellent working relationship with the cardiologists

28
Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1  employed by RHP. As alleged in more detail hereinafter, Renown engaged in a monopolistic and

2  malicious business strategy to interfere with St. Mary's relationship and business involvement

3  with local cardiologists causing St. Mary's financial harm and damage.

4       32.    SNCA was another cardiology group located in Reno, Nevada, and in 2009 it

5  enjoyed an excellent working relationship with Plaintiffs. Prior to and throughout 2009 and

6  2010, the SNCA Cardiologists were more directly aligned with Renown. The RHP cardiologists

7  were more directly aligned with Plaintiffs.

8       33.    SNCA and its cardiologists had, for many years, been entitled by way of contract

9  to be considered preferred providers under the Hometown Health insurance plan owned and

10  administered by Renown. Likewise, the RHP cardiologists had also entered into a contract with

11  Hometown Health, the insurance division of Renown, which enabled the RHP cardiologists to

12  treat Hometown Health Plan members. Renown also has allowed and permitted cardiologists

13  employed with Carson Tahoe Hospital to be preferred providers with the HTH/HHP plans. To

14  harm and damage St. Mary's, Renown and HTH are interfering with the ability of The

15  Cardiologists employed by St. Mary's to effectively and efficiently continue their treatment of

16  HTH/HHP members who have been patients of The Cardiologists now employed by St. Mary's

17  for decades. Renown's interference with the ability of The Cardiologists employed by St. Mary's

18  to continue to treat HHP members is a strategic effort by Renown and HTH to cause financial

19  harm to St. Mary's by this tortious interference.

20       34.    Also through 2009 and 2010, the SNCA Cardiologists and RHP cardiologists

21  were in contract with St. Mary's affiliated insurance company, Health First, and both cardiology

22  groups were considered preferred providers for Health First. The cardiologists employed by

23  Renown, formerly employed with RHP, are preferred providers for Health First and St. Mary's

24  has done nothing to interfere with or impede RHP's access to and right to treat Health First

25  members.

26       35.    In 2010, the SNCA Cardiologists commenced negotiations with Renown. The

27  essence of the negotiations were to merge the SNCA practices with Renown pursuant to a two-

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

part transaction. Renown was negotiating to purchase all of the issued and outstanding stock owned by the SNCA Cardiologists and Renown was to create a wholly owned subsidiary to employ the SNCA Cardiologists for a salary of approximately $600,000 per year.

36.    Renown hired valuation experts to value the SNCA stock. Although Renown's experts put a substantial value on the SNCA stock, Renown purposefully underpaid, promising to make up for the reduced payment by increased guaranteed compensation. Those representations were false and Renown committed a fraud on the SNCA shareholders. Renown promised each of the SNCA physicians as part of the transaction that these cardiologists, eight of whom are now employed with St. Mary's, unrestricted and unlimited access to the books and records of SNCA so that The Cardiologists could always have access to patient contact records and information. Though the SNCA Cardiologists have released Renown from breaching the Share Purchase Agreement, the SAMR does not provided that The Cardiologists are in any way barred or prohibited from filing claims that arose after March 28, 2013, and for Renown's post-settlement actions of depriving The Cardiologists patient contact information. Renown has egregiously, maliciously and fraudulently breached its contractual obligation to give these cardiologists access to their patient information. Renown has engaged in this tortious activity to cause St. Mary's financial harm and damage and to cause financial harm to The Cardiologists.

37.    Renown hired compensation experts to determine the fair and reasonable amount of compensation to be paid to the SNCA Cardiologists after the merger. Renown committed fraud by its failure and refusal to pay the SNCA Cardiologists the agreed upon $450,000 guaranteed annual salary in addition to another $157,000 for quality performance compensation. Renown committed the same fraud on the RHP doctors.

38.    In approximately June 2010, RHP cardiologists attempted to initiate merger negotiations with Renown. Renown and SNCA had exchanged an unsigned Memorandum of Understanding in which the parties agreed not to negotiate with others while the SNCA/Renown negotiations were pending.

39.    In August 2010, by and through Defendants Miller and Pearl, the SNCA

1  Cardiologists were offered an approximate $600,000 annual salary if the SNCA Cardiologists

2  became employed with Renown's NHI, with $450,000 of that salary being guaranteed.  Renown

3  knew that employing all of the SNCA Cardiologists would have an adverse impact on St. Mary's,

4  since the patients of the SNCA doctors would thereby be diverted to Renown.

5       40.   In September 2010, SNCA and Renown executed a second Memorandum of

6  Understanding.  This Memorandum permitted Renown to negotiate with RHP.  Renown did so

7  with an intent to tortiously interfere with St. Mary's relationship with local cardiologists,

8  including the RHP cardiologists.  Renown's intent was to monopolize the market for cardiology

9  healthcare.  By inducing and enticing RHP cardiologists to become employed with Renown's

10  subsidiary Defendant NHI, Renown knew it would be violating Nevada's Unfair Trade Practices

11  Act,  anti-trust and anti-monopoly laws, thereby causing financial damage to St. Mary's.

12       41.   Renown knew that its merger with RHP and SNCA would result in St. Mary's

13  losing its position in the area of cardiology and would result in substantial financial damage and

14  harm to St. Mary's.  Renown was warned that such acquisition was monopolistic and that the

15  acquisition of both cardiology groups, by and through false promises, was in reality an attempt to

16  force St. Mary's out of the cardiology business with resulting financial damage.

17       42.   Throughout September 2010, RHP cardiologists were negotiating a possible

18  merger of the RHP practices with St. Mary's.  Renown unduly and unnecessarily interfered with

19  those negotiations by making false representations to RHP cardiologists to fraudulently induce

20  RHP cardiologists to integrate with Renown to the detriment of and harm to St. Mary's.

21       43.   By the end of September 2010, Miller, Testolin and Pearl had devised a

22  conspiracy and illegal scheme to cause St. Mary's financial and irreparable financial harm.  The

23  scheme involved, among other things, a method to procure and purchase the practices of virtually

24  all cardiologists in the Reno/Sparks area.  The scheme also involved a planned series of

25  presentations, promises and representations that were designed to convince the SNCA and RHP

26  cardiologists that Renown would pay on average $600,000 to The Cardiologists, with $450,000

27  of that salary guaranteed by Renown.  Renown knew at the time these representations were made

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1   that they were false, devious and deceptive and they were intended to cause St. Mary's financial

2   harm. These three Renown executives knew that they would later change the compensation

3   arrangements at a time when it was far too late for The Cardiologists to refuse the prearranged

4   changes and these Defendants also knew that by falsely inducing and enticing all Reno area

5   cardiologists to be employed by Renown that St. Mary's would be the financial victim and would

6   sustain millions of dollars of damages.

7        44.     On or about October 13, 2010, Pearl made verbal and visual representations to the

8   RHP and SNCA physicians that promised a $600,000 salary to The Cardiologists in both groups

9   with the specific and express promise that $450,000 of that $600,000 salary would be guaranteed

10   by Renown. Both SNCA and RHP cardiologists relied on Renown's representations, which were

11   not only false, but were intended to mislead the SNCA Cardiologists and RHP cardiologists from

12   in any way being involved in good faith negotiations with the Plaintiffs. The false promises

13   made by Renown to the Reno area cardiologists was part of a fraudulent, malicious and

14   oppressive scheme to destroy St. Mary's position in the community with regard to its abilities to

15   provide cardiology services to its patients and to the Reno/Sparks community.

16        45.     From November 16, 2010, through November 23, 2010, in a conspiracy with Phil

17   Schweber, Renown secretly changed the proposed contract documents in an attempt to secretly

18   deprive the SNCA Cardiologists the $450,000 guarantee. This conspiracy was further

19   exacerbated by Schweber becoming Renown's agent and co-conspirator, which resulted in a

20   November 30, 2010, act of deceit and deception when Schweber provided Candace McNulty,

21   M.D., with a false and fabricated contract confirming that $450,000 of her salary was guaranteed.

22   At that time, Dr. McNulty was a member of SNCA. Schweber, as an agent of Renown, acted

23   with malicious and conscientious disregard for St. Mary's position in the community as a vibrant

24   and successful healthcare provider providing cardiology services to the Washoe County

25   community. Schweber knew that his acts of deceit on behalf of Renown would foreseeably and

26   proximately result in St. Mary's being left with no cardiologists and no ability to service the

27   cardiology needs of St. Mary's patients.

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

46.     Throughout December 2010, Renown, through the representations of Miller, Pearl and Testolin, continued its deceptive and fraudulent scheme to dissuade RHP from negotiating with Plaintiffs by and through a series of false promises concerning compensation that would be paid to RHP cardiologists if those cardiologists merged with Renown.  At all times during their negotiations with RHP, Miller, Pearl and Testolin knew that the purpose for acquiring both cardiology groups was to destroy St. Mary's ability to provide cardiology services in Northern Nevada.

47.     St. Mary's cardiology services through its relationship with SNCA and RHP to patients residing in the Truckee Meadows, but St. Mary's also had a viable presence in the rural communities of Northern California and Nevada.  By engaging in its illegal and improper business scheme to merge with and employ all Reno area cardiologists, Renown was purposefully and intentionally causing financial damage and harm to St. Mary's by eliminating St. Mary's presence in the rural communities of Eastern California and Northern Nevada.

48.     By December 21, 2010, neither the SNCA Cardiologists nor the RHP cardiologists were provided a copy of Exhibit A to their Employment Agreements.  Exhibit A was intended to specify the compensation that Renown was obligated to pay to the SNCA and RHP cardiologists.

49.     In December 2010, Renown had its attorneys draft an Exhibit A to be attached to the Employment Agreement NHI was to have with all cardiologists.  The Exhibit A ultimately attached to the Employment Agreements of the SNCA and RHP cardiologists was a fraudulent fabrication intended to deceive, defraud and mislead the SNCA and RHP cardiologists.  Renown knew that once The Cardiologists became employed with NHI that market conditions and the effect of other collateral agreements would prohibit the SNCA and RHP cardiologists from leaving Renown because Renown had successfully obtained total and complete control of the cardiology market by and through its fraudulent activities.  The contrived Exhibit A had serious and material changes to the agreed-upon compensation schedule.  Renown did not disclose these secret changes to the SNCA physicians and did not reveal these changes to the RHP physicians

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1   until March 1, 2011.

2        50.    On January 20, 2011, Renown made a power point presentation to the RHP

3   cardiologists, which was intended to deceive them and stop them from negotiating with St.

4   Mary's. By purposefully, intentionally and deviously making false inducements to the RHP

5   cardiologists, Renown knew and intended that severe financial harm would be caused to St.

6   Mary's. Renown's presentation clearly indicated that if the RHP cardiologists worked for

7   Renown they would earn an average annual salary of $600,000. Renown knew that it was

8   misrepresenting its willingness to pay $600,000 and Renown made these false representations

9   with a specific intent of interfering with Plaintiffs' negotiations with RHP. Renown knew at the

10  time that it would not pay the RHP physicians $600,000 a year and that any payment for

11  achieving quality measures would be considered a component of a $450,000 annual salary.

12  These acts were done by Renown to destroy, harm and negatively affect the financial affairs of

13  St. Mary's and to seriously adversely affect St. Mary's ability to provide cardiology services to

14  the Northern Nevada community.

15       51.    By misleading the SNCA and RHP cardiologists, Renown was intentionally trying

16  to deprive St. Mary's of the opportunity to have a competitive cardiology practice. By February

17  2011, Renown was creating a monopoly of cardiology practice in the Reno/Sparks community

18  through false pretenses.

19       52.    Meanwhile, in or about March of 2011, Renown, through the efforts of David

20  Line, Chairman of the Board of the Renown Board of Directors, and Jim Miller, met with the

21  CEO of Carson Tahoe Hospital ("CTH"). David Line and Miller attempted to convince Mr. Ed

22  Epperson, CEO of CTH, that CTH should no longer plan on doing business with St. Mary's

23  because with Renown's monopoly in place,  and with CTH's cooperation, Renown could put St.

24  Mary's out of business from a cardiology standpoint.

25       53.    On March 1, 2011, Pearl presented the proposed Employment Agreement to RHP

26  cardiologists. For the first time, it was revealed in those documents that the $450,000 salary

27  guarantee would only be paid only if and "assuming" that each and every RHP cardiologist

28
Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

achieved 100% of the quality incentive measures.  Dr. Anita Kedia of RHP objected to Renown's "bait and switch" tactics.  Pearl promised to review the proposed salary and guarantee.  Contrary to his promise, he thereafter misrepresented to RHP cardiologists that the SNCA Cardiologists had agreed to a payment whereby the $450,000 salary was guaranteed assuming that each and every SNCA cardiologist achieved 100% of the proposed quality performance incentive measures.  Pearl's representation was blatantly false and was expressed with the intent to cause St. Mary's financial harm because at that time each and every cardiologist was led to believe and was promised by Renown that they would be paid $600,000 per year, with $450,000 of that compensation being unconditionally guaranteed by Renown.

54.     By and through the false representations made by Miller, Pearl and Testolin to the SNCA and RHP cardiologists, Renown fulfilled its objective, in part, by destroying St. Mary's cardiology practice.

55.     By March 17, 2011, Renown had acquired SNCA and RHP and had contrived an employment arrangement with the former SNCA and RHP cardiologists through fraud, deceit and deception.  Renown knew that its fraud would result in St. Mary's not having a cardiology practice and that St. Mary's would sustain a substantial loss of revenue as a result of Renown's illegal and improper monopolistic actions.  By controlling the cardiology market, Renown could and did attempt to divert all cardiology practices and patients to Renown facilities, thereby depriving Renown the opportunity to efficiently and effectively treat cardiology patients, thereby causing St. Mary's substantial damages.

B.     **The FTC Investigation, Orders, Decisions and Results Thereof.**

56.     By December 2010, the FTC had been alerted about Renown's antitrust activities and its attempt to monopolize the practice of cardiology in the Reno/Sparks area.  Renown retained antitrust counsel, Bill Berlin, to represent the SNCA and RHP cardiologists in the FTC antitrust investigation, notwithstanding the egregious and irreconcilable conflicts of interest.  Renown did so with an intent to cause financial harm to St. Mary's and to prevent St. Mary's from having a cardiology practice in the Reno community and outlying areas.

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

57.     To further its efforts to damage St. Mary's, Renown falsely represented to the RHP cardiologists throughout January and February 2011 that there were no anti-trust problems regarding Renown's proposed acquisition of the RHP practices.  Renown made these false promises knowing that St. Mary's would lose cardiology business if RHP was induced and enticed to merge with Renown.  Renown's false promises to the RHP cardiologists were calculated to and did damage St. Mary's.

58.     On March 1, 2011, Pearl falsely represented to the RHP cardiologists that the FTC investigation did not propose a threat to Renown's proposed acquisition of the RHP practices.

59.     RHP did negotiate a provision in the Employment Agreements whereby Renown would have to "relocate"–at Renown's expense–any RHP cardiologists that would be divested in the event that the FTC found the RHP/Renown merger and integration to be a violation of the Clayton Act or otherwise amounted to monopolistic behavior and a restraint of fair trade.  Pearl's false representations were made with the intent to further Renown's scheme to cause financial harm to St. Mary's and to destroy St. Mary's ability to compete in the cardiology market.

60.     On or about March 17, 2011, the RHP/Renown merger occurred.  The SNCA and RHP mergers with Renown and the integration of the SNCA and RHP practices with Renown whereby the SNCA and RHP cardiologists became employees of Renown, through its wholly-owned subsidiary NHI, constituted an unlawful monopoly and restraint on trade, which, in turn, has caused Plaintiffs to sustain substantial damages.  Part of the SNCA and RHP merger transactions with Renown resulted in the patients of the SNCA and RHP cardiologists being treated as SNCA and RHP patients, even though the SNCA and RHP cardiologists were employed by Renown.

61.     Renown secretly devised a scheme to fraudulently and maliciously claim later that the SNCA patients and patient contact information were "purchased" by Renown and therefore Renown could monopolize access to and communications with SNCA's patients, even after the SNCA Cardiologists left the employment of Renown during the period of time from December 2012 through January 2013.  Renown continues this improper conduct despite two orders from

two judges directing Renown to provide the SNCA doctors patient contact information.

62.     Despite these monopolistic machinations, St. Mary's still permitted all of the SNCA and RHP cardiologists to have privileges at St. Mary's medical institution and permitted all cardiologists the opportunity and benefit to treat members of the Health First insurance program.

63.     Renown, on the other hand, refused to give privileges to three cardiologists who St. Mary's hired in 2011 as a result of Renown's monopolistic behavior and Renown refused to permit the St. Mary's Cardiologists to treat Hometown Health members, even though the cardiologists employed for CTH were permitted and allowed to do so.

64.     By April and early May 2011, the SNCA Cardiologists and thereafter the RHP cardiologists discovered that Renown had deceived them regarding the promised guaranteed salaries.  Renown refused efforts to discuss and negotiate the salary disputes in good faith but instead told the SNCA and RHP cardiologists they would not, under any circumstances, change the compensation arrangement to be consistent with the promises, representations and commitments that Renown used to induce and entice the SNCA and RHP cardiologists to merge and integrate.

65.     Renown took this strident and improper position because Renown believed that the SNCA physicians were bound by an oppressive covenant not to compete, which Renown drafted and believed would cause the SNCA Cardiologists to be liable for up to $1,200,000 if the SNCA Cardiologists left to compete with Renown.  By incorporating the onerous and patiently illegal covenant not to compete in the SNCA and RHP Employment Agreement, Renown intended to and did actually cause St. Mary's substantial financial damages because the SNCA and RHP cardiologists were threatened with being punished with up to a $1,200,000 penalty if any of The Cardiologists even "negotiated" with St. Mary's for alternative employment.  The illegal, oppressive and punitive covenant not to compete was a part of Renown's scheme and strategy to put St. Mary's out of the cardiology business.

66.     During 2011, the FTC, in conjunction with the Nevada Attorney General's office,

conducted an investigation into Renown's monopolistic behavior.  Renown prepared a "script" for various cardiologists.  Renown attempted to improperly influence and did manipulate for its own benefit proposed testimony that the cardiologists and their staff were asked to give to the FTC.

67.     A formal FTC investigation was initiated in approximately January 2011.

68.     Once Renown's acquisition of RHP became effective, Renown, NHI and HTH/HHP controlled more than 97% of the market for adult cardiology services in Washoe County, Nevada.

69.     Throughout 2011 and into 2012, the FTC, together with the Nevada Attorney General's office, investigated and scrutinized Renown's monopolistic behavior.  The FTC and Attorney General's office investigated the cardiology market.  FTC representatives took statements from various representatives of Renown, SNCA, RHP, and others.  The FTC investigation revealed Renown's monopolistic behavior and confirmed that Renown had successfully restrained free trade and business activities in the area of cardiology to the detriment and financial harm of St. Mary's.

70.     Renown attempted and attempted to convince employees, including SNCA Cardiologists represented by independent counsel, to give specific and tailored testimony to the FTC.  Testolin violated rudimentary rules of ethics by meeting with SNCA Cardiologists while SNCA Cardiologists were represented by independent counsel without first obtaining independent counsel's permission and consent.  These acts were done to preserve Renown's monopoly.

71.     Throughout May, June, and July 2012, Renown's antitrust counsel and counsel for the FTC and Nevada Attorney General's office were involved in settlement negotiations.  Renown divulged the essence of these negotiations to RHP's then-counsel John Desmond.  Renown did not disclose the status of the negotiations to any of the SNCA Cardiologists or their counsel.

72.     The FTC had determined that Renown blatantly violated § 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The FTC determined that Renown's conduct stifled competition

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

and caused financial harm to competitors of Renown, including St. Mary's, concerning market control in the field of cardiology.  Realizing that it was defenseless to the accusations, Renown settled with the FTC.

73.   By August 1, 2012, the FTC was prepared to file a complaint against Renown alleging that violations of § 7 of the Clayton Act had occurred.  A copy of the draft Complaint is attached hereto as **EXHIBIT 4** and is made a part hereof.  The FTC was prepared to allege and prove that Renown's acquisition of and merger with RHP, after having already acquired and merged with SNCA, constituted a restraint of trade and violated Federal antitrust laws.

74.   The FTC had determined that Renown's acquisition of RHP and employment of the RHP, after having acquired SNCA, did substantially lessen competition and created a monopoly in relevant markets by eliminating actual, direct and substantial competition between Renown and RHP, by increasing the ability of NHI to unilaterally raise prices for cardiology services, and by reducing incentives to improve cardiology services and products in the Reno/Sparks market and by causing financial harm to St. Mary's.

75.   By August 1, 2012, Renown and the FTC had entered into and executed an Agreement Containing Consent Orders ("Consent Agreement") containing an admission by Renown of all the jurisdictional facts alleged in the draft Complaint, which constituted, in effect, a settlement.

76.   The Consent Agreement, among other things, resulted in an order to suspend enforcement of Renown's non-compete  provision embedded in any employment agreement it entered into with the SNCA and RHP cardiologists; and further resulted in the entry of a Decision and Order by the FTC issued November 30, 2012.  A copy of the Order to Suspend Enforcement of Renown Non-Compete is attached to this Complaint as **EXHIBIT 4** and a copy of the Decision and Order is attached to this Complaint as **EXHIBIT 5**.  The FTC Orders specifically chastised Renown and ordered Renown not to interfere in the relationships that the departing cardiologists would have with their patients.  Renown has consistently thereafter violated this aspect of the Order and continues to maliciously interfere with the SNCA Cardiologists' relationship with their patients by refusing to give The Cardiologists who have left

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1  the employ of Renown information which would enable The Cardiologists to contact their

2  patients.

3         77.    The Decision and Order is to run for 10 years through and including November

4  30, 2022, and, among other things:

5            (a)    allowed up to 10 cardiologists to terminate their employment with Renown

6  without retribution or legal repercussion;

7            (b)    precluded Renown from enforcing certain non-compete provisions against

8  a cardiologist covered by the Decision and Order;

9            (c)    ordered that Renown not prevent, impede or otherwise interfere with the

10  provision of cardiology services by such terminating cardiologists; and

11            (d)    established the appointment of Judge Charles McGee (Ret.) as Monitor, to

12  ensure that Renown expeditiously complied with all of its obligations and performed all of its

13  responsibilities as set forth therein.

14         78.    The Decision and Order of the FTC has now become final and binding upon

15  Renown.

16         79.    Plaintiffs are informed and believe that Defendants attempted to avoid their

17  obligations under the Decision and Order by gaming the protocol allowing for the departure of up

18  to 10 cardiologists from Defendants' employ without retribution.  Defendants did this by

19  orchestrating the feigned termination of two senior cardiologists, Drs. Zebrack and Berndt,

20  thereby attempting to limit or thwart the actual departure of several physicians who would have

21  been otherwise eligible and willing to provide an acceptable Termination Notice.  Such senior

22  cardiologists were not actually intending to change their status with Defendants, were moved to

23  substantially similar positions in relation to Defendants, and whose pretextual termination in no

24  way addressed the monopoly concerns which were raised by the FTC.  Renown has attempted to

25  avoid its obligations under the FTC Orders and Decision by failing and refusing to give the

26  SNCA Cardiologists, eight of whom are now employed by St. Mary's, information necessary for

27  these cardiologists to contact their patients.  This constitutes a substantial and malicious

28

1   interference by Renown with the present St. Mary's Cardiologists' ability to contact their

2   patients, which in turn has caused St. Mary's substantial financial harm and damage.

3       80.     Plaintiffs are informed and believe that Defendants further attempted to avoid

4   their good faith compliance with the Decision and Order by directing Renown's General

5   Counsel, Testolin, and/or its counsel Pearl, to inform Monitor McGee that anyone who gave a

6   Termination Notice thereunder–regardless whether they had secured other employment–would be

7   terminated immediately, even if their Termination Notice was ineffective because the number of

8   physicians attempting to leave exceeded the number provided in the Decision and Order. This

9   had the effect of chilling efforts by several former SNCA Cardiologists to take advantage of the

10  opportunities afforded them by the Decision and Order, and was done by Defendants in order to

11  maintain their monopoly position.

12      81.     Plaintiffs are informed and believe that, prior to the SNCA litigation and the

13  Decision and Order, in the Spring of 2011, several executives of Renown, including its former

14  CEO, Jim Miller, and its Chairman of the Board, David Line, made statements to third parties

15  that Renown was going to put Plaintiffs' cardiology services out of business by virtue of

16  Renown's recent acquisition of the SNCA and RHP practices, and Renown's control over The

17  Cardiologists formerly affiliated with those practices.

18  **C.    The SNCA Litigation.**

19      82.     While the FTC investigation was pending, the SNCA Cardiologists initiated

20  litigation against Renown in September 2011. In the discovery process involved in that

21  litigation, it was discovered that Renown was falsifying books, records and financial statements.

22  It was further discovered that Renown was forcing key witnesses to sign letters that contained

23  false statements and that the letters were signed by at least one valued employee of Renown

24  under duress and coercion. Based upon the pressure put on the valued employee by Andy Pearl

25  and Jim Miller, the employee was forced to sign a letter that contained false representations.

26      83.     Prior to the litigation and on or about April 29, 2011, Renown caused its outside

27  lawyer to communicate with counsel for SNCA Cardiologists so as to contain false and

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

24

1    misleading statements about the negotiations.  Renown's intent was to intimidate all cardiologists

2    into believing that they could not leave Renown to work for or with St. Mary's.

3         84.    Renown was under the belief that because it had the SNCA and RHP physicians

4    execute Employment Agreements that contained overreaching, oppressive and onerous

5    noncompete provisions, it could improperly and maliciously control the SNCA Cardiologists by

6    threatening to fire any cardiologist that contested or disputed Renown's efforts to manipulate and

7    control.  The noncompete clauses that were contained in the Employment Agreements between

8    Renown and RHP and SNCA and RHP were designed to and did cause financial damages to St.

9    Mary's. That damage was accomplished by an illicit deterrence which prohibited by intimidation

10   Reno cardiologists from terminating their employment with Renown and accepting employment

11   with St. Mary's.

12        85.    The noncompete provisions in the Employment Agreements that Renown devised

13   with the RHP and SNCA Cardiologists were designed to impose a $1.2 million penalty on any

14   cardiologist that even "negotiated" with St. Mary's.  The purpose and effect of the noncompete

15   clauses were to exclude St. Mary's from the field of cardiology, thereby causing St. Mary's

16   substantial damages.

17        86.    Because certain SNCA Cardiologists were vocal about Renown's fraud and

18   misrepresentations, Renown threatened to fire outspoken SNCA Cardiologists.  As a result,

19   SNCA applied for injunctive relief before the Honorable Brent Adams.

20        87.    In January 2012, when confronted with testimony in support of SNCA's

21   application for a restraining order, Renown reluctantly agreed not to engage in retaliatory firing

22   and termination of any SNCA Cardiologists pending the result of the litigation.

23        88.    Renown did, however, retaliate against the SNCA Cardiologists by systematically

24   diverting patients away from the SNCA Cardiologists.

25        89.    When the preliminary FTC Order was entered in early August of 2012,

26   approximately 16 cardiologists attempted to leave the employment of Renown with the

27   protection offered by the FTC Order and Decision.  The FTC preliminary Order and Decision

28

prohibited Renown from interfering in any cardiologist's effort to find new employment.  The

FTC preliminary decision prohibited Renown from interfering with The Cardiologists'

privileges.  The FTC emphatically ordered Renown not to interfere with The Cardiologists'

relationship with their patients.

90.    Renown knew that St. Mary's was willing to hire cardiologists.  Renown

attempted to frustrate, impede, interfere and obstruct The Cardiologists' efforts to become

employed with St. Mary's, notwithstanding the terms, conditions and provisions of the FTC

Order.

91.    Renown attempted to manipulate the administration of the FTC Order by giving

the "Monitor" (Judge Charles McGee, ret.) false information.  Renown threatened that any

cardiologist who provided a notice of termination to the Monitor would be no longer employed

with Renown, regardless of whether the cardiologist found new employment.  Renown further

attempted to frustrate the purpose and intent of the cardiologist's right to leave the employment

of Renown by creating a false and deception notice of termination for Drs. Berndt and Zebrack.

Renown created a ruse by which two of the ten available slots were filled falsely by doctors who

actually did not leave Renown, but were represented to the FTC as leaving Renown.  This was

Renown's effort to interfere with St. Mary's right to employ departing cardiologists.

92.    During the litigation, Renown alleged that NHI's Employment Agreement was

unenforceable and void.  When the SNCA Cardiologists agreed, Renown then changed its

position in a strategic effort to harm St. Mary's by preventing the SNCA Cardiologists from

taking employment with St. Mary's.

93.    During the litigation, the FTC Order became final on or about November 28,

2012.  Seven SNCA Cardiologists left the employment of NHI with FTC protection.  Four of

those cardiologists took employment with St. Mary's, despite Renown's efforts to interfere with

that employment opportunity.  Thereafter, three additional doctors became employed with St.

Mary's because Renown was forced to agree that the Employment Agreements were void and

thereby conceded that the noncompete provisions were also void.  The remaining five SNCA

1    Cardiologists became employed with Northern Nevada Medical Center.  Arger will be employed

2    by St. Mary's as of January 1, 2014.

3        94.    During the trial of the SNCA litigation, the evidence revealed that Renown had

4    concealed entries in the financial records, had caused employees to sign letters that were false,

5    testified falsely about the negotiations in November 2012, and entered into illegal arrangements

6    to essentially pay for testimony by virtue of a promise to Schweber that his substantial attorneys'

7    fees would be paid for based upon the content of Schweber's testimony and the outcome of the

8    trial.  This illegal conduct was done in part to preserve Renown's monopoly.

9        95.    Faced with overwhelming evidence showing Renown's deceit, deception and

10   fraud, Renown agreed in the middle of the trial on February 3, 2013, to settle with SNCA

11   Cardiologists by paying the SNCA Cardiologists all sums that they were seeking and by

12   specifically promising the SNCA Cardiologists that Renown would use its good faith best efforts

13   to allow the SNCA Cardiologists to treat HTH/HHP members.  Renown also specifically and

14   expressly promised not to interfere in any way with the SNCA Cardiologists' relationships with

15   their patients.  Renown, however, has flagrantly done so as described herein, which has caused

16   St. Mary's damages.

17       96.    The settlement was intended to allow Drs. Bryan, Ram Challapalli, Sridevi

18   Challapalli, Frank Carrea, Devang Desai, Eric Drummer, Joseph Stevenson, and Kosta Arger to

19   practice cardiology with St. Mary's without interference and with the right to continue to treat

20   their patient some of whom were HTH/HHP members.  Renown breached its promises not to

21   interfere with The Cardiologists' relationships with their patients.

22       97.    Renown has tortiously interfered with the settlement in an effort to cause The

23   Cardiologists and St. Mary's substantial damages.  Among other improper conduct, Renown has

24   tortiously interfered with St. Mary's economic interests by refusing to allow The Cardiologists to

25   contact and treat their patients.

26       98.    Renown initially did not provide The Cardiologists employed by St. Mary's with a

27   contract to treat HTH/HHP members.  Renown has purposefully and intentionally delayed that

28

process for over seven months, during which time Renown engaged in diverting patients from these eight cardiologists now employed with St. Mary's to Renown cardiologists.

99.     With an intent to cause The Cardiologists and St. Mary's financial harm and damages, Renown has failed and refused to provide The Cardiologists now employed with St. Mary's patient access information.  In failing and refusing to give these cardiologists patient contact information, Renown has intended to and successfully caused St. Mary's to sustain substantial damages and under Nevada law, Renown must pay treble damages, court costs and attorneys' fees.

100.     Renown's refusal to abide by the spirit and intent of the Settlement Agreement is intended to and has caused The Cardiologists and St. Mary's damages.  Renown and HTH for a period of time purposefully and intentionally removed all SNCA physicians from the membership role published on the HTH/HHP website.  Renown has caused HTH/HHP to inform patients that The Cardiologists employed with St. Mary's are no longer eligible to treat HTH/HHP members.  Such information was false but was disseminated by Renown with the aggressive and malicious intent to cause financial damage to St. Mary's.

## IV.

## RENOWN'S ONGOING MONOPOLISTIC ACTIVITIES AND TORTIOUS ACTS AGAINST PLAINTIFFS

101.     Plaintiffs are informed and believe that such conduct and statements described herein were consistent with Defendants' strategy to interfere with St. Mary's abilities to provide cardiology services to patients in Washoe County, if such patient was not insured through Renown's captive insurance plan, Hometown Health.  Further and on information and belief, Testolin and Pearl condoned, encouraged and implemented such strategy.

102.     Plaintiffs are further informed and believe that–consistent with Defendants' plan to put St. Mary's cardiology services out of business–employees of Hometown Health were initially directed to limit access to Renown's employee-cardiologists to only Hometown Health Insureds, so as to maximize its revenue and with a goal of injuring St. Mary's.

103.     The result of Defendants' efforts to improperly monopolize adult cardiology

1   services in Washoe County beginning in 2010 has injured St. Mary's business interests and has

2   compromised the availability and affordability of needed care to consumers of cardiology

3   services.

4       104.   Even after the SNCA Litigation was resolved and a Settlement Agreement and

5   Mutual Release ("SAMR") executed on March 28, 2013, and even after the Decision and Order

6   of the FTC became effective, Renown has continued to interfere with St. Mary's ability to

7   provide needed adult cardiology services in Washoe County by limiting patient access to

8   cardiologists who are no longer employed by Defendants.

9       105.   Specifically, as a result of the FTC's actions, the resolution of the SNCA

10   Litigation, and for other reasons, eight cardiologists formerly affiliated with SNCA have left

11   Renown and are now employees of St. Mary's.  One cardiologist formerly affiliated with RHP

12   has done so as well.

13       106.   A second meeting between David Line and CTH CEO Epperson occurred in early

14   2011.  Line again attempted to induce and entice CTH to join forces with Renown to put St.

15   Mary's out of business.

16       107.   The Cardiologists are accomplished and recognized in their field, enjoying

17   excellent reputations for the provision of superior adult cardiology services.  Renown considers

18   The Cardiologists as among the best and brightest.

19       108.   However, notwithstanding the Decision and Order entered by the FTC, and

20   without regard to its commitments and obligations embedded in SAMR that was intended to

21   resolve the SNCA Litigation, Renown did and/or continues to: (1) limit or even prevent

22   disclosure of The Cardiologists' contact information for their patients; (2) incorrectly and

23   maliciously advise patients that HTH/HHP will soon no longer cover cardiac care by The

24   Cardiologists; (3) direct The Cardiologists' patients to themselves in violation of medical

25   professional standards, the SAMR; and (4) monopolize contact and access information for

26   patients of the St. Mary's Cardiologists.

27       109.   Plaintiffs are informed and believe that on multiple occasions over the past nine

28   months, consumers of cardiology services have contacted Defendants, seeking to make

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

appointments with The Cardiologists who are now affiliated with Plaintiffs. Rather than being apprised of how best to reach them, or at a minimum communicating that such cardiologists are employed with St. Mary's, such consumers have been abruptly and pointedly referred to one of the cardiologists employed by Renown, oftentimes giving the inaccurate impression that such consumers' choices are foreclosed, and that only a cardiologist affiliated with Renown or its captive health plan, Hometown Health, would be available to provide medical care. These misrepresentations to patients have caused interference with St. Mary's and The Cardiologists' rights to treat patients of The Cardiologists now practicing cardiology at St. Mary's.

110.    Such tactics are wrongful, improper, and are injuring St. Mary's business. These tactics are also having an adverse impact on the availability and access to continuity of healthcare, all to the detriment of open and fair competition, and to patient care.

111.    Plaintiffs are affiliated with Health First, a commercial health insurance company. For many years, the former RHP cardiologists were contracted with Health First such that those cardiologists were deemed preferred providers to patients insured by Health First. Renown knew this at all times relevant to this dispute.

112.    Renown's wrongful conduct, if not enjoined, will result in continuing harm to The Cardiologists and St. Mary's, for which money damages are inadequate, and such conduct will continue to adversely effect the quality and accessability of patient care in Nevada.

113.    The Cardiologists and St. Mary's are entitled to both a mandatory and prohibitory injunction against Renown, preventing it from further interfering with the doctor-patient relationship set forth above. Specifically, Renown should be enjoined from: telling patients (including those of the eight St. Mary's Cardiologists) that the former SNCA doctors are not affiliated with Hometown Health, attempting to re-direct such patients to Renown cardiologists for care, and any way impeding access by The Cardiologists to and with their patients. Defendants have been ordered to "forthwith" turn over the complete patient list of The Cardiologists, provide contact information to The Cardiologists, and provide support to such St. Mary's Cardiologists as in the patients' best interests for proper healthcare. This conduct is intended to and has caused The Cardiologists and St. Mary's to sustain damages.

114.    St. Mary's has attempted to mitigate its damages caused by Renown's wrongful conduct alleged herein.  Specifically, St. Mary's hired three cardiologists in 2011 from outside Northern Nevada to serve patients in need of cardiology services.  Nevertheless, and despite St. Mary's best efforts, the damages were caused by Renown's wrongful conduct because the new hired cardiologists lack established ties to the Northern Nevada medical community and had no patient business in this region, thus inhibiting and impairing St. Mary's ability to stem its losses caused by Renown.  In addition, Renown refused to grant St. Mary's three new cardiologists privileges at Renown and refused to permit those cardiologists to treat HTH/HHP members.

<p style="text-align:center">V.</p>

<p style="text-align:center"><strong><u>STRUCTURE OF MARKET</u></strong></p>

115.    The relevant line of commerce, *i.e.*, the "relevant market," is the provision of adult cardiology services.  "Cardiology services" includes diagnostic or treatment services by cardiologists who provide non-invasive services (general cardiology), invasive services (including diagnostic cardiac catheterization procedures), interventional cardiology (including placement of stents), and electrophysiology services (including the insertion and/or removal of devices related to heart rhythm functions).  "Cardiology services" does not include pediatric cardiology services.

116.    In addition to the relevant product market, there are several healthcare-related markets ("secondary product markets") that are negatively impacted by Renown's conduct.  One of these secondary product markets is no broader than outpatient cardiology services, which are provided by hospitals such as Renown and St. Mary's.  A second, secondary product market is no broader than inpatient cardiology services, which are provided by hospitals such as Renown and St. Mary's.

117.    The relevant geographic market in which to assess the effect of the SNCA and RHP mergers with Renown Health is the Reno-Sparks area, including Washoe County, Nevada, but not including Carson City, Nevada.  To the extent that Renown has monopolized the provision of cardiology services in rural communities in Eastern California and Northern Nevada, there may be other relevant geographic markets.

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

118.   Within this product and geographic market, Renown's acquisition of RHP following acquisition of SNCA created a monopoly.

119.   The merger of RHP into Renown Health and the employment of the RHP physicians by Renown Health reduced from two to one the number of adult cardiology service providers that offer a broad range of adult cardiology subspecialties in the Reno area.  These cardiology subspecialties, including non-invasive, invasive, interventional, and electrophysiology, are required to fully meet the needs of patients with heart conditions.  At the time of the RHP transaction, the only other cardiologist serving adult cardiology patients in the Reno area was a sole practitioner, who could not provide a comparable range of services.

120.   At the time of the consummation of the transaction at issue here, Renown Health employed 97% of the cardiologists in the relevant market, *i.e.*, the Reno-Sparks area.  The Hershman-Herfindahl Index ("HHI") in the market for the provision of cardiology services, based on the number of cardiologists serving the market increased from 4707 to 9395, an increase of 4688 points.

121.   Renown's acquisition of RHP after having acquired SNCA:  eliminated direct competition between Renown and RHP for the provision of cardiology services; gave the combined entity, Renown, greater ability to unilaterally raise the price of cardiology services; reduced the combined entity's incentive to improve service and product quality; and prevented St. Mary's from developing its own competing cardiology group.

122.   Additionally, a hospital can only provide inpatient and outpatient acute-care cardiology services if cardiologists admit to that hospital and provide coverage at that hospital. Therefore, by monopolizing cardiology services and steering admissions to itself, Renown markedly weakened St. Mary's as a competitor in the provision of inpatient and outpatient cardiology services and thereby reduced competition for inpatient and outpatient cardiology services.

123.   Renown influenced cardiologists to admit patients to Renown rather than St. Mary's for inpatient and outpatient cardiology services provided by hospitals.  Thus, Renown used its market power in the physician-cardiology market both to harm St. Mary's

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

32

competitiveness in the physician-cardiology market and to harm St. Mary's competitiveness in markets for out-patient cardiology services provided by hospitals and in-patient cardiology services provided by hospitals.

124.    Having monopolized adult cardiology services by acquiring RHP, Renown took additional actions to preserve its market power over cardiology services and to further disadvantage St. Mary's. These actions, which are described *supra*, include Renown's refusal to provide those cardiologists who left Renown to join St. Mary's with access to contact information for their former patients.

125.    Renown maintains and strengthens its illegal cardiology monopoly by intimidating, threatening and filing frivolous and vexatious lawsuits against local cardiologists not employed by Renown.

126.    Renown threatens to revoke privileges and preferred provider status to local cardiologists who do not "play ball" with Renown.

127.    These actions directly reduced competition in the provision of cardiology services and harmed patients. These actions also harmed St. Mary's because it now employs these physicians. Moreover, by limiting the patient volume of The Cardiologists who joined St. Mary's, Renown also reduced St. Mary's competitiveness as a provider of inpatient and outpatient cardiology services and thereby harmed competition and ultimately patients needing these services. And by reducing St. Mary's competitiveness in the provision of inpatient and outpatient cardiology services, Renown's actions may have also reduced St. Mary's ability to secure favorable reimbursement from private insurers.

128.    The loss of competition in cardiology services in the Reno-Sparks area described above could not have been prevented or quickly reversed by de novo entry by new cardiologists.

129.    Renown's actions also serve to maintain an entry barrier to the market for adult cardiology services in the Reno area because of the high costs associated with creating a de novo cardiology practice. Recruiting a sufficient number of cardiologists with appropriate training, experience, and areas of specialization is costly and time consuming.  Because cardiologists within a practice must provide coverage for each other, unless an entity can recruit a sufficient

1   number of cardiologists in each necessary subspecialty, it will fail to succeed. Human resource

2   costs for outreach, interviews, and due diligence are expensive. Creating a patient base will take

3   time as well. These efforts will easily take two years or more.

4        130.   In fact, St. Mary's efforts to create a cardiology department following Renown's

5   monopolization of cardiology services demonstrates that reversal of the loss of competition by de

6   novo entry by new cardiologists was not practical or feasible.

7                                          **VI.**

8                    **FIRST CLAIM FOR RELIEF - ST. MARY'S**
         **(Violation of Nevada Unfair Trade Practices Act - NRS 598A.060(1)(e), (f))**
9                              **(Renown Health)**

10       131.   Plaintiffs reallege and incorporate by reference all the preceding allegations and

11  paragraphs as fully set forth herein.

12       132.   In acting as alleged above, Renown has unlawfully engaged in and has attempted

13  to engage in and has conspired to engage in prohibited monopolization of trade or commerce in

14  this State.

15       133.   Renown obtained monopoly power over the market of adult cardiology services in

16  Washoe County, such that Renown had the power to and did exclude competition in the

17  provision of those services in that geographic location. Further monopolistic conduct by Renown

18  includes its improper control and monopolization of patient contact information.

19       134.   Renown, through its mergers with local cardiology groups obtained monopoly

20  power and maintained that power through anti-competitive conduct intended to foreclose

21  competition and/or to gain an unfair competitive advantage.

22       135.   Renown engaged in exclusionary conduct as a result of its mergers with the

23  specific intent to monopolize the market of adult cardiology services with the dangerous

24  probability of achieving and actual achievement of a monopoly with the intent to cause St.

25  Mary's financial harm.

26       136.   By committing the acts described herein, Renown has violated NRS

27  598A.060(1)(a)(d)(e) and (f).

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

137.     Between September 29, 2010, and March 16, 2011, Renown entered into an unlawful agreement between themselves and with other cardiologists to monopolize the market of adult cardiology services, an unlawful objective.

138.     Defendants acted in furtherance of the conspiracy by:

        a.     Renown's acquisition of competitors' stock.

        b.     the employment of all the competitors' cardiologists,

        c.     the efforts taken to prevent The Cardiologists from leaving Renown's employ, and

        d.     prohibiting St. Mary's new cardiologists hired in 2011 from having privileges at Renown or treating HHP/HTH patients.

139.     As a proximate consequence of Renown's violations of NRS 598A.060, The Cardiologists and St. Mary's have sustained compensatory and consequential damages, and each Plaintiff is entitled to damages according to proof, treble damages, costs of court and attorneys' fees.

## VII.

### SECOND CLAIM FOR RELIEF - THE CARDIOLOGISTS
#### (Breach of Contract)
#### (Renown Defendants)

140.     Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

141.     The Cardiologists settled Case No. CV11-02477 in good faith.

142.     The February 4, 2013 settlement required Renown to utilize its good faith best efforts to provide The Cardiologists, and each of them, with patient contact information which would allow each of The Cardiologists to continue to treat the patients that The Cardiologists had been treating for a period from January 1, 2011, through and including the date of the February 4, 2013 settlement.  Renown breached its promise by monopolizing and refusing to provide The Cardiologists with patient contact information for The Cardiologists' patients.

143.     On March 28, 2013, The Cardiologists and Renown Defendants executed the

SAMR and The Cardiologists did so in good faith. In the SAMR, Renown promised and contracted to utilize its good faith best efforts to provide The Cardiologists, and each of them, with patient information which was intended to and did include patient contact information.

144. Commencing on or about April 1, 2013, the Renown Defendants steadfastly, and in violation of the SAMR, refused to provide The Cardiologists with patient contact information. Even though Renown did provide some patient contact information in December of 2012, Renown, later in April of 2013, falsely contended that HIPAA privacy laws and Nevada privacy laws prohibited Renown from providing The Cardiologists with patient contact information.

145. Serving as Ombudsman, the Honorable David Gamble (ret.) did render a decision to the effect that Renown provide The Cardiologists, and each of them, with patient contact information. (*See* **EXHIBIT 1**). Renown refused.

146. Renown then sought declaratory judgment through its Motion for Summary Judgment before the Honorable Brent Adams seeking to protect and prevent Renown from having to provide The Cardiologists, and each of them, with patient contact information. Judge Adams denied and rejected Renown's request for summary judgment.

147. Instead, Judge Adams, on October 24, 2013, did grant The Cardiologists' Motion for Summary Judgment prosecuted by the SNCA Cardiologists and Judge Adams ordered Renown to "forthwith" provide The Cardiologists, and each of them, with patient contact information. The decision became a Judgment. (*See* **EXHIBIT 2**). Renown refused and has still not complied with Judge Gamble's decision or Judge Adams' summary judgment, which interpreted the language of the SAMR and February 4, 2013 Settlement Agreement so as to obligate Renown to provide The Cardiologists with patient contact information.

148. As a proximate consequence of Renown's breaches of the Settlement Agreements, The Cardiologists, and each of them, have been damaged in excess of $10,000 and is entitled to recover reasonable attorneys' fees and costs of court.

/ / /

/ / /

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

VIII.

**THIRD CLAIM FOR RELIEF - THE CARDIOLOGISTS**
**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(Renown Defendants)**

149. Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

150. Pursuant to Nevada law, every contract, including the February 4, 2013, settlement and the SAMR contains implied covenants of good faith and fair dealing.

151. In addition, the SAMR contains an express warranty and covenant of good faith and fair dealing, requiring and obligating the Renown Defendants from depriving The Cardiologists the benefit of their settlement bargains.

152. In violation and breach of the implied and expressed covenants of good faith and fair dealing, Renown has interfered with The Cardiologists' relationships with their patients, has violated the good faith requirement to provide The Cardiologists the patient contact information and have, in bad faith and in violation of the covenants of good faith and fair dealing, diverted patients from The Cardiologists to cardiologists otherwise employed by Renown.

153. As a proximate and foreseeable consequence of Renown's breaches of the covenants of good faith and fair dealing, Renown has caused The Cardiologists, and each of them, to sustain damages in excess of $10,000 and The Cardiologists, and each of them, are entitled to recover their costs of court and reasonable attorneys' fees.

IX.

**FOURTH CLAIM FOR RELIEF - THE CARDIOLOGISTS**
**(Intentional Interference With Prospective Economic Advantage)**
**(Renown Defendants)**

154. Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

155. The Cardiologists, and each of them, have ongoing economic relationships with their patients, including all patients they treated from January 1, 2011, through and including March 28, 2013.

Robison, Belaustegui, Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

156.   Renown was and is completely and fully aware of the economic relationship and economic advantage that The Cardiologists had by virtue of their relationship with their patients.

157.   The Renown Defendants purposefully, intentionally and maliciously have interfered with the prospective economic advantage that The Cardiologists, and each of them, enjoy regarding the treatment and economic relationship The Cardiologists have with their patients.

158.   Renown has interfered with this economic relationship and prospective economic advantages that each cardiologist had and has with regard to patient care of The Cardiologists' patients by purposefully, intentionally and maliciously refusing to provide The Cardiologists, and each of them, essential and necessary patient contact information so that The Cardiologists can contact and continue to treat the patients that they have been treating and had treated from January 1, 2011, through and including March 28, 2013.

159.   As a proximate and foreseeable consequence of Renown's intentional interference with prospective economic advantage enjoyed by The Cardiologists, and each of them, the Renown Defendants caused The Cardiologists, and each of them, to sustain foreseeable consequential damages in excess of $10,000, and because of the malicious and oppressive nature of Renown's conduct, each Cardiologist is entitled to punitive damages in an amount no less than three times the compensatory damages awarded, plus attorneys' fees and court costs.

## X.

## FIFTH CLAIM FOR RELIEF - ST. MARY'S
### (Breach of Contract)
### (Renown Defendants)

160.   Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

161.   The SAMR constitutes a valid, binding and enforceable agreement between the parties thereto, including Defendants herein Renown, RRMC, NHI, Jim Miller, and Kelly Testolin.

162.   The new employers of the SNCA Cardiologists are intended third-party

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

beneficiaries of the SAMR.

163.    Defendants herein Renown, RRMC, NHI, Jim Miller, Kelly Testolin and Andrew Pearl have breached or have caused breaches of the SAMR.

164.    St. Mary's has sustained damages as a result of said breaches, in excess of $10,000.

165.    St. Mary's has incurred legal fees and court costs in pursuing this matter and are entitled to reimbursement thereof.

## XI.

### SIXTH CLAIM FOR RELIEF - ST. MARY'S
#### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
#### (Renown Defendants)

166.    Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

167.    The St. Mary's Plaintiffs are intended third-party beneficiaries of the SAMR.

168.    The SAMR contains an implied and expressed covenants of good faith and fair dealing, obligating Defendants Renown, RRMC and NHI to act in a manner faithful to the purpose of the contract and to Plaintiffs' justified expectations therein.

169.    Defendants Renown, RRMC and NHI breached such duty of good faith by performing in a manner unfaithful to the purpose of the SAMR and in violation of their obligations of good faith.

170.    St. Mary's has sustained damages as a result of such breach of the covenant of good faith and fair dealing, in excess of $10,000.

171.    St. Mary's has incurred legal fees and court costs in pursuing this matter, and are entitled to reimbursement thereof.

/ / /

/ / /

/ / /

/ / /

## XII.

**SEVENTH CLAIM FOR RELIEF - ST. MARY'S**
**(Intentional Interference with Contractual Relations)**
**(All Defendants)**

172.    Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

173.    St. Mary's had existing and valid contractual relationships in place with consumers of adult cardiology services.

174.    Renown knew and knows of the existence of such relationships and has committed intentional acts intended to, designed to, and disrupting such agreements and relationships.

175.    There has been an actual disruption of the agreements and relationships, and St. Mary's has sustained damages as a result, in excess of $10,000.

176.    Renown has acted with oppression, fraud or malice, thereby justifying an award of punitive damages in favor of St. Mary's.

177.    Plaintiffs have incurred legal fees and court costs in pursuing this matter, and are entitled to reimbursement thereof.

## XIII.

**EIGHTH CLAIM FOR RELIEF - ST. MARY'S**
**(Intentional Interference with Prospective Economic Advantage)**
**(All Defendants)**

178.    Plaintiffs reallege and incorporate by reference all the preceding allegations and paragraphs as fully set forth herein.

179.    As an established hospital and provider of cardiology services in Washoe County, Nevada, St. Mary's has and had prospective contractual relationships with third parties including The Cardiologists.

180.    Defendants knew of such prospective relationships.

181.    Defendants intended to harm Plaintiffs by preventing the relationships by, including, but not limited to, directing consumers of cardiology services away from Plaintiffs and

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1    to its own employee-cardiologists and by depriving its cardiologists patient contact information.

2         182.    Defendants had no privilege or justification for interfering with these prospective

3    economic relationships.

4         183.    As a result of Renown's conduct, Plaintiffs have incurred actual harm, in excess

5    of $10,000 and are entitled to punitive damages in an amount no less than three times

6    compensatory damages.

7         184.    Renown has acted with oppression, fraud or malice, thereby justifying an

8    award of punitive damages in St. Mary's favor.

9         185.    Plaintiffs have incurred legal fees and court costs in pursuing this matter, and are

10   entitled to reimbursement thereof.

11                                              XIV.

12                        **NINTH CLAIM FOR RELIEF - ST. MARY'S**
                                          **(Conspiracy)**
13                                       **(All Defendants)**

14

15        186.    Plaintiffs reallege and incorporate by reference all the preceding allegations and

16   paragraphs as fully set forth herein.

17        187.    Defendants have acted in concert in planning and bringing harm to St. Mary's.

18        188.    The acquisition of the SNCA and RHP practices, together with the employment of

19   all of their cardiologists, plus the efforts taken to prevent the cardiologists from leaving

20   Renown's employ or subsequently treating HTH/HHP insureds, furthered Renown's unlawful

21   objective of driving St. Mary's cardiology services practice out of business and are overt acts in

22   furtherance of the Defendants' conspiratorial activities.  Renown, with others including the

23   named Defendants, continue to conspire to deprive present St. Mary's Cardiologists the right to

24   contact and treat all their patients.

25        189.    These wrongful acts were also evidenced a  design and conspiracy to create a

26   monopoly for Renown, RRMC and NHI to monopolize provision of adult cardiology services.

27        190.    Defendants' actions had an effect upon commerce.

28        191.    Plaintiffs sustained damages resulting from Defendants' conspiratorial acts in an

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1   amount in excess of $10,000.

2       192.   Defendants have acted with oppression, fraud or malice, thereby justifying an

3   award of punitive damages fore each of the Plaintiffs in an amount no less than three times the

4   compensatory damages awarded.

5       193.   St. Mary's has incurred legal fees and court costs in pursuing this matter, and is

6   entitled to reimbursement thereof.

7       WHEREFORE Plaintiffs pray for relief as follows:

8       1.   For compensatory and special damages in excess of $10,000 according to proof;

9       2.   For injunctive relief enjoining Defendants' further wrongful conduct;

10      3.   For punitive damages;

11      4.   For treble damages;

12      5.   For attorneys' fees and costs incurred; and

13      6.   For such other relief as the Court finds just and proper.

14                          **AFFIRMATION**
                    **Pursuant to NRS 239B.030**
15
16      The undersigned does hereby affirm that this document does not contain the social

17   security number of any person.

18      DATED this 16th day of December, 2013.

19                          ROBISON, BELAUSTEGUI, SHARP & LOW
                            A Professional Corporation
20                          71 Washington Street
                            Reno, Nevada  89503
21

22

23                          KENT R. ROBISON, ESQ.
                            BARRY L. BRESLOW, ESQ.
24                          KRISTEN L. MARTINI, ESQ.
                            Attorneys for Plaintiffs St. Mary's Regional Medical Center
25                          and St. Mary's Medical Group Inc.

26                          J:\WPData\Krr\1267.001-St.Marys\P-Amended Complaint 12-16-13.wpd

27

28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robison, Belaustegui,
Sharp & Low
71 Washington Street
Reno, Nevada 89503
(775) 329-3151

## EXHIBIT LIST

| NO. | DESCRIPTION | PAGES |
|-----|-------------|-------|
| 1 | Judge Gamble's Decision Re: Patient Contact Information | 4 |
| 2 | Judge Adams' Findings, Conclusions and Judgment | 41 |
| 3 | Settlement Agreement and Mutual Release executed March 28, 2013 | 49 |
| 4 | Federal Trade Commission Complaint and Order to Suspend Enforcement of Renown Non-Compete | 12 |
| 5 | Federal Trade Commission Decision and Order | 12 |

**F I L E D**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

# EXHIBIT 1

# EXHIBIT 1

## OMBUDSMAN'S FINAL RESOLUTION OF PENDING ISSUES

The parties have reached an impasse on two distinct issues. These issues have been discussed at length and the parties have made clear in those discussions their divergent views. It has become clear that they cannot reach agreement. I have therefore decided these issues under the "Resolution" portion of paragraph 24 of the SETTLEMENT AGREEMENT AND MUTUAL RELEASE. Following my decision, the parties "may exercise their rights as provided for in paragraph 16".

### THE ISSUE OF "NONAPPEALABILTY"

The parties are attempting to finalize an agreement concerning the content of paragraph 12 of the Settlement Agreement. Plaintiffs have requested that this agreement contain a provision that Judge Adams' interpretation and enforcement of that agreement be "unappealable". Plaintiffs base this request on Judge Adams' statement on the record contained in a transcript of proceedings before him on February 4, 2013 at page 12, line 23 through page 13, line 5. In that portion Judge Adams was discussing potential disputes concerning the language of the written settlement agreement and release. This immediately followed Judge Adams' acceptance of the oral recitation of the settlement and confirmation by all parties and counsel. Judge Adams indicated that in the event of "any dispute concerning the language of the written settlement agreement or the release" that he would "conduct an on-the-record telephone conference" and "all decisions of the Court concerning the language will be final and unappealable". (emphasis added)

Plaintiffs now request that Defendants stipulate to the "nonappealability" of any decisions Judge Adams might be required to make in the interpretation or enforcement of the new agreement concerning paragraph 12.

The Defendants have refused to include such a term in the new agreement.

My resolution of this issue is as follows:
Judge Adams has neither stated nor opined concerning the "appealability" of any substantive decision he might be required to make concerning the interpretation or enforcement of the Settlement Agreement or any new agreement or indeed anything other than the language of the Settlement Agreement and the Release which has already been resolved and is contained in the written Settlement agreement and Mutual Release itself.

Any such statement concerning "unappealability" would not finally be determined by the trial court anyway but rather by the appellate court, in this case the Nevada Supreme Court.  This impasse therefore is resolved in favor of the Defendants and against the Plaintiffs, and the "unappealability" term shall not be included in the new agreement related to paragraph 12.

## PATIENTS' INFORMATION ISSUE

Since April 2013 Plaintiffs have repeatedly requested that the Defendants provide them with information concerning the Plaintiffs' patients.  Plaintiffs base this request on the language contained in the original Share Purchase Agreement and specifically paragraph 5.4.1 thereof; on the settlement as placed on the record on February 4, 2013; on paragraphs 9 and 10 of the Settlement Agreement and Mutual Release; and in addition on certain terms of the FTC Decision and Order.

The Defendants disagree with the Plaintiffs' interpretation of each of the above provisions and have also provided to the Ombudsman

declarations by various knowledgeable experts in the area concerning standard practices and AMA guidelines.

It is my opinion that this issue is controlled primarily by this actual case between Renown and the former SNCA doctors. In their settlement agreement the parties have bound themselves to certain duties as reflected by the documents directly pertinent to this case.

I have read all the information provided in the Points and Authorities, the exhibits, and the declarations attached and I remain of the opinion that Renown must provide patient records as requested by the Plaintiffs.

This controversy arises based on financial and marketing issues as opposed to patient care issues. The patient list has not been provided to the Plaintiffs because the Defendants fear the loss of revenue from the patients in that they may be drawn away from their current insurance provider and to a different insurance provider more closely aligned with the Plaintiffs. Nonetheless the paragraphs of the various agreements call for the delivery of this information. These contractual provisions are perhaps best illuminated in the original oral recitation of the settlement and specifically page 5, line 17 through page 6, line 6 where the parties agreed as follows "within the next topic is medical records and cooperation. We have agreed that with the same force and effect of injunction, the parties will in good faith and use best effort (sic) to cooperate with the exchange of patient information". While it is true that this oral agreement has been replaced by the writing, the oral statement nonetheless informs concerning the writing.

I previously contemplated reviewing correspondence between the doctors and their patients to attempt to avoid the marketing use of the patient information but I now believe that would be inappropriate.

In sum, the issue concerning the patient lists is resolved in favor of the Plaintiffs and against the Defendants.  Absent any change by Judge Adams, the Renown Defendants shall provide full and complete information concerning the former SNCA doctors' patients to the Plaintiffs forthwith.

Either party aggrieved by these resolutions may now exercise their rights under paragraph 16 of the Settlement Agreement and Mutual Release.

DATED this 25th of July, 2013

Judge David R. Gamble, Retired
Ombudsman

**F I L E D**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

# EXHIBIT 2

# EXHIBIT 2

**F I L E D**
Electronically
11-20-2013:01:44:25 PM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4148110

1    1750

2

3

4

5

6    IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA

7    IN AND FOR THE COUNTY OF WASHOE

8    KOSTA M. ARGER, M.D.; CHAD M. BIDART,          CASE NO.:   CV13-01644
     M.D., F.A.C.C.; RICHARD H. BRYAN, JR.,
9    M.D., F.A.C.C.; FRANK P. CARREA, M.D.,         DEPT. NO.:  6
     F.A.C.C.; RAM M. CHALLAPALLI, M.D.,
10   F.A.C.C.; SRIDEVI CHALLAPALLI, M.D.,
     F.A.C.C.; DEVANG M. DESAI, M.D., F.A.C.C.;
11   ERIC M. DRUMMER, M.D., F.A.C.C.; COLIN         **FINDINGS OF FACT,**
     M. FULLER, M.D., F.A.C.C., F.A.C.P.,           **CONCLUSIONS OF LAW AND**
12   F.S.C.A.I.; MICHAEL J. NEWMARK, M.D.,          **JUDGMENT**
     F.A.C.C., F.S.C.A.I.; TOM NYLK, M.D.,
13   F.A.C.C.; and JOSEPH STEVENSON, D.O.,
     F.A.C.C.,
14
                   Plaintiffs,
15   vs.

16   RENOWN HEALTH, a Nevada Non-Profit
     Corporation; RENOWN REGIONAL MEDICAL
17   CENTER, a Nevada Non-Profit Corporation;
     NEVADA HEART INSTITUTE, a Nevada Non-
18   Profit Corporation; and DOES I-V,

19                 Defendants.

20   RENOWN HEALTH, a Nevada Non-Profit
     Corporation; RENOWN REGIONAL MEDICAL
21   CENTER, a Nevada Non-Profit Corporation;
     NEVADA HEART INSTITUTE, a Nevada Non-
22   Profit Corporation;

23                 Counterclaimants,

24   v.

25   KOSTA M. ARGER, M.D.; CHAD M. BIDART,
     M.D., F.A.C.C.; RICHARD H. BRYAN, JR.,
26   M.D., F.A.C.C.; FRANK P. CARREA, M.D.,
     F.A.C.C.; RAM M. CHALLAPALLI, M.D.,
27   F.A.C.C.; SRIDEVI CHALLAPALLI, M.D.,
     F.A.C.C.; DEVANG M. DESAI, M.D., F.A.C.C.;
28   ERIC M. DRUMMER, M.D., F.A.C.C.; COLIN

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

1

1  M. FULLER, M.D., F.A.C.C, F.A.C.P, F.S.C.A.I.;
   MICHAEL J. NEWMARK M.D., F.A.C.C., F
2  .S.C.A.I.; TOM NYLK, M.D., F .A.C.C.;
   JOSEPH STEVENSON, D.O., F.A.C.C.,
3
                        Counterdefendants.
4  _____/

5              **FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT**

6          This matter was heard on October 24, 2013, and, with good cause appearing, this Court

7  enters its Findings of Fact, Conclusions of Law and Judgment as follows:

8  **A.     PROCEDURAL BACKGROUND.**

9          1.      The parties hereto were adversaries in the underlying lawsuit, *Arger, et al. v.*

10 *Renown Health, et al.*, Case No. CV11-02477, tried to this Court from January 14, 2013, through

11 February 4, 2013.

12         2.      On February 4, 2013, the parties settled their claims asserted in Case No. CV11-

13 02477 and that settlement was put on the record with this Court approving the settlement and

14 ordering the parties to comply with the terms of the settlement as stated on the record.[1]

15         3.      As part of the settlement of Case No. CV11-02477, the parties agreed and this

16 Court ordered that this Court would retain jurisdiction to oversee implementation and

17 "enforcement of the [settlement] agreement," including any dispute concerning "the language of

18 the written settlement agreement" as that settlement was reached in Case No. CV11-02477. Pltfs.'

19 Opp'n to Renown's Mot. for Summ. J. & Pltfs.' Countermot. for Summ. J. ("Pltfs.'

20 Countermot."), Exh. 1 at Exh. 1, 3:24-4:2, 12:23-13:1. The parties further agreed that any decision

21 made by this Court with respect to any dispute regarding the language of the written settlement

22 agreement would be final and nonappealable. *Id.* at 13:4-5.

23         4.      On March 28, 2013, the parties executed a Settlement Agreement and Mutual

24 Release relative to Case No. CV11-02477 ("Settlement Agreement"). *See* Pltfs.' Countermot.

25 Exh. 1.

26         5.      On March 29, 2013, a Stipulation and Order Dismissing All Claims With Prejudice

27 _____

28 1 The transcript of the settlement that was placed on the record on February 4, 2013, is attached as Exhibit 1 to the
   Settlement Agreement, which is Exhibit 1 to Plaintiff's Opposition to Renown's Motion for Summary Judgment and
   Plaintiffs' Countermotion for Summary Judgment.

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

                                        2

1    was filed in Case No. CV11-02477.

2        6.      Thereafter, Plaintiffs herein demanded that Renown Defendants provide them with

3    Patient Contact Information ("PCI").[2]  Renown Defendants refused.  *See generally* Pltfs.'

4    Countermot.; Defs.' & Counterclaimants' Mot. for Summ. J.

5        7.      The dispute about whether Plaintiffs are entitled to PCI was submitted to the

6    Honorable David Gamble (Ret.), who was acting as Ombudsman pursuant to Paragraph 24 of the

7    Settlement Agreement.  *See* Pltfs.' Countermot. Exh. 1 at 9 ¶ 24; *see generally* Compl. Exh. 7.

8        8.      By July 25, 2013, Judge Gamble had been provided briefs and arguments from both

9    Plaintiffs and Renown Defendants.  *See* Compl. Exhs. 4-7.  Judge Gamble resolved the dispute in

10   favor of Plaintiffs and ruled that Renown Defendants were obligated to provide full and complete

11   contact information to Plaintiffs concerning all former patients of Plaintiffs.  *Id.* at Exh. 7.

12       9.      Renown Defendants refused to provide the PCI to Plaintiffs.  *See generally* Compl.;

13   Ans. & Countercl.

14       10.     In *SFPP, L.P. v. District Court*, 123 Nev. 608, 173 P.3d 715 (2007), the Nevada

15   Supreme Court held that a district court loses jurisdiction once an order for dismissal with

16   prejudice is entered.  Plaintiffs, therefore, filed this action seeking a declaratory judgment that they

17   are entitled to PCI for their patients.  *See* Compl.  Renown Defendants, however, had also filed a

18   Complaint seeking declaratory judgment, which was filed in another Department.  Renown

19   Defendants voluntarily dismissed that Complaint and, instead, filed their Answer and

20   Counterclaim to Plaintiffs' Complaint in this action.  *See* Ans. & Countercl.  Renown Defendants'

21   Counterclaim sought a declaratory judgment that Plaintiffs were not entitled to and Renown was

22   not obligated to disclose PCI.  *See id.* at 33-34 ¶¶92-99.

23       11.     In addition to declaratory relief, Renown Defendants alleged a second claim for

24   relief for contractual and tortious breach of the covenant of good faith and fair dealing, by which

25   Renown Defendants sought damages and a written public apology.  *Id.* at 36-36 ¶¶ 100-10.

26       12.     The Court met with the parties' counsel for a status hearing on August 27, 2013.  It

27   was agreed that the parties would brief their respective positions and appear before the Court for a

28
─────────────────────────────
2 "Patient Contact Information" includes the name, address, and telephone number of each patient being treated by the
Plaintiffs, or any one of them, from January 1, 2011, to March 28, 2013.

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

3

1   hearing on October 24, 2013.

2        13.    On September 11, 2013, Renown Defendants filed their Motion for Summary

3   Judgment (a) Sustaining Renown's First Counterclaim for Relief and (b) Dismissing Plaintiffs'

4   Complaint with Prejudice.

5        14.    On September 30, 2013, Plaintiffs filed their Opposition to Renown's Motion for

6   Summary Judgment, and Plaintiffs' Countermotion for Summary Judgment.  Plaintiffs rely on the

7   transcript of the February 4, 2013, settlement, the Settlement Agreement, the Federal Trade

8   Commission Decisions and Orders, and Paragraph 5.4.1 of the Share Purchase Agreement.

9        15.    On October 9, 2013, Plaintiffs filed a Supplement to Plaintiffs' Countermotion for

10   Summary Judgment.

11       16.    On October 10, 2013, Renown Defendants filed their Combined Reply Brief in

12   Support of [Their] Motion for Summary Judgment and In Opposition to Plaintiffs' Countermotion

13   for Summary Judgment.

14       17.    On October 11, 2013, Renown Defendants filed a Response to Plaintiffs'

15   Supplement to Countermotion for Summary Judgment.

16       18.    On October 21, 2013, Plaintiffs filed their Reply in Support of their Countermotion

17   for Summary Judgment.

18       19.    The parties appeared before the Court on October 24, 2013.  *See* Tr. of Proceedings,

19   Mot. for Summ. J., Oct. 24. 2013 (filed herein on Oct. 30, 2013).  The parties had previously

20   stipulated that their Motions for Summary Judgment could be argued without witnesses.  Both

21   parties assert and allege in their Motions for Summary Judgment that the issue of whether

22   Plaintiffs are entitled to PCI involves only a question of law and, therefore, could be determined by

23   this Court as a matter of law at the summary judgment stage of these proceedings.

24   **B.**    **FINDINGS OF FACT.**

25       The Court, having reviewed the pleadings, motions, oppositions, supplements, replies, and

26   exhibits and declarations affixed thereto, and having heard oral arguments of counsel, makes the

27   following findings of fact:

28

1.      The parties hereto were parties to the underlying action Case No. CV11-02477.[3]
After approximately three weeks of trial, the parties settled all of their claims and disputes on
Monday, February 4, 2013. *See* Pltfs.' Countermot., Exh.1 at Exh. 1. The parties stated their
settlement on the record. *Id.* The parties agreed that "with the same force and effect of an
injunction, the parties w[ould] in good faith and use their best effort to cooperate with the
exchange of patient information." *Id.* at 5:18-21. In addition, and separately, the parties agreed
that Plaintiffs would have access to medical records storage and retention in a software program
known as EPIC. *Id.* at 5:21-22.

2.      The Court thoroughly canvassed all parties and counsel concerning the settlement
put on the record on February 4, 2013. *Id.* at 8:16-12:17. Renown Defendants specifically
acknowledged that the settlement was driven by the Renown Health Board of Directors and that
Board of Director approval was not necessary to consummate the settlement. *Id.* at 6:17-20. The
Court specifically found that the settlement put on the record by Renown Defendants and Plaintiffs
herein in Case No. CV11-02477 was fair, just and reasonable. *Id.* at 12:18-19. The Court ordered
the parties, their officers, agents, employees, and counsel to forthwith perform the agreement. *Id.*
at 12:20-22. As part of the agreed-upon settlement, it was further ordered that this Court would
retain jurisdiction over the implementation, interpretation and enforcement of the settlement
entered into by, between, and among the parties and that all decisions of the Court concerning the
settlement would be final and nonappealable. *Id.* at 12:23-13:5.

3.      On March 28, 2013, the parties entered into the written Settlement Agreement also
addressing and resolving the claims and disputes that arose in Case No. CV11-02477. Attached as
Exhibit 1 to the parties' Settlement Agreement, and made part of the Settlement Agreement, was
the transcript of the settlement placed on the record on February 4, 2013. *See* Pltfs.' Countermot.,
Exh. 1 at Exh. 1.

4.      In their Settlement Agreement, the parties also agreed that this Court would retain
"jurisdiction over the implementation, interpretation and enforcement of" the Settlement
Agreement entered into by the parties. Pltfs.' Countermot. Exh. 1, at 7 ¶ 16.

---

3 Plaintiffs in this action were also the plaintiffs in Case No. CV11-02477. Defendants in this action were also
Defendants in Case No. CV11-02477.

1      5.      Paragraph 8 of the Settlement Agreement requires Renown Defendants not to

2  suspend or revoke Plaintiffs' hospital privileges at any Renown facility, subject to the Plaintiffs'

3  compliance with Renown's Bylaws, policies and procedures. *Id.* at 5 ¶ 8.

4      6.      The first two sentences of Paragraph 9 of the Settlement Agreement contain two

5  distinct promises. *Id.* at 5-6 ¶ 9. First, Renown is required to use its good faith best efforts to

6  provide the Plaintiffs with "patient information" in the possession of the Renown Defendants in

7  accordance with applicable law. *Id.* at 5 ¶ 9. The first sentence of Paragraph 9 expressly and

8  plainly obligates the parties to exchange and transfer "patient information and/or paper records in

9  the Renown Released Parties' possession, for patients under Plaintiffs' care, all in accordance with

10  applicable law." *Id.* The term "patient information" as used in that sentence is PCI. *See id.*

11      7.      The second sentence of Paragraph 9 of the Settlement Agreement relates to

12  "medical record information." *Id.* Medical record information must be supplied to Plaintiffs by

13  the Renown Defendants with the appropriate authorizations and/or consent of the individual

14  patients of the Plaintiffs. *Id.*

15      8.      "Patient information" was also the term used on February 4, 2013, when the parties

16  agreed that with the same force and effect of an injunction, the parties would, in good faith and

17  with best efforts, cooperate with the exchange of "patient information." *See* Pltfs.' Countermot.,

18  Exh. 1. at Exh.1 at 5:18-21.

19      9.      Paragraph 9 of the Settlement Agreement is neither vague nor ambiguous.

20      10.      The patient contact information (PCI) which is the subject of this action was

21  provided by the patients to their physicians for the purpose of treatment. Retention of this

22  information by the physicians does not violate federal or state statute, regulation or policy.

23      11.      The only material occurrence since the patients supplied their patient information is

24  that the Plaintiff physicians, at various times, changed the sites of their offices while the PCI

25  remained with Renown Defendants.

26      12.      Paragraph 10 of the Settlement Agreement is neither ambiguous nor vague. The

27  parties agreed to use their good faith best efforts not to interfere with each other's relationships

28  with their respective patients. *See* Pltfs.' Countermot. Exh. 1. at 6 ¶ 10. Further, in addition to PCI

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

6

1   addressed in Paragraph 9, Renown Defendants agreed to make available for each patient, upon

2   proper request, Plaintiffs' new work address, telephone number and contact information. *See id.* at

3   5 ¶ 9.

4          13.     No federal or state statute, administrative code, provision or policy is violated by

5   Plaintiffs being provided PCI for their patients for the purpose of treatment.

6          14.     The parties agreed that the Court was to retain jurisdiction over the enforcement,

7   implementation and interpretation of the Settlement Agreement. *See id.* at 7 ¶ 16.  The parties

8   agreed that the Court's decision concerning any dispute over the enforcement, interpretation, or

9   implementation of the Settlement Agreement would be determined by the Court and would be

10  nonappealable. *See* Pltfs.' Countermot., Exh. 1 at Exh. 1 at 12:23-13:5.

11         15.     Paragraph 24 of the Settlement Agreement provides that the Honorable David

12  Gamble (Ret.) would serve as Ombudsman to facilitate the spirit and intent of the Settlement

13  Agreement and to help resolve disputes that arise between or among the parties. *See* Pltfs.'

14  Countermot., Exh. 1 at 9 ¶ 24.

15         16.     The disputes over whether Plaintiffs are entitled to be provided the PCI by the

16  Renown Defendants was first considered by Judge Gamble. *See generally* Compl. at Exh. 7.

17         17.     On July 22, 2013, the Plaintiffs provided Judge Gamble with Plaintiffs' brief in

18  support of production by the Renown Defendants of PCI to Plaintiffs. *Id.* at Exh. 5.

19         18.     On July 22, 2013, the Renown Defendants provided Judge Gamble with their brief

20  in support of their positions that Renown was not required to provide Plaintiffs with PCI. *Id.* at

21  Exh. 6.

22         19.     On July 25, 2013, Judge Gamble resolved the issue concerning patient lists and PCI

23  in favor of Plaintiffs and ruled that the Renown Defendants must provide full and complete patient

24  information concerning the former SNCA doctors' patients to Plaintiffs. *Id.* at Exh. 7.

25         20.     Judge Gamble correctly noted in his decision that since April 2013 Plaintiffs had

26  repeatedly requested that the Renown Defendants provide them with PCI concerning the Plaintiffs'

27  patients. *Id.* at 2.

28         21.     In their Motion for Summary Judgment, Renown Defendants agree that issues of

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

1   contractual construction present questions of law for the Court, which are suitable for

2   determination by summary judgment. *See* Defs.' Mot. for Summ. J. 6.

3          22.    Given the representations made by the parties when they put their settlement on the

4   record on February 4, 2013, and the communications that have been exchanged between the parties

5   and with the Ombudsman, the language in Paragraph 9 is neither ambiguous nor vague. Renown

6   Defendants did provide nine of the Plaintiffs with limited PCI in December 2012, January 2013,

7   and February 2013. Defs.'s Combined Reply Brief in Support of Mot. for Summ. J. & Opp'n to

8   Pltfs.' Countermot., at Exh. 1. Renown did so notwithstanding NRS 449.720 and 45 C.F.R.

9   164.508(a)(1), authorities that Renown argues as prohibiting it from providing PCI. *See generally*

10   *id.*; Defs.' Mot. for Summ. J.

11          23.    The intention of the parties is expressed in the settlement put on the record and in

12   Paragraph 9 of the Settlement Agreement that with the same force and effect of an injunction, the

13   parties will in good faith and use best efforts to cooperate with the exchange of patient

14   information. Pltfs.' Countermot. Exh. 1, at Exh. 1 at 5:17-21. None of the defense experts address

15   the specific terms of the contract between these parties and the terms of this contract are

16   unambiguous.

17          24.    Renown Defendants rely in part on Paragraph 10.4 of the Share Purchase

18   Agreement. *See generally* Defs.' Mot. for Summ. J.; Defs.' Combined Reply Brief. Renown's

19   reliance on Paragraph 10.4 of the Share Purchase Agreement is misplaced because in Paragraph

20   5(b) of the Settlement Agreement Renown released Plaintiffs from any and all claims, disputes,

21   known or unknown, that pertain to the Share Purchase Agreement.

22          25.    Based upon the pleadings, motions, briefs, and arguments presented to the Court by

23   the parties in their Motion and Countermotion for Summary Judgment, neither Plaintiffs' demands

24   for and Motion for Summary Judgment concerning PCI, nor Renown's Motion for Summary

25   Judgment were in bad faith. Both parties' positions were taken in good faith.

26          26.    Neither Plaintiffs nor Renown Defendants were in any way forced or coerced into

27   entering into the February 4, 2013, settlement or the Settlement Agreement. All parties were

28   canvassed and informed the Court that they understood the settlement and were willing to comply

1   with all terms and conditions thereof. Both Plaintiffs and Renown Defendants were adequately

2   represented by counsel when the settlement was entered into on February 4, 2013, and further

3   memorialized in the Settlement Agreement. *See generally* Pltfs.' Countermot., Exh. 1 at Exh. 1.

4   **C.    CONCLUSIONS OF LAW.**

5        The Court, having reviewed the pleadings, motions, oppositions, supplements, replies, and

6   exhibits and declarations affixed thereto, and having heard oral arguments of counsel, makes the

7   following conclusions of law:

8        1.    The settlement put on the record on February 4, 2013, and the Settlement

9   Agreement involve issues of contractual construction, which in the absence of ambiguity or other

10  factual complexities, present questions of law for the Court and are suitable for determination by

11  summary judgment. *Gillardi v. Naples Polaris, LLC*, 129 Nev. ___, ___, 301 P.3d 364, 366 (Nev.

12  Adv. Op. 33, May 16, 2013). Neither the transcript of the settlement nor the Settlement

13  Agreement is ambiguous, or involves factual complexities.

14       2.    Whether a contract is ambiguous presents a question of law. *Margrave v. Dermody*

15  *Properties*, 110 Nev. 824, 827, 878 P.2d 291, 293 (1994). As a matter of law, neither the

16  settlement nor the Settlement Agreement is ambiguous.

17       3.    "Ambiguity" does not arise simply because the parties disagree on how to interpret

18  their contract. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). The first two

19  sentences of Paragraph 9 in the Settlement Agreement are not ambiguous. They contain distinct

20  and different promises.

21       4.    NRS 449.720 does not prohibit Plaintiffs from receiving from the Renown

22  Defendants the names and addresses of Plaintiffs' patients. Likewise, NRS 449.720 does not

23  prohibit Renown from disclosing to Plaintiffs the names and addresses of Plaintiffs' patients who

24  were patients of Plaintiffs from January 1, 2011, to and including March 28, 2013.

25       5.    The Health Insurance Portability and Accountability Act of 1996 and related

26  regulations ("HIPAA") do not prevent or prohibit the Renown Defendants from providing the

27  Plaintiffs with PCI.

28       6.    As a HIPAA covered entity, the Renown Defendants are permitted to disclose PCI

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

9

1   to the SNCA Plaintiffs for the purpose of treatment.  45 C.F.R. 164.502(a).

2        7.    Under the circumstances of this case and in light of 45 C.F.R. 164.502(a), 45

3   C.F.R. 164.501, and 45 C.F.R. 164.506(a)(c)(1), Renown may, without violating HIPAA laws and

4   regulations, provide to the Plaintiffs in this case PCI.

5        8.    The Office of Civil Rights ("OCR"), the United States governmental agency that

6   enforces HIPAA, permits healthcare providers to share patient information for treatment purposes

7   without the need for a patient's written authorization.

8        9.    In light of the position taken by both parties to this dispute and in accordance with

9   Nevada law, summary judgment is appropriate as a matter of law.  *Wood v. Safeway, Inc.*, 121

10   Nev. 724, 729, 121 P.3d 1026, 1029 (2005).

11        10.    Paragraph 9 of the Settlement Agreement should be afforded its plain an ordinary

12   meaning.  The plain and ordinary meaning of the terms "patient information" as used in the

13   Settlement Agreement includes the patient's name, address, and contact information.  Interpreting

14   "patient information" according to the plain and ordinary meaning of that term includes PCI,

15   including name and address.  *See Powell v. Liberty Mutual Fire Ins. Co.*, 127 Nev. 14, 252 P.3d

16   668, 672 (2011).

17        11.    To interpret Paragraph 9 of the Settlement Agreement as argued and alleged by the

18   Renown Defendants would render Paragraph 9 in effect meaningless and contradictory.

19        12.    No federal or state statute, administrative code, provision or policy is violated by

20   the Plaintiffs being provided Patient Contact Information for their patients for the purpose of

21   treatment.

22        13.    The parties entered into the settlement and the Settlement Agreement freely and

23   voluntarily without duress or coercion.

24        14.    The parties relinquished and released any claims they had and might otherwise have

25   under the Share Purchase Agreement (Paragraph 5.4.1 and Paragraph 10.4) in Paragraphs 5(a) and

26   5(b) of the Settlement Agreement.

27        15.    The Court entered its ruling from the Bench on October 24, 2013.  A true and

28   accurate copy of the Court's oral findings is set forth in the transcript attached as **Exhibit 1** and

1 | made a part hereof.

2 |     16.    On Monday, October 28, 2013, the Court conducted a telephone conference with

3 | counsel for the parties. During that conference, the Court made additional comments and findings.

4 | A copy of the transcript of that hearing is attached hereto as **Exhibit 2** and made a part hereof.

5 | <u>**JUDGMENT**</u>

6 |     Based on the foregoing, Judgment is entered and made in favor of Plaintiffs and against

7 | Defendants as follows:

8 |     1.    This Judgment enables and permits Plaintiffs to forthwith receive from the Renown

9 | Defendants Patient Contact Information for the patients they were treating from January 1, 2011,

10 | to and including March 28, 2013. Similarly, this Judgment requires Renown Defendants to

11 | forthwith disclose to Plaintiffs the Patient Contact Information for the patients that Plaintiffs were

12 | treating from January 1, 2011, to and including March 28, 2013;

13 |     2.    Plaintiffs' Countermotion for Summary Judgment was granted on October 24,

14 | 2013, and this Judgment is entered thereon;

15 |     3.    The Renown Defendants shall forthwith deliver to Plaintiffs the Patient Contact

16 | Information (name, address and telephone number) for each patient being treated by the Plaintiffs,

17 | or any of them, from January 1, 2011 to March 28, 2013;

18 |     4.    The Renown Defendants' Motion for Summary Judgment is denied;

19 |     5.    Each side is to bear their own costs and fees, the Court having found that both

20 | Motions for Summary Judgment were brought in good faith;

21 |     6.    This Judgment is not stayed because of the agreement of the parties and because the

22 | Renown Defendants will sustain no prejudice for sharing the contact information with the

23 | Plaintiffs because the Renown Defendants are still free to communicate with the patients; and

24 |

25 |

26 |

27 |

28 |

7.      Paragraphs 5(a) and 5(b) of the Settlement Agreement release any claims of any nature, known or unknown, that the parties have against one another under the Share Purchase Agreement.

Dated this _30_ day of _November_, 2013.

_____
DISTRICT JUDGE

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

1

## EXHIBIT LIST

2 | **NO.** | **DESCRIPTION** | **PAGES** |

3 | 1 | October 24, 2013 Transcript of Proceedings | 11 pages |

4 | 2 | October 28, 2013 Transcript of Proceedings | 12 pages |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robison, Belaustegui,
Sharp & Low
71 Washington St.
Reno, NV 89503
(775) 329-3151

**F I L E D**
Electronically
11-20-2013:01:44:25 PM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4148110

# EXHIBIT 1

# EXHIBIT 1

1        IN THE SECOND JUDICIAL DISTRICT COURT

2          STATE OF NEVADA, COUNTY OF WASHOE

3      THE HONORABLE BRENT ADAMS, DISTRICT JUDGE

4

5   KOSTA ARGER, M.D., et al.,        )

6                  Plaintiffs,        )

7   vs.                               )    Case No. CV13-01644

8   RENOWN HEALTH, et al.,            )    Dept. No. 6

9                  Defendants.        )

10

11             TRANSCRIPT OF PROCEEDINGS

12            MOTION FOR SUMMARY JUDGMENT

13                 OCTOBER 24, 2013

14  APPEARANCES:

15  For the Plaintiffs:        KENT ROBISON, ESQ.
                               Robison Belaustegui Sharp & Low
16                             71 Washington Street
                               Reno, Nevada 89503
17

18  For the Defendants:        EDWARD M. ROSENFELD, ESQ.
                               Bryan Cave LLP
19                             120 Broadway, Suite 300
                               Santa Monica, California 90401
20
                               TAMARA PETERSON, ESQ.
21                             Brownstein Hyatt Farber Schreck
                               50 West Liberty St., Ste. 1030
22                             Reno, Nevada 89501

23
    Reported by:               ROMONA MALNERICH, CCR #269
24                             MOLEZZO REPORTERS
                               (775) 322-3334

                              1

1    RENO, NEVADA, THURSDAY, OCTOBER 24, 2013, 1:30 P.M.
2                         --oOo--
3
4            THE COURT:  Please be seated.
5            This proceeding is in Case CV13-01644, Arger,
6    et al., versus Renown Health, et al., and this is the time
7    set for oral argument on the pending motions in this case,
8    principally the two motions for summary judgment.  The
9    record should reflect the Court has entered an order
10   earlier today to admit Mr. Rosenfeld for the purpose of
11   this case.
12           Mr. Robison, you may proceed.
13           MR. ROBISON:  Thank you, your Honor.
14           I think it's first important, your Honor, to cut
15   through what's going to be argued today, and I don't know
16   if the Court has had an adequate opportunity to review all
17   the papers that have been filed.
18           THE COURT:  I've tried.  It's a formidable job,
19   but I tried.
20           MR. ROBISON:  And when we met with you in August
21   to schedule this hearing, you indicated that you might be
22   prepared to make a ruling from the bench.
23           THE COURT:  I would hope so.  If I can do it,
24   I will.

                              2

1 | environment, that creates grounds for our reliance on the
2 | release.  And you said the release doesn't deal with
3 | future conduct under these other clauses.  We made it
4 | clear back at 5C and we drafted it for this reason, that
5 | it was future conduct after the signing of the contract.
6 | That conduct could give rise to different theories of
7 | relief, but the primary right is to get that contact
8 | information, and they signed that away.  This goes back to
9 | where I started.  Take a look at Mr. Robison's letter of
10 | April 16th, find in there the right that you're now
11 | talking about.  It is not there.  It's not there because
12 | it was understood and agreed that they couldn't have this.
13 |          Thank you, your Honor.
14 |          THE COURT:  Thank you.
15 |          I don't believe that further argument is
16 | necessary.  Both parties have made motions for summary
17 | judgment, and if I permit Mr. Robison to make a reply
18 | argument on his motion, then Mr. Rosenfeld would make a
19 | reply argument on his motion and we'll turn this hearing
20 | into a sleep-over.
21 |          The Court views this question as a very narrow
22 | one.  I have received and considered all the declarations,
23 | the legal pleadings, the legal memoranda, and the
24 | excellent arguments of both counsel today.  I think we

1  all agree that the Court's analysis begins with an
2  understanding of the settlement agreement and mutual
3  release that was entered into by the parties on March
4  28th, 2013.  Under paragraph 5(a), the Court finds that
5  the share purchase agreement and the parties' rights and
6  obligations thereunder were released by virtue of the
7  plain and unambiguous language of the release paragraph.
8  The primary focus is on Paragraph 9 and Paragraph 10 of
9  the settlement agreement, and I stress that the Court's
10 decision today relates only to patient identity and
11 contact information and not more broadly to other patient
12 records.  Both counsel have advised the Court during
13 argument today that there is no dispute about the medical
14 records of patients or former patients of the plaintiffs.
15         In Paragraph 9, the first sentence states, "The
16 parties will use their best efforts in good faith to
17 exchange and transfer patient information and/or paper
18 records in the Renown released parties' possession for
19 patients under plaintiffs' care."  There has been a
20 discussion today about what is the reasonable construction
21 of the phrase "patients under plaintiffs' care," and as
22 I've noted earlier, I think the only reasonable way to
23 read that phrase is patients who were under the care of
24 the plaintiffs when the Heart Institute agreement was

107

1  entered into, to and including the date of the settlement
2  agreement.  That provides a precise definition of who is
3  contemplated by the phrase "patients under plaintiffs'
4  care."  No other way to read it makes sense, because, as
5  I've noted, the nature of the cardiology practice means
6  that some patients are treated routinely, some for years,
7  some intermittently, and some are what Mr. Rosenfeld has
8  called "encounters" that may be episodic and that never
9  occur again.
10      This paragraph, of course, requires that the
11  performance of this paragraph must be in accordance with
12  applicable law.  Again, as we've all noted, the Nevada
13  statutes, specifically NRS 449.720, as well as what is
14  properly known as the HIPAA Act, as elaborated in Chapter
15  45 of the Code of Federal Regulations, generally apply to
16  patient records.  It is obvious to the Court in reading
17  Paragraph 9 that counsel for the parties did not
18  specifically review and incorporate each particular
19  statute when the settlement agreement was drafted.
20  Otherwise, specific statutory provisions would've been
21  referenced, but they did acknowledge -- and the Court
22  takes judicial notice -- that agreements of this nature,
23  including a settlement agreement, which involve patients
24  or medical services must comply with applicable state and

108

1  federal laws.  It is also clear, under the second sentence
2  of Paragraph 9, that if there is a request for patient
3  medical record information, that appropriate
4  authorizations and/or patient consent be given, and the
5  Court has been advised today -- and it's uncontested --
6  that in the 2800 instances in which Renown has previously
7  supplied patient medical records, there was an
8  authorization provided by the plaintiff.
9          The requested information that's before the
10 Court today is the narrowest possible information.  That
11 is simply the name and address or contact information for
12 patients actually treated by the physicians who are
13 plaintiffs in this case.  The Court can discern no privacy
14 interest of any kind by the patient that would be served
15 by precluding the patient's own physician from knowing the
16 patient's name and address.  The utility of such
17 information is obvious, because further treatment may be
18 necessary or supplying medical records to other treatment
19 providers may be necessary.  Of course, there are a number
20 of uses for such information that would be improper under
21 HIPAA, but there is no evidence today of any such
22 conduct -- for instance, improper marketing or disclosure
23 to governmental authorities for audit.  The only issue is,
24 is there any provision of the agreement or of the

109

1  statutory or case law or regulations which precludes these
2  physicians from knowing the names and addresses of their
3  own patients, and the Court finds there is not.  As I've
4  noted earlier, the only reason for this controversy in the
5  first place is because, due to the fact that physician
6  plaintiffs were employees of the Heart Institute, these
7  records now happen to be housed on the Renown premises.
8  Nothing otherwise has changed in terms of the identity of
9  the patients or the care of the patients or the treatment
10  of the patients, and no legal or policy interest would be
11  served by precluding physicians from having access to this
12  information.
13        As Mr. Rosenfeld has pointed out, in Paragraph
14  10, the parties are obliged to use their best efforts and
15  good faith not to interfere with each other's
16  relationships with their respective patients, and there's
17  no argument or evidence presented today that either the
18  plaintiffs or the defendants engaged in such conduct in
19  violation of the agreement.  Under Paragraph 10, the
20  Renown entities will make available for each patient that
21  is still being treated at the Renown entities -- and I
22  assume that means treated at the time of the settlement
23  agreement and perhaps prospectively -- upon proper
24  request, plaintiffs' new work address, phone number and

1   contact information.  Paragraph 10 relates to information
2   concerning the work address, phone number and contact
3   information not of the patient, but of the physician, and
4   today, apparently the parties are not agreed about whether
5   or how that information should be relayed.
6        The Court finds that under the unambiguous terms
7   of the agreement, the defendant entities are obliged to
8   forthwith provide the name, identifying information and
9   contact information of patients of the plaintiffs to the
10  plaintiffs and for the universe of patients which consist
11  of those actively treated at the time the Heart Institute
12  agreement was entered into, to and including the date of
13  the settlement agreement.  The Court finds, as a matter of
14  law, that this obligation is imposed on the defendants
15  pursuant to Paragraph 9 of the settlement agreement.
16       The Court finds that because of these
17  determinations, summary judgment on this issue only will
18  be entered in favor of the plaintiffs and against the
19  defendant.  As I noted earlier, I have reviewed carefully
20  the very lengthy legal and declaratory submissions to the
21  Court on this subject.  I believe the defendant's argument
22  made today and the briefs are made in good faith and,
23  therefore, I do not believe that any award of attorney's
24  fees or costs is appropriate.

111

1       Mr. Robison, would you prepare a judgment
2   consistent with what I've just said?
3       MR. ROBISON:  I will, your Honor.
4       MS. PETERSON:  Your Honor, could we make a
5   request that that be certified as final, in terms of that
6   particular claim for summary judgment?
7       THE COURT:  Are you actually contemplating there
8   might be an appeal?
9       MS. PETERSON:  I am, sir.
10      THE COURT:  Yes, I will certify it under Rule
11  56 -- is it C?  What is the rule?
12      MR. ROBISON:  It's 56C, your Honor.
13      THE COURT:  Thank you.  The Court so certifies.
14      MS. PETERSON:  Your Honor, could we stay your
15  opinion as well?
16      THE COURT:  Mr. Robison?
17      MR. ROBISON:  Your Honor, we adamantly oppose
18  that.  Your finding today means that we were entitled to
19  this patient contact information in February and in March,
20  and further delay of this is just serving Renown's efforts
21  to --
22      THE COURT:  All right.  The request for stay is
23  denied, but the defendants have leave to request stay from
24  the Nevada Supreme Court.

<div align="center">112</div>

1          Thank you all very much for your participation
2   and arguments today.   Court is in recess.
3          (End of proceedings.)
4                       --oOo--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                           113

```
 1  STATE OF NEVADA  )
                     )  ss.
 2  COUNTY OF WASHOE )

 3          I, ROMONA MALNERICH, official reporter of the

 4  Second Judicial District Court of the State of Nevada,

 5  in and for the County of Washoe, do hereby certify:

 6          That as such reporter, I was present in

 7  Department No. 6 of the above court on Thursday, October

 8  24, 2013, at the hour of 1:30 p.m. of said day, and I then

 9  and there took verbatim stenotype notes of the proceedings

10  had and testimony given therein upon the Motion for

11  Summary Judgment in the case of KOSTA ARGER, M.D., et al.,

12  Plaintiff, versus RENOWN HEALTH, et al., Defendants, Case

13  No. CV13-01644.

14          That the foregoing transcript, consisting of

15  pages numbered 1 to 113, both inclusive, is a full, true

16  and correct transcript of my said stenotype notes, so

17  taken as aforesaid, and is a full, true and correct

18  statement of the proceedings had and testimony given upon

19  the Motion for Summary Judgment in the above-entitled

20  action to the best of my knowledge, skill and ability.

21          DATED:  At Reno, Nevada, this 29th day of

22  October, 2013.

23                          Romona Malnerich
                            _____
24
                            ROMONA MALNERICH, CCR #269
                                     114
```

**F I L E D**
Electronically
11-20-2013:01:44:25 PM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4148110

# EXHIBIT 2

# EXHIBIT 2

4185

IN THE SECOND JUDICIAL DISTRICT COURT

STATE OF NEVADA, COUNTY OF WASHOE

THE HONORABLE BRENT ADAMS, DISTRICT JUDGE

KOSTA ARGER, ET AL,                          Department No. 6

        Plaintiffs,                  Case No.: CV11-02477

vs.

RENOWN REGIONAL, ET AL,

        Defendants.
_____/

Pages 1 to 12, inclusive.

TRANSCRIPT OF PROCEEDINGS
TELEPHONIC CONFERENCE CALL
Monday, October 28, 2013

REPORTED BY:               Christina Amundson, CCR #641
                           Molezzo Reporters, 322.3334

1

1    A P P E A R A N C E S:

2

     FOR PLAINTIFFS:

3
                              KENT R. ROBISON, ESQ.
4                             ROBISON, BELAUSTEGUI, SHARP & LOW
                              71 Washington Street
5                             Reno, NV  89503

6

7
     FOR RENOWN:
8
                              TAMARA PETERSON, ESQ.
9                             BROWNSTEIN HYATT FARBER SCHRECK
                              100 N. City Parkway, Suite 1600
10                            Las Vegas, NV  89106

11

12   FOR RENOWN:

13                            ED ROSENFELD, ESQ.
                              BRYAN CAVE, LLP
14                            120 Broadway, Suite 300
                              Los Angeles, CA 90401

15

16                              -oOo-

17

18

19

20

21

22

23

24

                                                          2

```
 1    RENO, NEVADA -- MONDAY, OCTOBER 28, 2013 -- 11:00 A.M.
 2                            -o0o-
 3         THE COURT:  This proceeding is a telephone
 4    conference with counsel in the case of Arger, Et Al
 5    versus Renown, Et Al.  I want to just briefly mention
 6    the background as -- let's first state our appearances
 7    for the record.  Counsel?
 8         MR. ROBISON:  Kent Robison and Kristen Martini
 9    for the plaintiffs, your Honor.
10         MR. ROSENFELD:  Bryan Cave by Ed Rosenfield
11    for the Renown parties.
12         MS. PETERSON:  Tammy Peterson with Brownstein
13    for Renown.
14         THE COURT:  Thank you.  As you know, we had an
15    oral argument last Thursday and I made findings and
16    conclusions and entered summary judgment from the bench
17    and, as sometimes happens, I had some thoughts later
18    that were not expressed on the record and I wanted to
19    augment the record.  And I tried to reach Kent and Tammy
20    by telephone Friday morning and belatedly remembered
21    that Friday was a holiday, so I wasn't able to reach
22    anybody.  But I appreciate very much your setting up
23    this teleconference and being available on short notice.
24    This should be very brief.
```

3

1        In the transcript when the settlement agreement
2   was placed on the record before the Court at page 13,
3   lines 3 through 5, it was stated that if there is any
4   dispute concerning the language of the agreement "the
5   Court will conduct an on-the-record telephone conference
6   and all decisions of the Court concerning the language
7   will be final and unappealable."
8        As we all know, the telephone conference
9   approach wasn't available because the action was dismissed
10  with prejudice and, therefore, the Court lost
11  jurisdiction.  As a result, this issue was placed before
12  the Court through the filing of two new actions which were
13  consolidated, and the Court was presented with competing
14  motions for summary judgment, which were argued last
15  Thursday.
16       Counsel, just as a minor matter, I haven't
17  searched the record.  Was there actually an order entered
18  consolidating the actions?
19       MR. ROSENFELD:  Yes.
20       MS. PETERSON:  Well, actually we had agreed to
21  transfer the cases and Renown -- we had an order that
22  was entered -- a stipulation and order that was entered
23  so Renown would voluntarily dismiss its case and be able
24  to bring those claims in in answer and counterclaim in

4

1  the first filed action, which was Mr. Robison's action.

2          THE COURT:  That's right.  So, technically,

3  speaking they weren't consolidated.  One was dismissed

4  but those same claims were preserved in the answer and

5  counterclaim in the first action.  Right?

6          MS. PETERSON:  Correct.

7          THE COURT:  Okay.  And I find that the

8  question presented to the Court on these motions is

9  really a narrow question and that that question falls

10 within the Court's authority as agreed to by the parties

11 and the language I just cited from page 13, lines 3

12 through 5; and, that is, under paragraph 9 the first

13 sentence obligates the parties to exchange and transfer

14 patient information and/or paper records in the Renown

15 released party's possession for patients in plaintiffs'

16 care and are all in accordance with applicable law.

17          Mr. Rosenfeld argued at the oral argument that

18 there is a distinction between the language of that

19 sentence and the second sentence of paragraph 9 which

20 relates to medical record information.  I agree with

21 that.  As to medical record information, there is no

22 dispute between the parties that such information shall

23 be supplied with the appropriate authorization and

24 releases of the patients.

5

1    As to the first sentence, I believe the term
2  "patient information" is exactly the information that is
3  the subject of this dispute.  The patients gave the
4  plaintiffs their names and contact information when the
5  plaintiffs became their treating physicians.  I find that
6  the only material occurrence since then in regard to the
7  patient information is the change in the site of the
8  plaintiffs' -- I don't know if I just said "plaintiffs'
9  information."  I meant patient information.
10    The only material occurrence since the patients
11  supplied this information to their own physicians is that
12  the physician plaintiffs at various times changed the
13  site of their offices while the patient information
14  remained at Renown.  I find that no federal or state
15  statute, administrative code, provision or policy is
16  violated by the plaintiffs retaining the names and
17  addresses of the patients who gave this information to
18  them for the purpose of treatment.
19    I wanted to mention two other issues briefly.
20  As you recall at the conclusion of the oral argument, the
21  defendants' counsel requested a stay of the Court's
22  summary judgment, and I believe that no stay is available
23  here for two reasons.
24    First, because this is a decision by the Court

6

1  concerning the language of the settlement agreement and,
2  therefore, is not appealable as a result of the agreement
3  of the parties.
4        And, secondly, because there is no prejudice to
5  the defendants.  The defendants had possession of all of
6  this information since it was created and the defendants
7  have been and are still free to communicate with the
8  patients.  So sharing that information with the
9  physicians who were supplied the information by their own
10 patients doesn't create any prejudice to the defendants.
11       And then, finally, there was a mention of a
12 contention that the defendants entered into this
13 agreement under duress.  And, as you know, I discussed
14 from the bench the canvass that was conducted of each of
15 the parties and their counsel at the time of the
16 agreement to confirm that the agreement was entered into
17 by all parties freely and voluntarily and not as a result
18 of any force, pressure, threats or coercion of anyone
19 except only the terms of the agreement itself.
20       There's one other reference I'd like to make
21 for the record on that subject, because I recalled it
22 later and then I went back to confirm it with the
23 transcript.  One of the questions I had when the
24 settlement agreement was placed on the record in open

7

1  court is whether the governing body of the institution

2  would be required to take a formal vote and consent to

3  the agreement.  This occurs frequently in settlement

4  agreements involving governmental institutions as well as

5  corporate parties.

6          Another example is instances where a large

7  number of homeowners have construction defect claims and

8  sometimes the persons who were actually present in the

9  courtroom or in chambers when the settlement agreement is

10  reached have to enter into that agreement subject to the

11  approval of others.

12          And so I asked defense counsel at the time this

13  agreement was placed on the record whether it would have

14  to be subject to approval by the board of Renown, and Mr.

15  Lenhard said it was driven by the board of Renown.  I

16  think the sentence states, The Board has driven this

17  agreement," and that appears at page 6.  The discussion

18  of the whole subject appears at page 6, lines 17 through

19  22 of the transcript.

20          So that covers what I wanted to augment the

21  record with and, again, I want to state my appreciation

22  to all of you for being available.

23          Mr. Robison, I'll direct you to place these

24  findings in the judgment.

1          Let me just ask you a practical question,

2   counsel.  Renown's indicated an intent to appeal my

3   decision, which is certainly understandable.  You're

4   welcome to do that.  But I would assume in the logical

5   order of things the judgment would be prepared, reviewed

6   by counsel, sent to me.  I would enter it and make any

7   modifications I wish to make and then there would be the

8   motion for stay.  In other words, it doesn't seem to me

9   to make sense that the motion for stay would occur before

10  the actual entry of the judgment.

11         Is that correct or incorrect?

12         MR. ROSENFELD:  That is correct from Renown's

13  standpoint, your Honor.

14         THE COURT:  I think that's the way it goes.

15  And, you know, I didn't hear anything at the argument or

16  in the pleadings that suggested to me that there is a

17  great urgency in supplying this information.  I've made

18  my decision and I've ordered that it be transmitted.

19         But I think the defendants are entitled to make

20  a request to the Nevada Supreme Court to stay the

21  judgment and so I think we'll prepare the judgment,

22  circulate it with counsel, submit it to me.  I'll enter

23  it -- I hope the same day I get it -- and then we'll take

24  it from there.

                                                          9

1       MR. ROSENFELD:  Your Honor, I assume that this

2   session this morning doesn't include an opportunity --

3   this is not opening up the hearing for discussion or for

4   argument, and so I would like to object to what you've

5   said without trying to re-argue your decision.

6       THE COURT:  That's fine.  I agree with that.

7   I know you don't agree with this because I actually was

8   present at the argument, but --

9       MR. ROSENFELD:  But we're also not agreeing

10  with things that were said today, but we understand that

11  we're not invited to comment on specific elements of

12  what you said.  And if that's incorrect, please advise.

13      THE COURT:  No.  That's true, Ed.  This is not

14  the time for extended argument.  I just wanted to

15  supplement my findings from the findings I made on the

16  bench.  And you're kind not to review all the

17  arguments -- I'm well aware of them -- but you have

18  preserved your right to object, not only to the order

19  and judgment I entered on Thursday, but to these

20  findings as well.

21      MR. ROSENFELD:  Thank you, your Honor, for

22  making that clear on the record.

23      THE COURT:  Thank you all very much.

24          Court is in recess.

                                                    10

1          (Whereupon, proceedings were concluded at 11:14
2   p.m.)
3                              -o0o-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

```
 1  STATE OF NEVADA        )
 2                         )    SS.
    COUNTY OF WASHOE       )
 3
 4       I, CHRISTINA MARIE AMUNDSON, official reporter of the
 5  Second Judicial District Court of the State of Nevada, in
 6  and for the County of Washoe, do hereby certify:
 7       That as such reporter, I was present in Department
 8  No. 6 of the above court on Monday, October 28, 2013, at
 9  the hour of 11:00 a.m. of said day, and I then and there
10  took verbatim stenotype notes of the proceedings had and
11  testimony given therein in the case of Kosta Arger, Et Al,
12  Plaintiffs, versus Renown Health, Et Al, Defendants, Case
13  No. CV13-01644.
14       That the foregoing transcript is a true and correct
15  transcript of my said stenotype notes so taken as
16  aforesaid, and is a true and correct statement of the
17  proceedings had and testimony given in the above-entitled
18  action to the best of my knowledge, skill and ability.
19
    DATED:  At Reno, Nevada, this 28th day of October 2013.
20
21       /S/ Christina Marie Amundson, CCR #641
22        Christina Marie Amundson, CCR #641
23
24
                                                           12
```

eFlex



user: Kent R. Robison

Existing Case ♦ Submission Confirmation

## Your Filing has been submitted

Case Type: Breach of Contract: Other Contracts/Acct/Judgment - CO - Request for Submission

**Note:** This filing is now being processed and added to the Clerk of Court document repository. Once ECF has stored the documents associated with your filing, a receipt will be issued to you. You may view the status of this filing, and access your receipt for 60 days, after which it will be purged from this system. The documents will be retained and available long term through the Clerk of Court.

User Manual | terms of use | privacy policy | payment policy | support | contact us | about Tybera Development Group, Inc.
© 2001-10 Tybera Development Group, Inc. All rights reserved.

11/18/2013

**Jayne Ferretto**

| | |
|---|---|
| **From:** | eflex@washoecourts.us |
| **Sent:** | Wednesday, November 20, 2013 1:52 PM |
| **To:** | Jayne Ferretto |
| **Subject:** | NEF: KOSTA ARGER, M.D., ETAL VS. RENOWN HEALTH, ETAL D6: Findings, Conclusions & Judg: CV13-01644 |

****** IMPORTANT NOTICE - READ THIS INFORMATION *****

PROOF OF SERVICE OF ELECTRONIC FILING

| | |
|---|---|
| **A filing has been submitted to the court RE:** | CV13-01644 |
| **Judge:** | BRENT ADAMS |
| <="" td=""> | |
| **Official File Stamp:** | 11-20-2013:13:44:25 |
| **Clerk Accepted:** | 11-20-2013:13:46:36 |
| **Court:** | Second Judicial District Court - State of Nevada |
| **Case Title:** | KOSTA ARGER, M.D., ETAL VS. RENOWN HEALTH, ETAL D6 |
| **Document(s) Submitted:** | Findings, Conclusions & Judg |
| | - **Continuation |
| | - **Continuation |
| **Filed By:** | Judicial Asst. HBoe |

You may review this filing by clicking on the following link to take you to your cases.

This notice was automatically generated by the courts auto-notification system.

If service is not required for this document (e.g., Minutes), please disregard the below language.

**The following people were served electronically:**

> KRISTEN MARTINI, ESQ. for SRIDEVI CHALLAPALLI, RAM CHALLAPALLI, ERIC DRUMMER, DEVANG DESAI, COLIN FULLER, RENOWN HEALTH, ERIC DRUMMER, RICHARD BRYAN, MICHAEL NEWMARK, CHAD BIDART, FRANCIS KELLEY, JOESPH STEVENSON, KOSTA ARGER, TOM NYLK, FRANK CARREA, KENT ROBISON, ESQ.
>
> KIRK LENHARD, ESQ. for RENOWN REGIONAL MEDICAL CENTER et al
>
> TAMARA PETERSON, ESQ. for RENOWN REGIONAL MEDICAL CENTER et al
>
> STEVE MORRIS, ESQ. for RENOWN REGIONAL MEDICAL CENTER et al

The following people have not been served electronically and must be served by traditional means (see Nevada electronic filing rules):

KENT ROBISON, ESQ.

**F I L E D**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

# EXHIBIT 3

# EXHIBIT 3

Execution copy - 3-28-13

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is entered into and effective as of the 28th day of March 2013 (the "Effective Date"), by and among, on the one hand, Renown Health, a Nevada Non-Profit Corporation ("Renown Health"), Renown Regional Medical Center, a Nevada Non-Profit Corporation ("Renown Regional"), Nevada Heart Institute, a Nevada Non-Profit Corporation ("NHI") (Renown Health, Renown Regional and NHI are collectively referred to, where appropriate, as the "Renown Entities"), James I. Miller ("Miller"), Kelly Testolin ("Testolin"), each acting for itself or himself, and, on the other hand, Kosta M. Arger, M.D., Chad Bidart, M.D., Richard H. Bryan, Jr., M.D., Frank P. Carrea, M.D., Ram M. Challapalli, M.D., Sridevi Challapalli, M.D., Devang M. Desai, M.D., Eric M. Drummer, M.D., Colin M. Fuller, M.D., Michael J. Newmark, M.D., Thomas Nylk, M.D., and Joseph Stevenson, M.D. (collectively referred to as the "Plaintiffs") (the Renown Entities, Plaintiffs, and Miller and Testolin, collectively, are referred to herein as the "Parties") (the Renown Entities, Miller and Testolin, collectively, are referred to herein as the "Renown Persons").

1.    On and subject to the terms hereof, the Parties desire to fully and finally resolve the Action and any and all issues or disputes relating to allegations, claims and counterclaims asserted therein or that could have been asserted therein and also fully and finally resolve any and all issues or disputes concerning or relating to the Employment Agreement, the Share Purchase Agreement and/or otherwise arising between the Parties to avoid further cost and uncertainty.

2.    Hon. Brent T. Adams, the Judge presiding over the Action (Case No. CV11-02477), on February 4, 2013, found that certain basic settlement terms proposed by the Parties were fair, just and reasonable; ordered the Parties to perform their agreement on these settlement terms; and retained jurisdiction over the implementation, interpretation and enforcement of the settlement agreement entered into by the Parties.  (*See* **Exhibit 1** attached hereto, made part hereof and incorporated herein.)

3.    Doctors Francis Kelley and Candace McNulty reached separate agreements with the named Defendants, and are not subject to, or a signatory of, this Agreement.

4.    **Dismissal with Prejudice.** On the Closing Date, as hereafter defined, the Parties, and each of them, shall execute and deliver and file a dismissal with prejudice of the Action in the form annexed hereto as **Exhibit 2**.

5.    **Release.**

a.    For good and valuable consideration, as herein provided, the receipt and sufficiency of which is hereby acknowledged, except for the rights and obligations expressly created by this Agreement in regard to facts occurring after the Closing Date, each of the Plaintiffs, effective as of the Closing Date, for himself and for his successors and assigns, hereby irrevocably and unconditionally relieves, releases and forever discharges the Renown Persons, and each of them, and each of their respective past and present owners, members, shareholders, partners, directors, officers, employees, agents, parents, subsidiaries, predecessors, successors, affiliates, managers, attorneys, administrators, representatives, executors, assigns,

958901.5

and insurers, and all persons acting by, through, under, or in concert with any of them, and each of them (collectively, "Renown Released Parties") from any and all claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, judgments, debts and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent that the Plaintiff executing this Agreement now has, owns, holds, or claims to have, claims to own, or claims to hold, or that the said Plaintiff at any time heretofore had, owned, held or claimed to have, claimed to own, or claimed to hold, or that the said Plaintiff at any time hereafter may have, own, hold or claim to have, claim to own, or claim to hold, against the Renown Released Parties, or any of them, arising out of any matter or thing, including but not limited to any and all claims asserted or that could have been asserted under federal or state law in federal or state court; the matters set forth and alleged in the Action; the matters that were set forth or could have been set forth and alleged in the Action regarding the conduct and alleged wrongdoing of the Renown Entities, Miller and Testolin and/or regarding the Employment Agreement, and/or regarding the Share Purchase Agreement, and/or regarding the transaction entered into by Plaintiffs and the Renown Entities on November 24, 2010, and closed on December 31, 2010 (the "Transaction"). Without limiting the generality of the foregoing, the release herein granted by Plaintiffs extinguishes any claim based on, or pertaining to Plaintiffs' employment or termination of employment with one or more of the Renown Entities and, likewise, includes, but is not limited to, any claims Plaintiffs may have under the Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Worker Adjustment and Retraining Notification Act ("WARN"), or any other federal, state or local law or regulation affecting employment rights or prohibiting employment discrimination, retaliation or harassment. Plaintiffs further agree and acknowledge that the claims released herein by Plaintiffs include, but are not limited to, all claims, however styled for compensation, wages, bonuses, severance, benefits, penalties, damages of any kind, interests, attorneys' fees or costs. Plaintiffs also intend by this Release to give up any rights under the common law, including, but not limited to, any claim for intentional or negligent infliction of emotional distress, fraud, defamation, invasion of privacy, wrongful discharge, violation of any public policy or statute, breach of any implied or express contract, whether written or oral between the Renown Released Parties or any of them and Plaintiffs, including the Employment Agreement or any amendment thereof or arising under any policy of the Renown Entities and any remedy for any such claim or breach.

b.    For good and valuable consideration, as herein provided, the receipt and sufficiency of which is hereby acknowledged, except for the rights and obligations expressly created by this Agreement in regard to facts occurring after the Closing Date, each of the Renown Persons, effective as of the Closing Date, for itself or himself, and for their successors and assigns, hereby irrevocably and unconditionally relieves, releases and forever discharges the Plaintiffs, and each of them, and each of their respective past and present owners, members, shareholders, partners, directors, officers, employees, agents, parents, subsidiaries, predecessors, successors, affiliates, managers, attorneys, administrators, representatives, executors, assigns, and insurers, and all persons acting by, through, under, or in concert with any of them, and each of them (collectively, "Plaintiff Released Parties") from any and all claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, judgments, debts and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent that the Renown

3 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

Person executing this Agreement now has, owns, holds, or claims to have, claims to own, or claims to hold, or that the said Renown Person at any time heretofore had, owned, held or claimed to have, claimed to own, or claimed to hold, or that the said Renown Person at any time hereafter may have, own, hold or claim to have, claim to own, or claim to hold, against the Plaintiff Released Parties, or any of them, arising out of any matter or thing, including but not limited to any and all claims asserted or that could have been asserted under federal or state law in federal or state court; the matters set forth and alleged in the Action; the matters that were set forth or could have been set forth and alleged in the Action regarding the conduct and alleged wrongdoing of the Plaintiffs and/or regarding the Employment Agreement, and/or regarding the Share Purchase Agreement, and/or regarding the transaction entered into by Plaintiffs and the Renown Entities on November 24, 2010, and closed on December 31, 2010 (the "Transaction"). The Renown Persons also intend by this Release to give up any rights under the common law, including, but not limited to, any claim for intentional or negligent infliction of emotional distress, fraud, defamation, invasion of privacy, violation of any public policy or statute, breach of any implied or express contract, whether written or oral between the Renown Released Parties or any of them and Plaintiffs, including the Employment Agreement or any amendment thereof or arising under any policy of the Renown Entities and any remedy for any such claim or breach.

c.    Nothing in either sub-paragraph "a" or sub-paragraph "b" of this paragraph "5" constitutes a release for future (after the date hereof) conduct, including but not limited to alleged improper interference with patients and/or the failure to honor the provisions and commitments in paragraphs 8 through 14 hereof. The Parties acknowledge and agree that any alleged future misconduct shall not affect the finality of the releases set out in sub-paragraphs "a" and "b" of this paragraph "5." The term "date hereof" as used in this sub-paragraph "c" is both the Effective Date and Closing Date.

d.    Anything in either sub-paragraph "a" or sub-paragraph "b" of this paragraph "5" to the contrary notwithstanding, the releases herein granted exclude, and do not extinguish, claims for contribution or indemnity, if any exist, for actual out-of-pocket losses, costs or expenses incurred in the defense and disposition of an action or proceeding brought by an unrelated party alleging coding irregularities.

6.    **Representations.**

a.    Each Party represents and warrants each to the other that, as of the Closing Date, such Party has not instituted a lawsuit or proceeding of any kind, including but not limited to arbitral or administrative proceedings asserting any claims which are released in paragraph 5 hereof (collectively, "Other Action").

b.    Each Party represents, affirms and warrants that such Party is the sole owner and has not assigned or transferred to any other person or entity any of the claims which such Party has released in paragraph 5.

c.    Each Party represents, affirms and acknowledges that all other Parties are entering into this Agreement to settle all claims and, by doing so, no Party admits any liability or breach of any legal or contractual obligation.

958901.5

4 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

d.     Each Party represents, affirms and acknowledges that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown or unsuspected claims, demands, causes of action.

e.     Each Party represents, affirms and acknowledges that such Party has been given a reasonable opportunity to consider the Agreement, is represented by counsel in connection with the negotiations of the Agreement and is fully advised as to the finality of said Agreement and intends to be bound by it.

f.     Each Party represents, affirms and acknowledges that such Party may be mistaken as to the facts or law upon which such Party may be relying in executing this Agreement and settling their disputes and that such facts or law may be other than or different from their present beliefs.

g.     Except as provided in paragraph 5.b., each Party represents, affirms and acknowledges that this Agreement may be pleaded as a full and complete defense to, and may be used as a basis to enjoin, any action, suit, or other proceeding that may be attempted, commenced, or maintained by any Party to this Agreement or on its behalf or on behalf of its legal representatives, heirs and agents.

h.     Each Plaintiff represents, affirms and acknowledges that the Renown Persons provide no information, and make no representations or warranties, concerning the consequences to Plaintiffs of the Agreement under any federal, state or local tax law or regulation, and Plaintiffs shall be responsible in full for any and all taxes assessed against them.

i.     Each Party understands and agrees that this Agreement effects the settlement of claims, present and possible, which are denied and contested, and nothing contained herein shall be construed as an admission by any Party of liability of any kind to any other Party. All such liability is expressly denied.

7.     **Settlement Payments.**

a.     At 1:30pm on March 28, 2013 (the "<u>Closing Date</u>"), at the offices of Brownstein, Hyatt, Farber & Schreck, 50 West Liberty Street, Suite 1050, Reno, NV 89501, a representative of one of the Renown Entities will deliver the following settlement checks ("<u>Renown Checks</u>") to Kent R. Robison, Esq., or other member of Robison, Belaustegui, Sharp & Low, counsel for Plaintiffs in the Action (the "<u>Robison Firm</u>"):

i.     Twelve (12) Renown Checks representing the aggregate sum of Three Million Nine Hundred Ninety Nine Thousand Dollars and No Cents ($3,999,000.00) less applicable federal and state withholding taxes payable to the persons and in the gross and net amounts set out in the table below:

| | Gross Payment | Federal Income Tax Withholding | Federal Medicare Withholding | Federal Social Security Withholding | Payment Net of Withholdings |
|---|---|---|---|---|---|
| 1. Kosta M. Arger, M.D.: | $237,652.70 | $59,413.18 | $3,784.84 | $7,049.40 | $167,405.28 |
| 2. Chad M. Bidart, M.D.: | $382,870.80 | $95,717.70 | $7,425.43 | $5,478.96 | $274,248.71 |

5 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

| | | | | |
|---|---|---|---|---|
| 3. Richard H. Bryan, Jr., M.D.: | $359,548.10 | $89,887.03 | $6,649.38 | $7,049.40 | $255,962.29 |
| 4. Frank P. Carrea, M.D.: | $393,135.85 | $98,283.96 | $7,532.15 | $6,405.55 | $280,914.19 |
| 5. Ram Challapalli, M.D.: | $390,705.75 | $97,676.44 | $7,381.58 | $7,049.40 | $278,598.33 |
| 6. Sridevi Challapalli, M.D.: | $314,939.88 | $78,734.97 | $5,601.09 | $7,049.40 | $223,554.42 |
| 7. Devang M. Desai, M.D.: | $447,982.13 | $111,995.53 | $8,821.04 | $6,405.55 | $320,760.01 |
| 8. Eric M. Drummer, M.D.: | $298,015.83 | $74,503.96 | $5,203.37 | $7,049.40 | $211,259.10 |
| 9. Colin M. Fuller, M.D.: | $324,277.63 | $81,069.41 | $6,189.00 | $4,511.04 | $232,508.18 |
| 10. Michael J. Newmark, M.D.: | $287,957.73 | $71,989.43 | $4,967.01 | $7,049.40 | $203,951.89 |
| 11. Tom Nylk, M.D.: | $253,594.00 | $63,398.50 | $4,159.46 | $7,049.40 | $178,986.64 |
| 12. Joseph Stevenson, D.O.: | $308,319.63 | $77,079.91 | $5,828.71 | $4,409.57 | $221,001.44 |

ii.    A Renown Check payable to the Robison Firm Trust Account for Plaintiffs' attorney's fees and costs in the amount of Eight Hundred Seventy Two Thousand Dollars and No Cents ($872,000.00).

b.    The Renown Checks shall be delivered, as set forth above, in exchange for duly executed copies of this Agreement, including **Exhibit 2** hereto, whereupon the Renown Released Parties shall have no duties or obligations relating to the Renown Checks.

8.    **Privileges.**  The Renown Entities agree that none of the Plaintiffs' hospital privileges at any Renown facility (a "Renown Facility") will be revoked other than in accordance with by-laws, policies and procedures, as in effect from time to time, that are generally applicable to all other physicians having privileges at the Renown Facility, it being understood and agreed that Plaintiffs, and each of them, are subject to, and will comply with, said by-laws, policies and procedures. Anything herein to the contrary notwithstanding, the Renown Entities may freely revoke any or all of the Plaintiffs' said privileges if St. Mary's Regional Medical Center ("St. Mary's") and/or Northern Nevada Medical Center ("Northern Nevada") revokes the hospital privileges of a cardiologist employed or affiliated by Renown. The Renown Entities further agree to proceed in good faith with respect to the application for privileges, if any, made by Dr. Truong and/or Dr. Einev, it being acknowledged that Dr. Truong has already been granted "temporary privileges" while his application is being further processed.

9.    **Medical Records.**  The Parties will use their best efforts, in good faith, to exchange and transfer patient information and/or paper records in the Renown Released Parties' possession, for patients under Plaintiffs' care, all in accordance with applicable law. Upon reasonable request, the Renown Entities agree to provide medical record information requested relative to Plaintiffs' patients, provided that the appropriate authorization and/or patient consent is given. The Renown Entities agree to use their best efforts, in good faith, to allow Plaintiffs access to and use of electronically stored medical accounts of their patients, including EPIC or successor software, on the same terms as made available to other non-Renown employed physicians, assuming Plaintiffs comply with applicable procedural, administrative and legal requirements pertaining to such use. For the avoidance of doubt, the Parties understand that, under this arrangement, (a) access to historical encounter information will be "read only," (b) access to hospitalized inpatients and Emergency Room patients will be "read and update," and (c) the Epic system cannot be used to document either new non-Renown patient encounters or new Renown outpatient encounters.

6 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

10.     **Relations with patients.** The Parties will use their best efforts, in good faith, not to interfere with each other's relationships with their respective patients. The Renown Entities will make available for each patient that are still being treated at Renown Entities, upon proper request, Plaintiffs' new work address, phone number and contact information.

11.     **Renown Health Board of Directors.** Plaintiffs shall designate two representatives and one attorney of their choice to meet and confer in person in a cordial and civil manner with the Renown Health Board of Directors to discuss such issues as Plaintiffs' representatives may choose to discuss, including but not limited to health service issues and other issues forming the subject matter of the Action. The meet and confer session shall take place at a meeting scheduled within 30 days of the Closing Date on 10 days reasonable prior written notice to the Robison Firm, issued by the Renown Health Board of Directors. The presentation by the Plaintiffs and counsel shall be limited to two hours. Renown likewise will be represented by counsel of its choice.

12.     **Hometown Health.**   The following terms stated on the record of proceedings before Judge Adams on February 4, 2013, **Exhibit 1** at p. 7:2-9 are incorporated herein:

> MR. ROBISON: Renown will also engage in good faith best efforts to help us work out a system where the SNCA physicians, if possible, can continue to treat the needs of the members of Hometown Health Plan members. We have been told today that is a bit complicated and a bit problematic, but, nonetheless, we want to address those issue. Renown is committed to use good faith effort to help us work on those types of issues.

It is further understood and agreed that nothing in this paragraph 12 imposes personal liability on the directors of Renown Health participating in the discussions called for in this paragraph 12.

13.     **Gary Beck.**   The Renown Entities agree that, if Gary Beck is terminated from his position with the Renown organization, the covenant not to compete contained in his employment agreement shall not be enforced. Mr. Beck will not be subject to retaliation for actions taken by him relative to his role in discovery conducted in the Action and relative in any way regarding his trial testimony in the Action.

14.     **Joint Media Statement.** The Parties agree to give their statements to the press as follows:

**We can confirm that there has been a settlement of the lawsuit between Renown and former SNCA cardiologists.**

**The Parties have resolved their differences and the Renown Board has agreed to meet with the physicians and their counsel in order to continue a productive dialogue.**

**All involved are ready to move forward positively and cooperatively with the goal of improving heart care for the residents of Northern Nevada.**

958901.5

7 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

15.     **Entire Agreement.**

All prior or contemporaneous understandings or agreements between the Parties as they relate to this Agreement, the Employment Agreement and/or the Share Purchase Agreement are merged into this Agreement, and it alone expresses the agreement of the Parties.  This Agreement may be modified only in writing, signed by all the Parties hereto, and no term or provision may be waived except by such writing.  There are no other agreements or representations, express or implied, either oral or in writing, between the Parties, concerning the subject matter of this Agreement, except as specifically set forth in this Agreement.  There are no promises, agreements or expectations of the Parties unless otherwise stated in this Agreement.  The Parties have been represented by counsel in connection with the preparation of this Agreement, and the Parties, and each of them, have had the opportunity to consult with counsel on the terms of this Agreement.  This Agreement was drafted through the joint efforts of the Parties and/or through counsel, and shall not be read for or against any Party to this Agreement on that account.

16.     **Applicable Law and Jurisdiction.**

This Agreement is intended to be enforced according to its written terms under the laws of the State of Nevada.  Any dispute considering the interpretation, implementation or enforcement of this Agreement and the provisions hereof shall be resolved by the Honorable Brent Adams, Department 6 of the Second Judicial District Court, Washoe County, Nevada.  All Parties consent to jurisdiction and venue in said court, which has expressly retained jurisdiction over the implementation, interpretation and enforcement of this Agreement.

17.     **Benefit.**

This Agreement shall be binding upon and inure to the benefit of the Parties, and each of them, their successors, assigns, affiliates, subsidiaries, stockholders, personal representatives, agents, employees, managers, directors, and officers.  Except as expressly provided herein, nothing in this Agreement is intended to confer on any other person or entity any rights or remedies under or by reason of this Agreement.

18.     **Counterparts.**

This Agreement may be executed in any number of counterparts and each counterpart executed by any of the undersigned together with all other counterparts so executed shall constitute a single instrument and agreement of the Parties.  Facsimile copies hereof and facsimile signatures hereon shall have the same force and effect as originals.

19.     **Captions and Construction.**

The captions which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement.  Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice

958901.5

8 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

versa, unless the context requires otherwise. The words "herein," "hereof," "hereunder," and other similar compounds of the words "here" when used in this Agreement shall refer to the entire Agreement and not to any particular paragraph or Section. All representations and warranties contained in this Agreement, including without limitation, the representations and warranties set forth in paragraph 6, shall survive the execution and delivery of this Agreement.

20.    **Invalid Provisions.**

If any term, paragraph, condition or covenant of this Agreement or the application thereof to any Party or circumstance shall, to the extent, be held invalid or unenforceable, the remainder of this Agreement, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and paragraph of this Agreement shall be valid and enforceable to the fullest extent permitted by law, and said invalid or unenforceable term, provision, condition or covenant shall be substituted by a term, paragraph, condition or covenant as near in substance as may be valid and enforceable.

21.    **Further Assurances.**

All Parties agree and consent to sign additional documents as reasonably necessary and appropriate to effectuating the intent and purposes of this Agreement.

22.    **Notice.**

All notices or demands of any kind that any Party is required to or desires to give in connection with this Agreement shall be in writing and shall be delivered by facsimile and/or by depositing the notice or demand in the United States mail, postage prepaid, and addressed to the Parties as follows:

Notice to Plaintiffs:
Kent R. Robison
ROBISON, BELAUSTEGUI, SHARP & LOW
71 Washington Street
Reno, Nevada 89503
Tel: 775.329.3151
Facsimile: 775.329.7169


Notice to Renown Defendants:
Kelly Testolin
General Counsel
Renown Health
1155 Mill Street Z-7
Reno, Nevada 89502
Tel: 775.982.6054

958901.5

9 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

Facsimile: 775.982.5754

With a copy to:
Tamara Beatty Peterson, Esq.
Brownstein Hyatt Farber Schreck, LLP
100 N. City Parkway, Suite 1600
Las Vegas, NV 89106
Tel: 702.464.7046
Facsimile: 702.382.8135

David Line
President and CEO
InfoSearch International
(775) 332-3691 (Direct)
(775) 771-6509 (Mobile)
dline@infosearchintl.com

23.   **General.**

a.     This Agreement may not be amended, canceled, revoked or otherwise modified except by written agreement subscribed by all of the Parties to be charged with such modification.

b.     Each Party whose signature is affixed hereto represents and warrants that he or she is authorized to execute this Agreement.

c.     The Parties agree, except as set forth in paragraph 7.a.iii., to pay their own respective costs and attorneys' fees.

d.     Each Party represents and warrants that such Party's counsel-of-record in the Action is duly authorized by such Plaintiff to execute **Exhibit 2** hereto to effect the dismissal of the Action with prejudice.

24.   **Ombudsman.**

To facilitate the spirit and intent of this Agreement, the Honorable David Gamble (Ret.) shall serve as an Ombudsman to help resolve disputes that arise between or among the Parties relating to the day-to-day operation of the business and medical issues addressed herein. The Parties agree that any charges for the use of Judge Gamble serving as an Ombudsman will be paid by the Renown Entities. Before seeking the assistance, involvement or ruling from Judge Adams, as permitted in paragraph 16 hereof, the Parties agree to utilize the services of Judge Gamble. If dissatisfied with Judge Gamble's assistance or resolution, Plaintiffs and/or the Renown Entities may exercise their rights as provided for in paragraph 16.

25.   **Good faith and fair dealing.**

958901.5

10 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

Paragraphs 8 through 14 hereof provide for continuing contractual arrangements between persons who were adversaries in the Action. In entering into the contracts provided for in these paragraphs 8 through 14, the Parties acknowledge and agree that "all contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other." *Nelson v. Heer,* 123 Nev. 217, 226 (2007). The Parties further acknowledge and agree that their respective duties of good faith and fair dealing under paragraphs 8 through 14 are delineated by the underlying goals of these paragraphs 8 through 14, which are to provide for the harmonious operation of a community hospital that seeks to optimize its patients' healthcare experience and promote health and healing in the community. To achieve these goals, the Parties agree that each of them shall refrain from directly or indirectly, engaging in any conduct or making any statement, whether in commercial or noncommercial speech, disparaging or criticizing in any way one another or any of the Parties and their affiliates, respective officers, directors, employees, customers or agents, or any products or services offered by any of them, nor shall either Party engage in any other conduct or make any other statement that could be reasonably expected to impair the goodwill of any other Party; *provided, however*, nothing contained in this paragraph 25, shall (i) relate or refer to any statement, act or omission occurring before the Effective Date of this Agreement; (ii) limit or abridge the communications between any Party and a governmental agency or unit or any regulatory body; (iii) preclude any Party from asserting its rights before Judge Adams under the terms of this Agreement, including paragraph 6 hereof; or (iv) preclude any Party from communicating fully and freely with the Renown Health Board of Directors pursuant to paragraph 11 hereof or with the Ombudsman, as provided for in paragraph 24 hereof.

[Remainder of this Page Left Intentionally Blank]

11 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

KOSTA M. ARGER, M.D

STATE OF Nevada )
                        ) ss.
COUNTY OF Washoe )

This instrument was acknowledged before me on the 28th day of March, 2013, by Kosta M. Arger.

NOTARY PUBLIC in and for said
County and State



V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

03/29/2013  11:08    7607573128              MAILBOXES OF OSIDESD                    PAGE  01/01

12 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
CHAD M. BIDART, M.D., F.A.C.C

STATE OF _California_ 
                    ) ss.
COUNTY OF _San Diego_ )

This instrument was acknowledged before me on the 29 day of _March_
2013, by Chad M. Bidart.

_____
NOTARY PUBLIC in and for said
County and State

ELISE CARTER
Commission # 1971799
Notary Public - California
San Diego County
My Comm. Expires Mar 11, 2016

958901.5

13 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____

RICHARD H. BRYAN, JR., M.D., F.A.C.C.

STATE OF  Nevada  )

                    ) ss.

COUNTY OF  Washoe  )

    This instrument was acknowledged before me on the 28th day of  March  , 2013, by Richard H. Bryan, Jr.

_____

NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2018

958901.5

14 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____

FRANK P. CARREA, M.D. F.A.C.C.

STATE OF Nevada )
COUNTY OF Washoe ) ss.

This instrument was acknowledged before me on the 28th day of March, 2013, by Frank P. Carrea.

_____

NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

15 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
RAM M. CHALLAPALLI, M.D., F.A.C.C.

STATE OF _Nevada_ )
                          ) ss.
COUNTY OF _Washoe_ )

This instrument was acknowledged before me on the _29th_ day of _March_ , 2013, by Ram M. Challapalli.

_____
NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0697-2 - Expires February 24, 2018

958901.5

16 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_Sridevi Challapalli_
SRIDEVI CHALLAPALLI, M.D., F.A.C.C.

STATE OF   Nevada   )
                              ) ss.
COUNTY OF   Washoe   )

This instrument was acknowledged before me on the 29th day of March 2013, by Sridevi Challapalli.



NOTARY PUBLIC in and for said County and State

> V. JAYNE FERRETTO
> Notary Public - State of Nevada
> Appointment Recorded in Washoe County
> No: 88-0597-2 - Expires February 24, 2016

958901.5

17 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
DEVANG M. DESAI, M.D., F.A.C.C.

STATE OF _Nevada_ )
                       ) ss.
COUNTY OF _Washoe_ )

This instrument was acknowledged before me on the 28th day of _March_ , 2013, by Devang M. Desai.

_____
NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 86-0567-2 - Expires February 24, 2016

958901.5

18 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

ERIC M. DRUMMER, M.D., F.A.C.C.

STATE OF Nevada )
) ss.
COUNTY OF Washoe )

This instrument was acknowledged before me on the 25th day of March 2013, by Eric M. Drummer.

NOTARY PUBLIC in and for said County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

19 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
COLIN M. FULLER, M.D., F.A.C.C., F.A.C.P., F.S.C.A.I.

STATE OF Nevada )
                        ) ss.
COUNTY OF Washoe )

This instrument was acknowledged before me on the 20th day of March, 2013, by Colin M. Fuller.

_____
NOTARY PUBLIC in and for said County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

20 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
MICHAEL J. NEWMARK, M.D., F.A.C.C.,
F.S.C.A.I

STATE OF  Nevada         )
                         ) ss.
COUNTY OF  Washoe        )

This instrument was acknowledged before me on the 28th day of ___March___,
2013, by Michael J. Newmark.

_____
NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No. 88-0597-2 - Expires February 24, 2016

958901.5

21 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

THOMAS NYLK, M.D., F.A.C.C

STATE OF Nevada )
                 ) ss.
COUNTY OF Washoe )

This instrument was acknowledged before me on the 29th day of March, 2013, by Thomas Nylk.



NOTARY PUBLIC in and for said
County and State

V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

22 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

**IN WITNESS WHEREOF, the Parties hereby execute and consent to the terms of this Agreement.**

_____
JOSEPH STEVENSON, D.O.

STATE OF Nevada )
) ss.
COUNTY OF Washoe )

This instrument was acknowledged before me on the 29th day of March, 2013, by Joseph Stevenson.

_____
NOTARY PUBLIC in and for said County and State



V. JAYNE FERRETTO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 88-0597-2 - Expires February 24, 2016

958901.5

23 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

RENOWN HEALTH

By: _James L Buelle_
Name: JAMES I MILLER
Its: PRESIDENT AND CEO

STATE OF _Nevada_    )
                     ) ss.
COUNTY OF _Washoe_   )

This instrument was acknowledged before me on the 28th day of _March_, 2013, by _James I Miller_, as the _President & CEO_ of Renown Health.

_Tawnya R Hillygus_
NOTARY PUBLIC in and for said
County and State

TAWNYA R. HILLYGUS
Notary Public - State of Nevada
Appointment Recorded in Storey County
No: 00-63448-16 - Expires June 15, 2016

24 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

RENOWN REGIONAL MEDICAL CENTER

By: _James L. Miller_
Name: _JAMES I MILLER_
Its: _PRESIDENT_

STATE OF _Nevada_ )
                 ) ss.
COUNTY OF _Washoe_ )

This instrument was acknowledged before me on the _28th_ day of _March_ , 2013, by _James I. Miller_ , as the _President_ of Renown Regional Medical Center.

_Tawnya R. Hillygus_
NOTARY PUBLIC in and for said
County and State

TAWNYA R. HILLYGUS
Notary Public - State of Nevada
Appointment Recorded in Storey County
No: 00-63448-16 - Expires June 15, 2016

958901.5

25 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

NEVADA HEART INSTITUTE

By: _James S. Miller_
Name: _JAMES I MILLER_
Its: _SECRETARY_

STATE OF _Nevada_ )
                      ) ss.
COUNTY OF _Washoe_ )

This instrument was acknowledged before me on the _28th_ day of _March_,
2013, by _James I. Miller_, as the _Secretary_ of Nevada Heart Institute.

_Tawnya R. Hillygus_
NOTARY PUBLIC in and for said
County and State

TAWNYA R. HILLYGUS
Notary Public - State of Nevada
Appointment Recorded in Storey County
No: 00-63448-16 - Expires June 15, 2016

958901.5

26 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

_[signature]_
JAMES MILLER

STATE OF _Nevada_ )
                                     ) ss.
COUNTY OF _Washoe_ )

    This instrument was acknowledged before me on the _28th_ day of _March_, 2013, by James Miller.

_[signature]_
NOTARY PUBLIC in and for said
County and State

TAWNYA R. HILLYGUS
Notary Public - State of Nevada
Appointment Recorded in Storey County
No: 00-58448-16 - Expires June 15, 2016

27 of 27 of Settlement Agreement Between Renown Released Parties and Plaintiffs

_____
KELLY TESTOLIN

STATE OF _Nevada_ )
                              ) ss.
COUNTY OF _Washoe_ )

    This instrument was acknowledged before me on the _28th_ day of _March_ , 2013, by Kelly Testolin.

_____
NOTARY PUBLIC in and for said
County and State

TAWNYA R. HILLYGUS
Notary Public - State of Nevada
Appointment Recorded in Storey County
No: 00-63448-16 - Expires June 15, 2016

958901.5

# EXHIBIT 1

1    4185

2    JUDITH ANN SCHONLAU

3    CCR #18

4    75 COURT STREET

5    RENO, NEVADA

6

7        IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

8                    IN AND FOR THE COUNTY OF WASHOE

9            BEFORE THE HONORABLE BRENT ADAMS, DISTRICT JUDGE

10                              -oOo-

11   KOSTA ARGER, et al,                )
                                        )
12              Plaintiffs,             )
                                        )
13       vs.                            )  CASE NO. CV11-02477
                                        )  DEPARTMENT NO. 6
14   RENOWN REGIONAL MEDICAL            )
     CENTER, et al,                     )
15                                      )
                Defendants.             )
16   _____

17                  TRANSCRIPT OF PROCEEDINGS

18                        SETTLEMENT

19            MONDAY, FEBRUARY 4, 2013, 1:30 P.M.

20                      Reno, Nevada

21

22   Reported By:              JUDITH ANN SCHONLAU, CCR #18
     NEVADA-CALIFORNIA CERTIFIED; REGISTERED PROFESSIONAL REPORTER
23   Computer-aided Transcription

24

                                  1

```
 1                    A P P E A R A N C E S
 2     For the Plaintiffs:        ROBISON, BELAUSTEGUI, SHARP & LOW
 3                                 BY:  KENT R. ROBISON, ESQ.
 4                                 71 WASHINGTON STREET
 5                                 RENO, NEVADA 89503
 6
 7
 8
 9     For the Defendants:        BROWNSTEIN, HYATT, FARBER & SCHRECK
10     Renown Health, et al       BY:  KIRK LENHARD, ESQ.
11                                      TAMARA B. PETERSON, ESQ.
12                                 100 N. CITY PARKWAY, SUITE 1600
13                                 LAS VEGAS, NEVADA 89106
14
15     For the Defendant:         LAXALT & NOMURA
16     Phil Schweber              BY:  DANIEL T. HAYWARD, ESQ.
17                                 9600 GATEWAY DRIVE
18                                 RENO, NEVADA 89521
19
20
21
22
23
24
```

2

1       RENO, NEVADA; MONDAY, FEBRUARY 4, 2013; 1:30 P.M.

2                        -oOo-

3

4          THE COURT:  Mr. Robison, you may proceed.

5          MR. ROBISON:   Your Honor, I would like, with the

6  Court's permission, to inform the Court a settlement has bean

7  reached.  We would like to put the settlement on the record

8          THE COURT:  You may do so.

9          MR. ROBISON:  Before I do so, Your Honor, I wanted

10  to certainly, and on behalf of my clients and me and I think

11  everybody here, thank you for your dedication and attention

12  and devotion to this case. I cannot tell you how significant

13  that has been to our ability to resolve this case.

14         And I also want to thank counsel.  As you know, I

15  have been around for a while in these courtrooms.  I don't

16  think I have had an opportunity to have a case against more

17  professional, civil and ethical lawyers than the people I

18  dealt with in this case.

19         That said, Your Honor, the settlement will be as

20  follows:  All Plaintiffs and all Defendants will enter into a

21  mutual release and definitive settlement agreement in which

22  all claims in the pleadings and claims that could have been

23  pled will be dismissed with prejudice. The settlement we put

24  on the record today, we are asking it be construed as an

3

1    enforceable settlement with you retaining jurisdiction over

2    implementation and enforcement, and we ask that this

3    settlement, as put on the record, satisfies the criteria in

4    May versus Anderson.  It includes release provisions which

5    will make it enforceable.

6            In consideration for the Plaintiffs dismissing their

7    claims and the Defendants also dismissing their claims, Renown

8    will pay the Plaintiffs, which is essentially one hundred

9    percent of the QPI, $157,125 per Plaintiff per year for a

10   total partial payment of $3,771,000.

11           In addition, there will be a true-up payment of

12   $228,000 that represents compensation pertaining to the comp

13   pool as we have used that term in this case.

14           THE COURT:  The number of $3,771,000, will the

15   compensation the Plaintiffs already have received be deducted

16   from that?

17           MR. ROBISON:  No.  This is new money.

18           THE COURT:  Okay.  Thank you.

19           MR. ROBISON: The $228,000 true-up figure will

20   include true-ups for the wages that Dr. Fuller and Dr. Bidart

21   took out of their salary for the year 2011 and the months of

22   January and February of 2012.

23           Renown will pay the Plaintiffs attorney's fees and

24   costs in the amount of $872,000.

4

1          The next item, Your Honor, pertains to privileges.

2     And Renown has agreed that none of the Plaintiffs' privileges

3     will be revoked, and that they will consider in good faith and

4     use best efforts to permit Dr. Troung, T-R-O-U-N-G from

5     Northern Nevada to proceed with the Privilege Application and

6     do nothing to interfere to impede with that application, and

7     doctor --

8          PLAINTIFF BRYAN: Einev.

9          MR. ROBISON:  How do you spell it?

10         PLAINTIFF BRYAN: E-I-N-E-V will be in the same

11    situation.  That commitment by Renown is conditioned on the

12    commitment by St. Mary's and Northern Nevada Medical Center to

13    reciprocate with respect to privileges and not engage in any

14    revocation of Renown Health cardiologists.  And I have already

15    been in contact with the CEO's of both of those institutions,

16    and they are willing to cooperate and participate.

17         Within the next topic is medical records and

18    cooperation.  We have agreed that with the same force and

19    effect of injunction, the parties will in good faith and use

20    best effort to cooperate with the exchange of patient

21    information. We have bargained for access to the medical

22    records storage and retention process referred to as Epic.  It

23    has got some issues with regard to licensing, so we are going

24    to agree that Renown will, upon request, use its good faith

5

1    and best efforts to provide the requested medical information

2    to the requesting SNCA physician Plaintiff, and that the SNCA

3    patients that are still treated at Renown will be, upon

4    request, provided the necessary contact information including

5    phone number and addresses for their SNCA physicians upon

6    request.

7            One of the important components of this settlement,

8    Your Honor, that we have agreed to is that two of my clients

9    to be selected by the SNCA cardiologists and myself will be

10   permitted to make a presentation to the Renown Health Board of

11   Directors, which we would like to provide some clarity and

12   explanation to some of the issues that have been addressed in

13   this trial and some of the issues that preceded us getting to

14   this trial with respect to how this deal came about and some

15   of the misinformation that was exchanged, and Renown has

16   agreed to that.

17           THE COURT:  Is this agreement subject to approval of

18   the Board?

19           MR. LENHARD:  The Board has driven this agreement.

20   They actually suggested that provision.  The one thing though,

21   Kent, with you being present they are going to have either

22   myself or Mrs. Peterson present to listen, not to debate.

23           MR. ROBISON:  That's a deal breaker. All right.

24           THE COURT:  They actually argued against a living

                                    6

1    person before.  He doesn't want to take that risk.

2         MR. ROBISON: Renown will also engage in good faith

3    best efforts to help us work out a system where the SNCA

4    physicians, if possible, can continue to treat the needs of

5    the members of Hometown Health Plan members.  We have been

6    told today that is a bit complicated and a bit problematic,

7    but, nonetheless, we want to address those issue.  Renown is

8    committed to use good faith effort to help us work on those

9    types of issues.

10        There is a gentleman that is part of this

11   settlement, Your Honor, that we are concerned about.  His name

12   is Gary Beck.  If Gary Beck is terminated, the parties have

13   agreed any covenant not to compete that pertains to his

14   employment at Renown will be waived.

15        The parties also agree that we will prepare and make

16   part of the definitive settlement agreement a joint statement

17   that can be used for publication to media and other related

18   and interested parties, and we have agreed to work in good

19   faith and use our best efforts to draft a joint statement that

20   explains the reasons and resolution and hopefully stress the

21   importance of going forward in a cooperative fashion.

22        The final -- That I think concludes all of the

23   provisions of the settlement between the Plaintiffs and the

24   Renown Defendant.

7

1    As it pertains to Mr. Schwerber, Mr. Schwerber will

2    pay the sum of $30,000 as and for general damages within 30

3    days from the date hereof in exchange for full and complete

4    release and will probably be included in the definitive

5    settlement agreement to revolve this case.

6    Unless I forgot something or missed something, I

7    believe that is the deal.

8    THE COURT:  Is there any agreement as to whether

9    Renown will retain their right to seek reimbursement of

10    attorney's fees expended on behalf of Mr. Schweber?

11    MR. LENHARD:  No.

12    MR. ROBISON:  That's none of my business.

13    MR. LENHARD:  That is outside this.  That frankly

14    has not been discussed.

15    MR. HAYWARD:  That is the case, Your Honor.

16    THE COURT:  Mr. Lenhard, has Mr. Robison accurately

17    stated the terms of the settlement agreement?

18    MR. LENHARD:  Yes, I think that is correct.  The

19    only clarification, Gary Beck, we also agreed, I think that is

20    appropriate, we would not engage in any retaliation or

21    retribution against Mr. Beck from his testimony here which you

22    would expect, I am sure.

23    Otherwise, yes, I think we worked very hard the last

24    two days to put this together and his statements are accurate.

8

1   On behalf my client and myself and Mrs. Peterson, we certainly

2   thank you for all the attention you paid to this case. I know

3   you worked extremely hard.

4         THE COURT: All right. Thank you. Mr. Hayward, has

5   counsel accurately stated the terms of the settlement

6   agreement?

7         MR. HAYWARD: They have, Your Honor. On behalf of

8   my client and myself we also appreciate your focus and time on

9   this case and you maintained your sense of humor throughout.

10         THE COURT: Well, lawyers are much more grateful for

11   my work before I render a decision.

12         MR. LENHARD: No kidding.

13         THE COURT: Dr. Bryan, I notice you are present.

14   Have the lawyers accurately stated your understanding of the

15   settlement agreement in this case?

16         PLAINTIFF BRYAN: Yes, sir.

17         THE COURT: Do you represent to the Court that you

18   are authorized to enter into this agreement on behalf of

19   yourself, the SNCA entity and all the other Plaintiffs?

20         PLAINTIFF BRYAN: Yes, sir. We met morning.

21         THE COURT: Are you doing so freely and voluntarily

22   without threats or promises of any kind except only the terms

23   of the agreement, itself?

24         PLAINTIFF BRYAN: Yes, sir.

9

1      THE COURT:  Do you understand that, if this

2  agreement is approved by the Court and performed by the

3  parties, that all claims of any nature that were made in this

4  case by you, your colleagues, or could have been made will

5  ultimately be dismissed with prejudice which means they may

6  not be brought again in any court anywhere?

7      PLAINTIFF BRYAN: I understand that, sir.

8      THE COURT:  Thank you. Mr. Miller, are you present?

9      DEFENDANT MILLER:  Yes, Your Honor.

10      THE COURT:  Have your counsel also accurately stated

11  the terms of the settlement agreement as you understand it to

12  be?

13      DEFENDANT MILLER:  Yes, sir.

14      THE COURT:  And you are authorized as Chief

15  Executive Officer of the Renown entity to enter into this

16  agreement?

17      DEFENDANT MILLER:  Yes, sir.

18      THE COURT:  Are you doing so freely and voluntarily

19  without threats or promises of any kind except only the terms

20  of the agreement, itself?

21      DEFENDANT MILLER:  Yes.

22      THE COURT:  Do you understand, if the Court approves

23  the agreement and it is performed by the parties, then all

24  claims or counterclaims that could have been asserted in this

10

1    case by you and your client will ultimately be dismissed with

2    prejudice which means they may not be brought again in any

3    court anywhere?

4            DEFENDANT MILLER:  Yes.

5            THE COURT:  Is Mr. Schweber present?

6            DEFENDANT SCHWEBER: Yes, sir.

7            THE COURT:  Mr. Schweber, have the lawyers

8    accurately stated the terms of the settlement agreement as it

9    applies to you?

10           DEFENDANT SCHWEBER: Yes, sir.

11           THE COURT:  Are you entering into this agreement

12    freely and voluntarily without threats or promises of any kind

13    except only the terms of the agreement, itself?

14           DEFENDANT SCHWEBER: Yes, sir.

15           THE COURT:  Do you also understand that, if the

16    agreement is approved by the court and performed by the

17    parties, that all claims or counterclaims you may have

18    asserted in this case will be dismissed with prejudice which

19    means they may not be brought again in any court anywhere?

20           DEFENDANT SCHWEBER: Yes, sir.

21           THE COURT:  The Court finds the agreement is fair,

22    just and reasonable.  The Court orders the parties, their

23    officers, agents, counsel, employees --

24           MR. LENHARD:  Your Honor, you didn't ask

11

1    Mr. Testolin the same questions.  He's also a named defendant.

2          THE COURT:  Is Mr. Testolin here?

3    DEFENDANT TESTOLIN:  Yes.

4          THE COURT:  Mr. Testolin, let's review these matters

5    with you, please.  Have the lawyers accurately stated the

6    terms of the agreement as you understand it to be?

7          DEFENDANT TESTOLIN:  Yes, Your Honor.

8          THE COURT:  Are you entering into the agreement

9    freely and voluntarily without threats or promises of any kind

10   except only the terms of the agreement, itself?

11         DEFENDANT TESTOLIN: Yes.

12         THE COURT:  And do you understand that, if the Court

13   approves the agreement and it is performed by the parties,

14   that any claims or counterclaims you could have asserted in

15   the case will be dismissed with prejudice and may not be

16   brought again in any court anywhere at any time?

17         DEFENDANT TESTOLIN: Yes.

18         THE COURT:  The Court then now finds the agreement

19   is fair, just and reasonable.

20         The Court orders the parties, their officers,

21   agents, employees and counsel to forthwith perform the

22   agreement.

23         The Court will retain jurisdiction to oversee

24   enforcement of the agreement. If there is any dispute

                                12

1   concerning the language of the written settlement agreement or

2   the release, counsel may contact the Administrative Assistant

3   in this department.   The Court will conduct an on-the-record

4   telephone conference, and all decisions of the Court

5   concerning the language will be final and unappealable.

6          Ms. Peterson and gentlemen, I also wish to thank you

7   for your participation in the case. This lawsuit reminded me

8   that many years ago, a long time ago, just after I got this

9   job, I was sitting on the front porch of Bruce Thompson's

10  house, and I said to him, "What do you like better, criminal

11  or civil cases?"  And he said, "It doesn't make any difference

12  what kind of case it is. It is who the lawyers are."  And so

13  it so true.   It has been a wonderful professional experience

14  for me as well, although I do look forward to the two-day DUI

15  trial next Monday.  For me it is just a delight to have

16  wonderful professional people, and I commend you all very

17  much.

18          Mr. Scott, thank you for your service to the parties

19  as well. Court is in recess.

20          (Whereupon, the proceedings were concluded.)

21                          --oOo--

22

23

24

1  STATE OF NEVADA,        )
                           )  ss.
2  COUNTY OF WASHOE.       )

3        I, Judith Ann Schonlau, Official Reporter of the

4  Second Judicial District Court of the State of Nevada, in and

5  for the County of Washoe, DO HEREBY CERTIFY:

6        That as such reporter I was present in Department

7  No. 6 of the above-entitled court on Monday, February 4, 2013,

8  at the hour of 1:30 p.m. of said day and that I then and there

9  took verbatim stenotype notes of the proceedings had in the

10  matter of KOSTA ARGER, et al vs. RENOWN REGIONAL MEDICAL

11  CENTER, Case Number CV11-02477.

12        That the foregoing transcript, consisting of pages

13  numbered 1-14 inclusive, is a full, true and correct

14  transcription of my said stenotypy notes, so taken as

15  aforesaid, and is a full, true and correct statement of the

16  proceedings had and testimony given upon the trial of the

17  above-entitled action to the best of my knowledge, skill and

18  ability.

19  DATED:  At Reno, Nevada this 6th day of February, 2013.

20

21

22                          /s/ Judith Ann Schonlau
                            ――――――――――――――――――――――――――
23                          JUDITH ANN SCHONLAU CSR #18

24

                              14

# EXHIBIT 2

1    3990

**F I L E D**
Electronically
03-29-2013:11:16:55 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 3625680

2

3

4

5

6            IN THE SECOND JUDICIAL DISTRICT FOR THE STATE OF NEVADA

7                    IN AND FOR THE COUNTY OF WASHOE

8                                * * * * *

9

10   KOSTA M. ARGER, M.D.; CHAD              CASE NO.:   CV11-02477
     M. BIDART, M.D., F.A.C.C.;
11   RICHARD H. BRYAN, JR., M.D.,            DEPT. NO.:   B6
     F.A.C.C.; FRANK P. CARREA, M.D.,
12   F.A.C.C.; RAM M. CHALLAPALLI,
     M.D., F.A.C.C.; SRIDEVI CHALLAPALLI,
13   M.D., F.A.C.C.; DEVANG M. DESAI,
     M.D., F.A.C.C.; ERIC M. DRUMMER,        **STIPULATION AND ORDER
14   M.D., F.A.C.C.; COLIN M. FULLER, M.D.,   DISMISSING ALL CLAIMS
     F.A.C.C., F.A.C.P., F.S.C.A.I.; FRANCIS P.  WITH PREJUDICE**
15   KELLEY, M.D., F.A.C.C.; MICHAEL J.
     NEWMARK, M.D., F.A.C.C., F.S.C.A.I.;
16   TOM NYLK, M.D., F.A.C.C.; JOSEPH
     STEVENSON, D.O., F.A.C.C.,
17
               Plaintiffs,
18
     vs.
19
     RENOWN HEALTH, a Nevada Non-Profit
20   Corporation; RENOWN REGIONAL MEDICAL
     CENTER, a Nevada Non-Profit Corporation;
21   NEVADA HEART INSTITUTE, a Nevada Non-
     Profit Corporation; JIM MILLER, an individual;
22   KELLY TESTOLIN, an individual; PHIL
     SCHWEBER, an individual; and DOES I-V,
23
               Defendants.
24
     RENOWN HEALTH, a Nevada Non-Profit
25   Corporation; RENOWN REGIONAL MEDICAL
     CENTER, a Nevada Non-Profit Corporation;
26   NEVADA HEART INSTITUTE, a Nevada Non-
     Profit Corporation,
27
               Counterclaimants,
28   v.

1  KOSTA M. ARGER, M.D.; CHAD
   M. BIDART, M.D., F.A.C.C.;
2  RICHARD H. BRYAN, JR., M.D.,
   F.A.C.C.; FRANK P. CARREA, M.D.,
3  F.A.C.C.; RAM M. CHALLAPALLI,
   M.D., F.A.C.C.; SRIDEVI CHALLAPALLI,
4  M.D., F.A.C.C.; DEVANG M. DESAI,
   M.D., F.A.C.C.; ERIC M. DRUMMER,
5  M.D., F.A.C.C.; COLIN M. FULLER, M.D.,
   F.A.C.C., F.A.C.P., F.S.C.A.I.; FRANCIS P.
6  KELLEY, M.D., F.A.C.C.; MICHAEL J.
   NEWMARK, M.D., F.A.C.C., F.S.C.A.I.;
7  TOM NYLK, M.D., F.A.C.C.; JOSEPH
   STEVENSON, D.O., F.A.C.C., CANDACE
8  M. McNULTY, M.D.,

9                Counterdefendants.

10  _____/

11     Plaintiffs, Kosta M. Arger, M.D., Chad M. Bidart, M.D., Richard H. Bryan, Jr., M.D.,

12  Frank P. Carrea, M.D., Ram M Challapalli, M.D., Sridevi Challapalli, M.D., Devang M. Desai,

13  M.D., Eric M. Drummer, M.D., Colin M. Fuller, M.D., Michael J. Newmark, M.D., Tom Nylk,

14  M.D., and Joseph Stevenson, D.O. ("Plaintiffs"), Defendants Renown Health ("Renown

15  Health"), Renown Regional Medical Center ("Renown Regional"), Nevada Heart Institute

16  ("NHI"), Jim Miller ("Miller"), and Kelly Testolin ("Testolin") (collectively the "Renown

17  Defendants"), and Phil Schweber ("Schweber") hereby stipulate as follows:

18     1.     Plaintiffs filed a Complaint against the Renown Defendants and Schweber on

19  August 22, 2011.  Plaintiffs amended their Complaint on August 26, 2011, on January 4, 2012,

20  and again on January 11, 2013.

21     2.     The Renown Defendants and Schweber answered each of Plaintiffs' Complaints

22  and the Renown Defendants asserted various Counterclaims against Plaintiffs.

23     3.     The Renown Defendants, Schweber and Plaintiffs have been able to reach a

24  mutually acceptable resolution and have agreed to dismiss all Claims and Counterclaims against

25  each other with prejudice.

26     4.     The jury fees deposited with the Court by the Plaintiffs be returned to their

27  counsel, Robison, Belaustegui, Sharp & Low.

28

                                    2

1

### AFFIRMATION

2

#### Pursuant to NRS 239B.030

3          The undersigned does hereby affirm that this document does not contain the social

4    security number of any person.

5    IT IS SO STIPULATED:

6    DATED: 3-28-13                          DATED: _____

7    BROWNSTEIN HYATT FARBER            ROBISON, BELAUSTEGUI, SHARP & LOW
     SCHRECK, LLP                       A Professional Corporation
8    100 N. City Parkway, Suite 1600    71 Washington Street
     Las Vegas, Nevada 89106            Reno, Nevada  89503
9

10
     _____            _____
11   KIRK B. LENHARD (#1437)            KENT R. ROBISON (#1167)
     TAMARA BEATTY PETERSON (#5218)     KRISTEN L. MARTINI (#11272)
12   NIKKI L. BAKER (#6562)             *Attorneys for Plaintiffs / Counterdefendants*
     *Attorneys for Defendants and*
     *Counter-claimants*
13

14   DATED: _____

15   LAXALT & NOMURA, LTD.
     9600 Gateway Drive
16   Reno, Nevada 89521

17

18   _____
     DANIEL T. HAYWARD (#5986)
19   *Attorneys for Defendant*
     *Phil Schweber*

20
                              ### O R D E R
21
             IT IS HEREBY ORDERED that all Claims against the Renown Defendants and Phil

22   Schweber, and all Counterclaims against the Plaintiffs are dismissed with prejudice and the jury

23   fees deposited with the Court herein be returned to Plaintiffs' counsel, Robison, Belaustegui,

24   Sharp & Low.

25          DATED this _____ day of _____, 2013.

26

27

28                                         _____
                                           DISTRICT JUDGE

                                  3

1   **AFFIRMATION**

2   **Pursuant to NRS 239B.030**

3       The undersigned does hereby affirm that this document does not contain the social

4   security number of any person.

5   IT IS SO STIPULATED:

6   DATED: _____        DATED: *March 28, 2013*

7   BROWNSTEIN HYATT FARBER         ROBISON, BELAUSTEGUI, SHARP & LOW
    SCHRECK, LLP                    A Professional Corporation
8   100 N. City Parkway, Suite 1600  71 Washington Street
    Las Vegas, Nevada 89106         Reno, Nevada  89503
9

10  _____       _____
11  KIRK B. LENHARD (#1437)         KENT R. ROBISON (#1167)
    TAMARA BEATTY PETERSON (#5218)  KRISTEN L. MARTINI (#11272)
    NIKKI L. BAKER (#6562)          *Attorneys for Plaintiffs / Counterdefendants*
12  *Attorneys for Defendants and*
    *Counter-claimants*
13

14  DATED: *March 13, 2013*

15  LAXALT & NOMURA, LTD.
    9600 Gateway Drive
16  Reno, Nevada 89521

17  _____
18  DANIEL T. HAYWARD (#5986)
    *Attorneys for Defendant*
19  *Phil Schweber*

20  **ORDER**

21      IT IS HEREBY ORDERED that all Claims against the Renown Defendants and Phil

22  Schweber, and all Counterclaims against the Plaintiffs are dismissed with prejudice and the jury

23  fees deposited with the Court herein be returned to Plaintiffs' counsel, Robison, Belaustegui,

24  Sharp & Low.

25      DATED this *27th* day of *March*, 2013.

26

27  _____
28  DISTRICT JUDGE

3

NEF: KOSTA ARGER ETAL VS. RENOWN REGIONAL ETAL (B6): Stip & Ord Dismiss W/Prejud...   Page 1 of 2

**Jayne Ferretto**

| | |
|---|---|
| **From:** | eflex@washoecourts.us |
| **Sent:** | Friday, March 29, 2013 11:21 AM |
| **To:** | Jayne Ferretto |
| **Subject:** | NEF: KOSTA ARGER ETAL VS. RENOWN REGIONAL ETAL (B6): Stip & Ord Dismiss W/Prejudice: CV11-02477 |

****** IMPORTANT NOTICE - READ THIS INFORMATION *****

PROOF OF SERVICE OF ELECTRONIC FILING

| | |
|---|---|
| **A filing has been submitted to the court RE:** | CV11-02477 |
| **Judge:** | BRENT ADAMS |
| **Official File Stamp:** | 03-29-2013:11:16:55 |
| **Clerk Accepted:** | 03-29-2013:11:17:52 |
| **Court:** | Second Judicial District Court - State of Nevada |
| **Case Title:** | KOSTA ARGER ETAL VS. RENOWN REGIONAL ETAL (B6) |
| **Document(s) Submitted:** | Stip & Ord Dismiss W/Prejudice |
| **Filed By:** | Heidi Boe |

You may review this filing by clicking on the following link to take you to your cases.

This notice was automatically generated by the courts auto-notification system.

If service is not required for this document (e.g., Minutes), please disregard the below language.
**The following people were served electronically:**

> NIKKI BAKER, ESQ for RENOWN REGIONAL MEDICAL CENTER, NEVADA HEART INSTITUTE, GREG BOYER, KELLY TESTOLIN, CANDACE MCNULTY, M.D., RENOWN HEALTH, JAMES MILLER, CHRIS GAW, BLAIN CLAYPOOL
>
> TAMARA PETERSON, ESQ. for RENOWN REGIONAL MEDICAL CENTER, NEVADA HEART INSTITUTE, GREG BOYER, KELLY TESTOLIN, CANDACE MCNULTY, M.D., RENOWN HEALTH, JAMES MILLER, CHRIS GAW, BLAIN CLAYPOOL
>
> KIRK LENHARD, ESQ. for RENOWN REGIONAL MEDICAL CENTER, NEVADA HEART INSTITUTE, GREG BOYER, KELLY TESTOLIN, CANDACE MCNULTY, M.D., RENOWN HEALTH, JAMES MILLER, CHRIS GAW, BLAIN CLAYPOOL
>
> DANIEL HAYWARD, ESQ. for PHIL SCHWEBER
>
> KEVIN BERTONNEAU, ESQ. for CANDACE MCNULTY, M.D.

NEF: KOSTA ARGER ETAL VS. RENOWN REGIONAL ETAL (B6): Stip & Ord Dismiss W/Prejud...   Page 2 of 2

JUSTIN BUSTOS, ESQ. for ROBERT SWACKHAMER, M.D., F.A.C.C., FSCAI, STANLEY THOMPSON, M.D., F.A.C.C., RICHARD SHERER, M.D., F.A.C.C., FSCAI, DAVID SMITH, M.D., F.A.C.C.A., THEODORE BERNDT, M.D., F.A.C.C., FSACI, THOMAS DAVEE, M.D., F.A.C.C., SUMER DHIR, M.D., RICHARD GANCHAN, M.D., F.A.C.C.; FSCAI, JOHN GRINSELL, M.D., F.A.C.C., JAKE ICHINO, M.D., F.A.C.C., FSCAI, ANITA KEDIA, M.D., F.A.C.C., CHIRSTOPHER LAMBERT, M.D., F.A.C.C., LETITIA ANDERSON, M.D., LARRY NOBLE, M.D., F.A.C.C., JOHN WILLIAMSON, M.D., F.A.C.C., CHANWIT ROONGSRITONG, M.D., F.A.C.C., JERRY ZEBRACK, M.D., F.A.C.C.

KENT ROBISON, ESQ. for FRANK CARREA et al

JOHN DESMOND, ESQ. for ROBERT SWACKHAMER, M.D., F.A.C.C., FSCAI, STANLEY THOMPSON, M.D., F.A.C.C., RICHARD SHERER, M.D., F.A.C.C., FSCAI, DAVID SMITH, M.D., F.A.C.C.A., THEODORE BERNDT, M.D., F.A.C.C., FSACI, THOMAS DAVEE, M.D., F.A.C.C., SUMER DHIR, M.D., RICHARD GANCHAN, M.D., F.A.C.C.; FSCAI, JOHN GRINSELL, M.D., F.A.C.C., JAKE ICHINO, M.D., F.A.C.C., FSCAI, ANITA KEDIA, M.D., F.A.C.C., CHIRSTOPHER LAMBERT, M.D., F.A.C.C., LETITIA ANDERSON, M.D., LARRY NOBLE, M.D., F.A.C.C., JOHN WILLIAMSON, M.D., F.A.C.C., CHANWIT ROONGSRITONG, M.D., F.A.C.C., JERRY ZEBRACK, M.D., F.A.C.C.

**The following people have not been served electronically and must be served by traditional means (see Nevada electronic filing rules):**

3/29/2013

**F I L E D**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

# EXHIBIT 4

# EXHIBIT 4

111 0101

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:        Jon Leibowitz, Chairman
                      J. Thomas Rosch
                      Edith Ramirez
                      Julie Brill
                      Maureen K. Ohlhausen

---
)
In the Matter of )
)
RENOWN HEALTH, )          Docket No.
   a corporation. )
)
)
---

**COMPLAINT**

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by said Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondent Renown Health, directly or by or through its wholly-owned subsidiaries Nevada Heart Institute and NHI-1, Inc. (collectively "Renown Health") has acquired the medical practices and assets of Sierra Nevada Cardiology Associates, Inc. ("SNCA"), and Reno Heart Physicians, Inc. ("RHP"), and has employed the physician members and physician employees previously providing cardiology services in connection with those entities, and has violated and is violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

**NATURE OF THE CASE**

1.     Renown Health's acquisition of two cardiology groups in Reno, Nevada, SNCA and RHP, and the employment of the doctors who had formerly practiced in association with these medical group entities, is likely to lead to anticompetitive effects including increased prices and reduced non-price competition. This consolidation resulted in 15 of the cardiologists who had been associated with SNCA and 17 of the physicians who had been associated with RHP becoming employees of Renown Health.

1

SNCA  0013

2.      Prior to the transactions at issue, SNCA and RHP, the two largest groups of physicians providing adult cardiology services in the Reno/Sparks, Nevada Metropolitan Statistical Area ("Reno area"), competed head-to-head to serve cardiology patients.

3.      As a result of Renown Health's acquisition of SNCA in 2010 and the employment of the SNCA-affiliated cardiologists, Renown Health employed approximately 47% of the cardiologists serving private patients in the Reno area.  As a result of Renown Health's subsequent acquisition of RHP in 2011 and employment of the RHP-affiliated cardiologists, Renown Health then employed approximately 97% of the cardiologists serving private patients in the Reno area.  Renown Health's acquisition of RHP makes it likely that Renown Health will be able to exercise unilateral market power in the Reno area, which will result in higher prices and a reduction in non-price competition for the provision of cardiology services.

4.      Although health plans are the direct customers for cardiology services provided to many patients, higher prices for those services are passed on to employers, unions, and other group purchasers of health insurance plans, and such costs are ultimately borne by patients in the Reno area through higher premiums, co-payments, and other out-of-pocket expenditures.

5.      The price and non-price competition eliminated by Renown Health's acquisition of RHP and employment of its cardiologists will not be replaced by other providers.  Prior to the acquisition, RHP was the only group of cardiologists that competed meaningfully with Renown Health for Reno-area cardiology patients.

## RESPONDENT

6.      Respondent Renown Health is a non-profit corporation, organized, existing, and doing business under and by virtue of the laws of the State of Nevada, with its office and principal place of business located at 1155 Mill Street, Reno, Nevada 89502.  In Reno, Renown Health owns and operates Renown Regional Medical Center, with 808 licensed beds, and Renown South Meadows Medical Center, with 76 licensed beds.  Renown Health also operates Carson Valley Medical Center in Gardnerville, Nevada, as part of a joint venture with Barton Healthcare Service.  In addition, Renown Health owns and operates Hometown Health Plan, a commercial health insurance company that does business in northern Nevada as well as other portions of the state.

7.      Respondent Renown Health is, and at all times herein has been engaged in commerce or in activities in or affecting commerce within the meaning of Section 1 of the Clayton Act, 15 U.S.C. § 12.  The acquisitions of SNCA and RHP constitute acquisitions under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## THE TRANSACTIONS

8.      On or about November 24, 2010, Arger, DiPaolo, Drummer, Fuller, Newmark & Spring, a Nevada professional corporation doing business as SNCA was converted to a Nevada for-profit corporation.  SNCA, was then merged into Renown Health.  In addition, Renown Health purchased certain of SNCA's assets, including its interest in a free-standing cardiac

2

SNCA   0012

catheterization laboratory and its goodwill, for approximately $3.4 million. This merger of SNCA into Renown Health ("SNCA merger") became effective on January 1, 2011.

      9.     On or about November 24, 2010, 15 physicians associated with SNCA signed employment agreements with Renown Health, providing that each such physician would become employed by Renown Health for a specified numbers of years, for a salary and certain specified benefits. The effective date of the employment agreements between Renown Health and each of the SNCA physicians was January 1, 2011.

      10.     The employment agreements between the former SNCA doctors and Renown Health contain "covenants," including a covenant not to compete, a covenant of non-solicitation, and a covenant of non-interference. The covenant not to compete contained in the employment agreements between Renown Health and each of the physicians formerly affiliated with SNCA provides, *inter alia*, that a Renown Health-employed cardiologist who chooses to leave Renown Health's employ is barred for two years from negotiating or entering into an agreement to provide cardiology services at any hospital, medical practice or medical facility at a location within 50 miles of the physician's principal place of practice with Renown Health, or from owning, operating, managing, becoming an employee, or in any way becoming connected with any hospital, medical practice or medical facility at a location within 50 miles of the physician's principal place of practice with Renown Health. The covenant of non-solicitation contained in the employment agreements between Renown Health and each of the physicians formerly affiliated with SNCA provides, *inter alia*, that a Renown Health-employed cardiologist who chooses to leave Renown Health's employ is barred for a period of two years after leaving from soliciting or contacting former patients. The covenant of non-interference contained in the employment agreements between Renown Health and each of the physicians formerly affiliated with SNCA provides, *inter alia*, that a Renown Health-employed cardiologist who chooses to leave Renown Health's employ is barred from causing any entity with a contractual relationship with Renown Health from terminating such relationship with Renown Health.

      11.     On or about March 17, 2011, Berndt, Chaney-Roberts, Davee, Ganchan, Ichino, Juneau, Noble, Seher, Smith, Swackhamer, Thompson, Williamson and Zebrack, Ltd., a professional corporation doing business as Reno Heart Physicians was converted to a Nevada for-profit corporation. This corporation was then merged into Renown Health. In addition, Renown Health purchased certain of RHP's assets, for approximately $4 million. This merger of RHP into Renown Health ("RHP merger") became effective on or about March 29, 2011.

      12.     On or about March 17, 2011, 17 physicians associated with RHP signed employment agreements with Renown Health, providing that each such physician would become employed by NHI for specified numbers of years, for a salary and certain specified benefits. The effective date of the employment agreements between Renown Health and each of the RHP physicians was March 29, 2011. Of the 17 cardiologist affiliated with RHP who became Renown Health employees, 16 practiced primarily and regularly in the Reno area; one cardiologist practiced regularly in an office located in Carson City, Nevada. The employment agreements between the former RHP doctors and Renown Health also contain "covenants" including a covenant not to compete, a covenant of non-solicitation, and a covenant of non-

<div align="center">3</div>

SNCA  0014

interference, which are identical or virtually identical to those contained in the employment agreements between the SNCA doctors and Renown Health.

13.     Prior to the SNCA merger, Renown Health did not employ any cardiologists. With the SNCA merger and employment of the former SNCA cardiologists, Renown Health employed 15 cardiologists who competed with RHP in the provision of cardiology services in the Reno area. After the RHP merger, Renown Health, either directly or through its subsidiaries, employed 31 cardiologists in Reno and one cardiologist in Carson City.

14.     The effect of the acquisition of RHP by Renown Health was to combine 31 of the 32 cardiologist then practicing in the Reno area under Renown Health, the owner and operator of the largest hospital system in that area.

## THE RELEVANT MARKET

15.     For the purposes of this Complaint, the relevant line of commerce is the provision of adult cardiology services. "Cardiology services" includes diagnostic or treatment services by cardiologists who provide non-invasive services (general cardiology), invasive services (including diagnostic cardiac catheterization procedures), interventional cardiology (including placement of stents), and electrophysiology services (including the insertion and/or removal of devices related to heart rhythm functions). For purposes of this complaint, cardiology services does not include pediatric cardiology services or cardiac surgery.

16.     The relevant geographic market in which to assess the effect of the SNCA and RHP mergers with Renown Health is the Reno area, including Washoe County, Nevada, but not including Carson City, Nevada.

## THE STRUCTURE OF THE MARKET

17.     The merger of RHP into Renown Health and the employment of the RHP physicians by Renown Health reduced from two to one the number of adult cardiology service providers that offer a broad range of adult cardiology subspecialties in the Reno area. These cardiology subspecialties, including non-invasive, invasive, interventional, and electrophysiology, are required to fully meet the needs of patients with heart conditions. At the time of the RHP transaction, the only other cardiologist serving adult cardiology patients in the Reno area was a sole practitioner, who could not provide a comparable range of services.

18.     At the time of the consummation of the transaction at issue here, Renown Health employed 97% of the cardiologists in the relevant market. The Hershman-Herfindahl Index ("HHI") in the market for the provision of cardiology services, based on the number of cardiologists serving the market, increased from 4707 to 9395, an increase of 4688 points.

19.     Since the time the former RHP doctors became employees of Renown Health, two Renown Health cardiologists have left the Reno area. In addition, three cardiologists who are not affiliated with Renown Health have started practicing cardiology in the Reno area. As a result, Renown Health now employs approximately 88% of the cardiologists in the area. The

4

SNCA 0015

current HHI, based on the number of cardiologists serving the market is now 7815, an increase of 3108 points over the HHI prior to the Renown Health's acquisition of RHP.

20.    Prior to January 1, 2011, the effective date of the SNCA physicians' employment by Renown Health, SNCA and RHP were actual and substantial competitors in the relevant market. After Renown Health's employment of the SNCA physicians, Renown Health became an actual and substantial competitor of RHP in the provision of cardiology services to patients in the Reno area.

21.    Prior to March 29, 2011, the effective date of the RHP physicians' employment by Renown Health, health plans and self-insured employers, seeking to contract with cardiologists for the provision of cardiology services to their members and/or employees, would have been able to choose between RHP and Renown Health based on price and non-price terms offered by the respective groups of cardiologists. Health plans and employers contracting for adult cardiology services benefitted from this head-to-head competition with lower prices and improved quality and service.

22.    The availability and number of alternative providers is the primary source of a health plan's bargaining power to negotiate competitive rates on behalf of its members. Thus, an acquisition that reduces a health plan's choice of providers reduces the health plan's bargaining power when negotiating with providers, and can lead to higher prices and reduced quality. Renown Health's acquisition of RHP reduced the number of cardiology practices capable of providing a full range of cardiology services from two to one, creating a significant risk of higher prices and reduced quality.

## ENTRY CONDITIONS

23.    The most significant barrier to entry into the market for adult cardiology services in the Reno area is the need for new entrants to recruit a sufficient number of cardiologists with appropriate training, experience and areas of specialization. Because cardiologists within a practice must provide coverage for each other, unless an entity can recruit a sufficient number of cardiologists in each necessary subspecialty, any cardiologists recruited to the market will not have a sufficient number of other cardiologists with whom they can share responsibilities.

24.    New entry into the relevant geographic market sufficient to deter or counteract the anticompetitive effects described in Paragraphs 25 and 26 is unlikely to occur in a timely manner because recruitment of a sufficient number of cardiologists to provide a competitive constraint to Renown Health would take more than two years.

## EFFECTS OF THE TRANSACTION

25.    The effects of Renown Health's acquisition of RHP and employment of the RHP physicians may be substantially to lessen competition and tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in the following ways, among others:

5

SNCA 0016

a.   eliminating actual, direct and substantial competition between Renown Health and RHP in the market for the provision of cardiology services;

b.   increasing the ability of the merged entity unilaterally to raise prices for cardiology services; and

c.   reducing incentives to improve service or product quality in the relevant markets

26.   After the consummation of the transaction with its combination of the two largest cardiology physician groups in the Reno area, health plans can no longer threaten, implicitly or explicitly, to exclude Renown Health or the cardiologists employed by Renown Health. This substantially reduces the health plans' bargaining power, and substantially increases Renown Health's bargaining power, when negotiating rates for adult cardiology services in the Reno area.

## VIOLATIONS CHARGED

27.   The transaction described in Paragraph 11, and Renown Health's subsequent employment of RHP doctors, described in Paragraph 12, constitute a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

WHEREFORE, THE PREMISES CONSIDERED, the Federal Trade Commission on this third day of July, 2012, issues its Complaint against said Respondent.

By the Commission.

Donald S. Clark
Secretary

SEAL:

6

111 0101

**UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION**

COMMISSIONERS:      Jon Leibowitz, Chairman
                              J. Thomas Rosch
                              Edith Ramirez
                              Julie Brill
                              Maureen K. Ohlhausen

---

In the Matter of

Renown Health,
  a corporation.

Docket No. C-

---

**ORDER TO SUSPEND ENFORCEMENT OF RENOWN NON-COMPETE**

The Federal Trade Commission ("Commission"), having initiated an investigation of the acquisition by Renown Health of Reno Heart Physicians ("RHP"), and Renown Health (hereafter referred to as "Renown Health" or "Respondent Renown") having been furnished thereafter with a copy of a draft Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondent Renown with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18; and

Respondent Renown, its attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondent Renown of all the jurisdictional facts set forth in the aforesaid draft Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondent Renown that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it had reason to believe that Respondent Renown has violated the said Act, and that a Complaint should issue stating its charges in that respect, and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, now in further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the Commission hereby issues its Complaint, makes the following jurisdictional findings, and issues the following Order

SNCA 0018

Suspending Enforcement of the Renown Non-Compete ("Order to Suspend Enforcement"):

1. Respondent Renown is a not-for-profit corporation organized, existing and doing business under and by virtue of the laws of the State of Nevada with its office and principal place of business located at 1155 Mill Street, Reno, Nevada 89502.

2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of Respondent Renown, and the proceeding is in the public interest.

## ORDER

### I.

**IT IS ORDERED** that, all the capitalized terms used in this Order to Suspend Enforcement, but not defined herein, shall have the meanings attributed to such terms in the Decision and Order contained in the Consent Agreement. In addition to the definitions in Paragraph I of the Decision and Order attached to the Agreement Containing Consent Orders, the following definitions shall apply:

A. "Decision and Order" means:

    1. the Proposed Decision and Order contained in the Consent Agreement in this matter until the issuance of a final Decision and Order by the Commission; and

    2. the Final Decision and Order issued and served by the Commission.

B. "Monitor" means any monitor appointed pursuant to Paragraph III of the Order to Suspend Enforcement.

C. "Termination Date" means the date on which the Decision and Order becomes final, or on the date Renown Health receives notice from the Commission that a final Decision and Order will not be issued in this matter.

### II.

**IT IS FURTHER ORDERED** that Renown Health shall:

A. From the date this Order to Suspend Enforcement becomes final until the Termination Date ("Suspension Period"), not enforce any Renown Non-Compete Provisions against any Cardiologist Employee for any activity that Cardiologist Employee engages in that Relates To providing Termination Notification; *provided, however*, that this Paragraph II.A does not prohibit Renown Health from enforcing any Renown Non-Compete Provisions against any Cardiologist Employee who terminates Contract Services prior to the date the Decision and Order becomes final.

SNCA  0019

B.  Within three (3) days from the date this Order to Suspend Enforcement becomes final, certify that Renown Health has sent by first-class mail, return receipt requested to each Cardiologist Employee the letter attached as Appendix A to this Order within two (2) days of the Agreement Containing Consent Order in this matter being placed on the public record.

C.  For any activity Related To this Paragraph II, waive all rights to seek or obtain legal or equitable relief for breach of contract or for violation by any Cardiologist Employee of any Renown Non-Compete Provisions.

D.  Not take any other action to discourage, impede, or otherwise prevent any Cardiologist Employee from seeking to terminate Contract Services, pursuant to this Paragraph II.

E.  The purpose of this Paragraph is to ensure that those Cardiologist Employees who seek to terminate their Contract Services can offer Cardiology Services in a Reno Cardiology Practice in competition with Renown Health and to remedy the lessening of competition alleged in the Commission's Complaint.

### III.

**IT IS FURTHER ORDERED** that:

A.  Judge Charles McGee shall be appointed Monitor to assure that Renown Health expeditiously complies with all of its obligations and performs all of its responsibilities as required by this Order.

B.  No later than one (1) day after the Commission accepts the Order to Suspend Enforcement issues, Renown Health shall, pursuant to the Monitor Agreement, attached as Appendix B and Confidential Appendix B-1 to this Order, transfer to the Monitor all the rights, powers, and authorities necessary to permit the Monitor to perform its duties and responsibilities in a manner consistent with the purposes of this Order.

C.  In the event a substitute Monitor is required, the Commission shall select the Monitor, subject to the consent of Renown Health, which consent shall not be unreasonably withheld. If Renown Health has not opposed, in writing, including the reasons for opposing, the selection of a proposed Monitor within ten (10) days after notice by the staff of the Commission to Renown Health of the identity of any proposed Monitor, Renown Health shall be deemed to have consented to the selection of the proposed Monitor. Not later than ten (10) days after appointment of a substitute Monitor, Renown Health shall execute an agreement that, subject to the prior approval of the Commission, confers on the Monitor all the rights and powers necessary to permit the Monitor to monitor Renown Health's compliance with the terms of this Order and the Order to Suspend Enforcement in a manner consistent with the purposes of this Order.

D.  In the event a substitute Monitor is required, the Commission shall select the Monitor, subject to the consent of Renown Health, which consent shall not be unreasonably withheld.

E.  Renown Health shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

   1.  The Monitor shall have the power and authority to monitor Renown Health's compliance with the terms of this Order to Suspend Enforcement, and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with the purposes of this Order to Suspend Enforcement and in consultation with the Commission, including, but not limited to:

      a.  receiving Termination Notification from Cardiologist Employees;

      b.  notifying each Cardiologist Employee that submitted a Termination Notification whether or not such notification will be an Acceptable Notification; and

      c.  assuring that Renown Health expeditiously complies with all of its obligations and performs all of its responsibilities as required by the this Order.

   2.  The Monitor shall act in a fiduciary capacity for the benefit of the Commission.

   3.  The Monitor shall serve for such time as is necessary to monitor Renown Health's compliance with the Paragraph II.

   4.  Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Renown Health's personnel, books, documents, records kept in the ordinary course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, related to Renown Health's compliance with its obligations under this Order to Suspend Enforcement. Renown Health shall cooperate with any reasonable request of the Monitor and shall take no action to interfere with or impede the Monitor's ability to monitor Renown Health's compliance with this Order to Suspend Enforcement.

   5.  The Monitor shall serve, without bond or other security, at the expense of Renown Health on such reasonable and customary terms and conditions as the Commission may set. The Monitor shall have authority to employ, at the expense of Renown Health, such consultants, accountants, attorneys and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities. The Monitor shall account for all expenses incurred, including fees for services rendered, subject to the approval of the Commission.

   6.  Renown Health shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any

claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from malfeasance, gross negligence, willful or wanton acts, or bad faith by the Monitor.

7. Renown Health shall report to the Monitor in accordance with the requirements of this Order and/or as otherwise provided in any agreement approved by the Commission. The Monitor shall evaluate the reports submitted to the Monitor by Renown Health with respect to the performance of Renown Health's obligations under this Order to Suspend Enforcement.

8. Within one (1) month from the date the Monitor is appointed pursuant to this paragraph, every sixty (60) days thereafter, until the termination of this Order to Suspend Enforcement, and otherwise as requested by the Commission, the Monitor shall report in writing to the Commission concerning performance by Renown Health of its obligations under this Order to Suspend Enforcement.

9. Renown Health may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

F. The Commission may, among other things, require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement Relating To Commission materials and information received in connection with the performance of the Monitor's duties.

G. If the Commission determines that the Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Monitor in the same manner as provided in this Paragraph III.

H. The Commission may on its own initiative, or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order to Suspend Enforcement.

I. The Monitor appointed pursuant to Paragraph III of this Order to Suspend Enforcement may be the same Person appointed as Monitor under the Decision and Order.

## IV.

**IT IS FURTHER ORDERED** that within thirty (30) days after the date this Order to Suspend Enforcement becomes final, and every sixty (60) days thereafter until this Order to Suspend Enforcement terminates, Renown Health shall submit to the Commission a verified written report setting forth in detail the manner and form in which it intends to comply, is complying, and has complied with this Order to Suspend Enforcement

**V.**

IT IS FURTHER ORDERED that Renown Health shall notify the Commission at least thirty (30) days prior to:

A.  Any proposed dissolution of Renown Health,

B.  Any proposed acquisition, merger or consolidation of Renown Health, or

C.  Any other change in Renown Health, including but not limited to assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of the Order to Suspend Enforcement.

**VI.**

IT IS FURTHER ORDERED that, for the purpose of determining or securing compliance with this Order to Suspend Enforcement, and subject to any legally recognized privilege, and upon written request with reasonable notice to Renown Health, Renown Health shall permit any duly authorized representative of the Commission:

A.  Access, during office hours of Renown Health and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Renown Health related to compliance with this Order to Suspend Enforcement, which copying services shall be provided by Renown Health at the request of the authorized representative(s) of the Commission and at the expense of Renown Health; and

B.  Upon five (5) days' notice to Renown Health and without restraint or interference from Renown Health, to interview officers, directors, or employees of Renown Health, who may have counsel present, regarding such matters.

IT IS FURTHER ORDERED that this Order to Suspend Enforcement shall terminate on the Termination Date.

By the Commission.


Donald S. Clark
Secretary


SEAL

ISSUED:  August 3, 2012

SNCA  0023

**F I L E D**
Electronically
12-18-2013:11:56:46 AM
Joey Orduna Hastings
Clerk of the Court
Transaction # 4206687

# EXHIBIT 5

# EXHIBIT 5

111 0101

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

COMMISSIONERS:   Jon Leibowitz, Chairman
                 J. Thomas Rosch
                 Edith Ramirez
                 Julie Brill
                 Maureen K. Ohlhausen

| | |
|---|---|
| In the Matter of<br><br>Renown Health,<br>a corporation. | Docket No. C-4366 |

## DECISION AND ORDER

The Federal Trade Commission ("Commission"), having initiated an investigation of the acquisition by Renown Health of Reno Heart Physicians ("RHP"), and Renown Health (hereafter referred to as "Renown Health" or "Respondent Renown") having been furnished thereafter with a copy of a draft Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondent Renown with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18; and

Respondent Renown, its attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondent Renown of all the jurisdictional facts set forth in the aforesaid draft Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondent Renown that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it had reason to believe that Respondent Renown has violated the said Act, and that a Complaint should issue stating its charges in that respect, and having thereupon issued its Complaint and its Order to Suspend Enforcement of Renown Non-Compete ("Order to Suspend Enforcement"), and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, and having duly considered the comments filed thereafter by interested persons

SNCA  0024

pursuant to Commission Rule 2.34, 16 C.F.R. § 2.34, now in further conformity with the procedure described in Commission Rule 2.34, the Commission hereby makes the following jurisdictional findings and issues the following Decision and Order ("Order"):

1. Respondent Renown is a not-for-profit corporation organized, existing and doing business under and by virtue of the laws of the State of Nevada with its office and principal place of business located at 1155 Mill Street, Reno, Nevada 89502.

2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of Respondent Renown, and the proceeding is in the public interest.

## ORDER

## I.

**IT IS ORDERED** that, as used in this Order, the following definitions shall apply:

A. "Renown Health" means Renown Health, its directors, officers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries, divisions, groups and affiliates controlled by Renown Health, including but not limited to Nevada Heart Institute, Inc., and NHI-1, Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B. "Commission" means the Federal Trade Commission.

C. "Acceptable Termination" means any termination of employment with Renown Health resulting from (1) a Termination Notification which, upon consultation between the Monitor and the Commission's staff, is submitted, after the Order becomes final, to Renown Health by the Monitor, or (2) Renown Health notifying the Monitor that a Cardiologist Employee is otherwise leaving employment with Renown Health with the intention of Participating in a Reno Cardiology Practice for a period of at least one year and the Monitor consulting with the Commission's staff regarding such notice.

D. "Cardiologist Employee" means a Physician who provides Cardiology Services in the Reno/Sparks Geographic Area as an employee of Renown Health and who, prior to providing Contract Services for Renown Health, offered Cardiology Services as a Participant in SNCA or as a Participant in Reno Heart.

E. "Cardiology Services" means medical professional services in general cardiology (e.g., medical management of heart and vascular conditions), invasive cardiology (e.g., cardiac catheterizations), interventional cardiology (e.g., angioplasty, placement of stents), and electrophysiology (e.g., placement of pacemakers and defibrillators); provided, however, Cardiology Services does not include services provided to pediatric patients or services provided by cardiac surgeons.

2

SNCA 0025

F. "Contract Services" means any service performed pursuant to any Employment Agreement between Renown Health and a Cardiologist Employee.

G. "Employment Agreement" means, as applicable to the Cardiologist Employee, either an employment agreement between Renown Health and a Participant in SNCA entered into on or around November 24, 2010, or an employment agreement between Renown Health and a Participant in Reno Heart entered into on or around March 17, 2011.

H. "Monitor" means the Person appointed to act as monitor by the Commission pursuant to Paragraph VII of this Order.

I. "Participate" in an entity or an arrangement means (1) to be a partner, joint venturer, shareholder, owner, member, or employee of such entity or arrangement, or (2) to provide services, agree to provide services, or offer to provide services through such entity or arrangement. This definition applies to all tenses and forms of the word "participate," including but not limited to, "participating," participated," "participation," and "participant."

J. "Payer" means any Person that pays, or arranges for the payment, for all or any part of any physician services for itself or for any other person, as well as any person that develops, leases, or sells access to networks of physicians.

K. "Person" means any natural person or artificial person, including, but not limited to, any corporation, unincorporated entity, or government entity. For the purpose of this Order, any corporation includes the subsidiaries, divisions, groups, and affiliates controlled by it.

L. "Physician" means a doctor of allopathic medicine ("M.D.") or a doctor of osteopathic medicine ("D.O.").

M. "Relating To" means pertaining in any way to, and is not limited to that which pertains exclusively to or primarily to. This definition applies to all tenses and forms of the word "relate to," including but not limited to," relates to," and "related to."

N. "Release Period" means the period of time beginning on the date this Order becomes final and ending thirty (30) days from the date this Order becomes final.

O. "Reno Cardiology Practice" means Cardiology Services offered in the Reno/Sparks Geographic Area by a cardiologist Participating in a medical practice or in an employment arrangement, excluding that of a Cardiologist Employee.

P. "Reno Heart Physicians" or "Reno Heart" means the professional corporation formerly known as Berndt, Chaney-Roberts, Davee, Ganchan, Ichino, Juneau, Noble, Seher, Smith, Swackhamer, Thompson, Williamson and Zebrack, Ltd. doing business as Reno Heart Physicians.

3

Q. "Reno/Sparks Geographic Area" means the Reno/Sparks Metropolitan Statistical Area, as defined by the United States Office of Management and Budget, consisting of Washoe and Storey Counties.

R. "Renown Non-Compete Provisions" means, (1) with respect to the Share Purchase Agreement (i) Sections 10.5 as it relates to disclosing the identities of and communicating with patients treated by a Cardiologist Employee; and (ii) Section 10.7(a) as it relates to interfering with relationships between Renown and patients treated by a Cardiologist Employee; (iii) Sections 10.6, 10.7(b)-(d), 10.8, 10.9, 10.12, 10.15, and Exhibit A (Additional Breach Damages - Article 10) as such action under (i), (ii) or (iii) relates to a Cardiologist Employee Participating in a Reno Cardiology Practice pursuant to an Acceptable Termination; and (2) with respect to any Employment Agreement between Renown Health and any Cardiologist Employee, (i) Sections 7.5 and 11 as they relate to disclosing the identities of and communicating with patients treated by a Cardiologist Employee; (ii) Section 7.7(a) as it relates to interfering with relationships between Renown and patients treated by a Cardiologist Employee; (iii) Sections 7.6, 7.7(b)-(d), 7.8, 7.9, 7.12, 7.15, 10.4, and Exhibit C as such action under (i), (ii) or (iii) relates to a Cardiologist Employee Participating in a Reno Cardiology Practice pursuant to an Acceptable Termination.

S. "Separation Agreement" and "Separation Agreements" mean any agreement Related To terms by which a Cardiologist Employee terminates his or her Contract Services. *Provided, however,* a Separation Agreement shall not include (1) any agreement between Renown Health and such Cardiologist Employee to Participate in a Reno Cardiology Practice for a period of at least a year; or (2) any agreement by Renown Health to provide support to such Cardiologist Employee to Participate Reno Cardiology Practice.

T. "Share Purchase Agreements" means any share purchase agreements entered into between Renown Health and SNCA, or any of SNCA's members, in or around December 2010, and any share purchase agreement entered into between Renown Health and Reno Heart Physicians, or any of its members, in or around March 2011.

U. "Suspension Period" means the period from the date the Order to Suspend Enforcement becomes final until the Termination Date.

V. "SNCA" means Sierra Nevada Cardiology Associates, the professional corporation formerly known as Arger, DiPaolo, Drummer, Fuller, Newmark & Spring doing business as Sierra Nevada Cardiology Associates.

W. "Termination Date" means the date on which the Decision and Order becomes final, or on the date Renown Health receives notice from the Commission that a Decision and Order will not be issued in this matter.

X. "Termination Notification" means (1) written notification submitted to the Monitor by a Cardiologist Employee of that employee's intention to terminate his or her Employee

4

SNCA 0027

Agreement and intention to Participate in a Reno Cardiology Practice for a period of at least one year after such termination, or (2) independent determination by the Monitor that a Cardiologist Employee intends to Participate in a Reno Cardiology Practice for a period of at least one year after such termination.

## II.

**IT IS FURTHER ORDERED** that Renown Health shall:

A. Not enforce any of the Renown Non-Compete Provisions against any Cardiologist Employee for any activity that Cardiologist Employee engaged in during the Suspension Period through the Release Period that Relates To providing Termination Notification; *provided, however,* that this Paragraph II.A does not prohibit Renown Health from enforcing any of the Renown Non-Compete Provisions against any Cardiologist Employee who terminates Contract Services prior to the Release Period;

B. Within two (2) days from the date the Order becomes final, certify that Renown Health has sent by first-class mail, return receipt requested to each Cardiologist Employee the letter attached as Appendix A to this Order within two (2) days of the Agreement Containing Consent Order in this matter being placed on the public record;

C. For each Termination Notification that is (1) submitted during the Release Period and (2) received by Renown Health as an Acceptable Termination, terminate Contract Services of the Cardiologist Employee who submitted that Termination Notification, and allow that Cardiologist Employee to leave Renown Health's employment on or before sixty (60) days of Renown Health's receipt of such notification from the Monitor;

D. For any activity Related To this Paragraph II, waive all rights to seek or obtain legal or equitable relief for breach of contract for violation by any Cardiologist Employee of any of the Renown Non-Compete Provisions; and

E. Not take any other action to discourage, impede, or otherwise prevent any Cardiologist Employee from terminating Contract Services pursuant to this Paragraph II.

PROVIDED, HOWEVER, upon receipt by the Commission of Renown Health's Paragraph VIII.A verified report of Acceptable Termination by ten (10) Cardiologist Employees, the Release Period shall end. *Provided further* that, if during the Release Period there are more than ten (10) Acceptable Terminations, the Monitor, after consultation with the Commission's staff, shall forward to Renown Health the first ten (10) such notifications received by the Monitor and shall not reveal the identity of any of the additional Cardiologist Employees who submitted Termination Notifications.

5

## III.

IT IS FURTHER ORDERED that, if after the expiration of the Release Period, Renown Health has not received Acceptable Termination for at least six (6) Cardiologist Employees, then until receipt by the Commission of Renown Health's Paragraph VIII.A verified report of Acceptable Termination by six (6) Cardiologist Employees, Renown Health shall:

A. Not enforce, directly or indirectly, the Renown Non-Compete Provisions against any Cardiologist Employee seeking to provide Termination Notification;

B. Upon Acceptable Termination of any Cardiologist Employee, terminate Contract Services of each such Cardiologist Employee and allow that cardiologist to leave Renown Health's employment on or before ninety (90) days from the date such notification was received;

C. For any activity Related To this Paragraph III, waive all rights to seek or obtain legal or equitable relief for breach of contract for violation by any Cardiologist Employee of any of the Renown Non-Compete Provisions; and

D. Not take any other action to discourage, impede, or otherwise prevent any Cardiologist Employee from terminating Contract Services pursuant to this Paragraph III.

## IV.

IT IS FURTHER ORDERED that:

A. With respect to each Cardiologist Employee who terminates his or her Contract Services pursuant to Paragraph II or III of this Order, Renown Health shall not:

1. Offer any incentive to such Cardiologist Employee to decline to provide Cardiology Services in a Reno Cardiology Practice;

2. Enforce any provision of such Cardiologist Employee's Employment Agreement that would prevent that cardiologist from informing patients treated by that cardiologist of his or her new Reno Cardiology Practice and providing Cardiology Services to those patients;

3. Enforce any of the Renown Non-Compete Provisions for any activity Relating To terminating Contract Services;

4. Require any Cardiologist Employee, prior to terminating his or her Contract Services to enter into a Separation Agreement, including but not limited to any agreement to provide any payment to Renown Health;

6

SNCA 0029

5. Prevent, impede, or otherwise interfere with the provision of Cardiology Services by such Cardiologist Employee; *provided however*, that nothing in this Paragraph IV.A.5 shall require Renown Health to include any cardiologist in Renown Health's emergency room call panel, in the provider network of any health plan, network, or provider organization or to compensate any cardiologist for providing professional services to Renown Health or to its patients or its contractors beyond any requirement contained in Paragraph V of this Order;

6. For a period of three (3) years from the date this Order becomes final deny, terminate or suspend medical staff privileges, or reduce or change medical staff membership status, of such Cardiologist Employee based solely on the status of that cardiologist's employment or lack of employment by Renown Health. *Provided, however*, that Renown Health may deny, terminate or suspend a cardiologist's medical staff privileges, or reduce or change medical staff membership status, due to (a) quality or patient safety determinations; or (b) violations by the cardiologist of facility rules and regulations or standards of conduct that apply to all medical staff members; and

7. For a period of two (2) years from the date such Cardiologist Employee terminates his or her Contract Services, directly or indirectly, solicit, induce, or attempt to solicit or induce the employment of such Cardiologist Employee. *Provided, however*, that Renown Health may make general advertisements for cardiologists including, but not limited to, in newspapers, trade publications, websites, or other media not targeted specifically at the cardiologist who so terminated his or her employment or who was released from the Renown Non-Compete Provisions. *Provided further* that Renown Health may employ any cardiologist who applies to Participate with Renown Health, as long as such cardiologist was not solicited by Renown Health in violation of this Paragraph.

B. The purpose of Paragraphs II, III, and IV of this Order is to ensure that those Cardiologist Employees who terminate their Contract Services can offer Cardiology Services in a Reno Cardiology Practice in competition with Renown Health and to remedy the lessening of competition alleged in the Commission's Complaint.

V.

**IT IS FURTHER ORDERED** that, for a period of one (1) year from the date any Cardiologist Employee terminates Contract Services pursuant to Paragraphs II or III of this Order, if that cardiologist's Employment Agreement with Renown Health contained any provisions for support in the event that termination of employment was required by a determination, order, or agreement with a governmental agency, Renown Health shall provide such support in accordance with the terms of the cardiologist's Employment Agreement if requested by the Cardiologist Employee; *provided, however*, that Renown Health shall not, whether or not it is so provided in the Employment Agreement, negotiate with any Payer on behalf of that cardiologist.

7

## VI.

**IT IS FURTHER ORDERED** that for a period of five (5) years from the date this Order becomes final, Renown Health shall not, without providing advance written notification to the Commission in the manner described in this paragraph, directly or indirectly:

A.  Acquire any assets of or financial interest in any group that provides Cardiology Services in the Reno/Sparks Geographic Area; or

B.  Enter into any Contract Services with any group that provides Cardiology Services in the Reno/Sparks Geographic Area.

Said advance written notification shall contain (i) either a detailed term sheet for the proposed acquisition or the proposed agreement with all attachments, and (ii) documents that would be responsive to Item 4(c) and Item 4(d) of the Premerger Notification and Report Form under the Hart-Scott-Rodino Premerger Notification Act, Section 7A of the Clayton Act, 15 U.S.C. § 18a, and Rules, 16 C.F.R. § 801-803, Relating To the proposed transaction (hereinafter referred to as "the Notification").

PROVIDED, HOWEVER, that (i) no filing fee will be required for the Notification, (ii) an original and one copy of the Notification shall be filed only with the Secretary of the Commission and need not be submitted to the United States Department of Justice, and (iii) the Notification is required from Renown Health and not from any other party to the transaction. Renown Health shall provide the Notification to the Commission at least thirty (30) days prior to consummating the transaction (hereinafter referred to as the "first waiting period"). If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 803.20), Renown Health shall not consummate the transaction until thirty days after submitting such additional information or documentary material. Early termination of the waiting periods in this Paragraph may be requested and, where appropriate, granted by letter from the Bureau of Competition.

PROVIDED FURTHER, that prior notification shall not be required by this paragraph for a transaction for which Notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a.

SNCA  0031

## VII.

**IT IS FURTHER ORDERED** that:

A. Judge Charles McGee shall be appointed Monitor to assure that Renown Health expeditiously complies with all of its obligations and performs all of its responsibilities as required by this Order.

B. No later than one (1) day after this Order issues, Renown Health shall, pursuant to the Monitor Agreement, attached as Appendix B and Confidential Appendix B-1 to this Order, transfer to the Monitor all the rights, powers, and authorities necessary to permit the Monitor to perform its duties and responsibilities in a manner consistent with the purposes of this Order.

C. In the event a substitute Monitor is required, the Commission shall select the Monitor, subject to the consent of Renown Health, which consent shall not be unreasonably withheld. If Renown Health has not opposed, in writing, including the reasons for opposing, the selection of a proposed Monitor within ten (10) days after notice by the staff of the Commission to Renown Health of the identity of any proposed Monitor, Renown Health shall be deemed to have consented to the selection of the proposed Monitor. Not later than ten (10) days after appointment of a substitute Monitor, Renown Health shall execute an agreement that, subject to the prior approval of the Commission, confers on the Monitor all the rights and powers necessary to permit the Monitor to monitor Renown Health's compliance with the terms of this Order and the Order to Suspend Enforcement in a manner consistent with the purposes of this Order.

D. Renown Health shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

  1. The Monitor shall have the power and authority to monitor Renown Health's compliance with the terms of this Order, and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with the purposes of this Order and in consultation with the Commission, including, but not limited to:

      a. receiving Termination Notifications from Cardiologist Employees;

      b. notifying each Cardiologist Employee that submitted a Termination Notification whether or not such notification will be an Acceptable Termination;

      c. forwarding such Acceptable Terminations to Renown Health pursuant to this Order; and

9

SNCA  0032

    d. assuring that Renown Health expeditiously complies with all of its obligations and performs all of its responsibilities as required by this Order.

2. The Monitor shall act in a fiduciary capacity for the benefit of the Commission.

3. The Monitor shall serve for such time as is necessary to monitor Renown Health's compliance with the Paragraphs II, III, IV.A.1-4, and V of this Order.

4. Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Renown Health's personnel, books, documents, records kept in the ordinary course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, Related To Renown Health's compliance with its obligations under this Order. Renown Health shall cooperate with any reasonable request of the Monitor and shall take no action to interfere with or impede the Monitor's ability to monitor Renown Health's compliance with this Order.

5. The Monitor shall serve, without bond or other security, at the expense of Renown Health on such reasonable and customary terms and conditions as the Commission may set. The Monitor shall have authority to employ, at the expense of Renown Health, such consultants, accountants, attorneys and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities. The Monitor shall account for all expenses incurred, including fees for services rendered, subject to the approval of the Commission.

6. Renown Health shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from malfeasance, gross negligence, willful or wanton acts, or bad faith by the Monitor.

7. Renown Health shall report to the Monitor in accordance with the requirements of this Order and/or as otherwise provided in any agreement approved by the Commission. The Monitor shall evaluate the reports submitted to the Monitor by Renown Health, and any reports submitted by a current or former Cardiologist Employee with respect to the performance of Renown Health's obligations under this Order.

8. Within one (1) month from the date the Monitor is appointed pursuant to this Paragraph, every sixty (60) days thereafter, until the later of: (i) one (1) year; or (ii) no fewer than six (6) Cardiologist Employees have terminated their Employment Agreements to provide Cardiology Services in the Reno/Sparks Geographic Area, and otherwise as requested by the Commission, the Monitor shall report in writing to the Commission concerning performance by Renown Health of its obligations under this Order.

SNCA  0033

9. Renown Health may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however*, that such agreement shall not restrict the Monitor from providing any information to the Commission.

E. The Commission may, among other things, require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement Relating To Commission materials and information received in connection with the performance of the Monitor's duties.

F. If the Commission determines that the Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Monitor in the same manner as provided in this Paragraph VII.

G. The Commission may on its own initiative, or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order.

H. The Monitor appointed pursuant to this Order may be the same Person appointed as Monitor under the Order to Suspend Enforcement.

## VIII.

**IT IS FURTHER ORDERED** that:

A. No later than thirty (30) days after the date this Order becomes final, and every thirty (30) days thereafter until Renown Health has fully complied, as relevant, with Paragraphs II, and III of this Order, Renown Health shall submit to the Commission a verified written report setting forth in detail the manner and form in which it intends to comply, is complying, and has complied with all the terms of this Order. Renown Health shall submit at the same time a copy of these reports to the Monitor.

B. Beginning twelve (12) months after the date this Order becomes final, and annually thereafter on the anniversary of the date this Order becomes final, for the next four (4) years, Renown Health shall submit to the Commission verified written reports setting forth in detail the manner and form in which it is complying and has complied with this Order.

11

SNCA  0034

## IX.

**IT IS FURTHER ORDERED** that Renown Health shall notify the Commission at least thirty (30) days prior to:

A.  Any proposed dissolution of Renown Health;

B.  Any proposed acquisition, merger or consolidation of Renown Health; or

C.  Any other change in the Renown Health, including but not limited to assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of the Order.

## X.

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request with reasonable notice to Renown Health, Renown Health shall permit any duly authorized representative of the Commission:

A.  Access, during office hours of Renown Health and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Renown Health Related To compliance with this Order, which copying services shall be provided by Renown Health at the request of the authorized representative(s) of the Commission and at the expense of Renown Health; and

B.  Upon five (5) days' notice to Renown Health and without restraint or interference from Renown Health, to interview officers, directors, or employees of Renown Health, who may have counsel present, regarding such matters.

## XI.

**IT IS FURTHER ORDERED** that this Order shall terminate on November 30, 2022.

By the Commission.

Donald S. Clark
Secretary

SEAL
ISSUED:  November 30, 2012

12

SNCA 0035